**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-61344-CIV-ALTMAN/Hunt**

D.N., by her next friends, JESSICA N.,
mother, and GARY N., father,

      Plaintiff,

v.

GOVERNOR RONALD DESANTIS,
in his official capacity as Governor of
Florida; *et al*.,

      Defendants.

_____/

_____

**DEFENDANTS' MOTION TO DISMISS**
_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .......................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.       D.N.'S CLAIMS ARE PREMATURE. .......................................................... 3

II.      D.N.'S TITLE IX CLAIM SHOULD BE DISMISSED. .................................. 4

         A.       Title IX Does Not Entitle Biological Males to Participate in Female
                  Athletic Competition. ........................................................................ 4

         B.       Title IX's Regulations Expressly Permit Sex-Separated Athletic Teams... 5

         C.       Title IX Does Not Require States to Assign Students to Athletic Teams
                  on the Basis of Gender Identity. ...................................................... 7

         D.       *Bostock* Does Not Support D.N.'s Title IX Claim. ....................... 10

III.     D.N.'S EQUAL-PROTECTION CLAIM SHOULD BE DISMISSED. ............... 13

         A.       D.N.'s Complaint Fails to State a Plausible Facial Challenge. ................ 13

         B.       D.N.'s Complaint Fails to State a Plausible Equal-Protection Claim. ....... 14

                  1.       Biological Males Who Identify As Female Are Not Similarly
                           Situated to Biological Females. ...................................... 14

                  2.       D.N.'s Complaint Fails Plausibly to Allege Discriminatory
                           Animus Against Transgender Students. ........................... 15

                  3.       The Statutory Classification Is Substantially Related to an
                           Important Governmental Objective. ............................... 17

IV.      D.N.'S DUE-PROCESS CLAIM SHOULD BE DISMISSED. ......................... 20

         A.       Count III Fails to Allege Actual or Imminent Injury. ........................... 21

         B.       Count III Fails to Allege Traceability and Redressability. ................... 22

         C.       Count III Does Not State a Plausible Due-Process Claim. ................... 22

V.       THE SUPERINTENDENT OF BROWARD COUNTY PUBLIC SCHOOLS SHOULD BE
         DISMISSED AS A REDUNDANT DEFENDANT. ............................................... 23

VI.      THE FHSAA SHOULD BE DISMISSED. ................................................. 24

         A.       D.N. Lacks Standing to Sue the FHSAA. ...................................... 24

         B.       Counts II and III Do Not Allege Any Wrongful Conduct By
                  the FHSAA. ....................................................................................... 26

VII.     GOVERNOR DESANTIS SHOULD BE DISMISSED AS AN IMPROPER DEFENDANT. .... 26

CONCLUSION ........................................................................................................... 27

i

## TABLE OF AUTHORITIES

CASES

*31 Foster Children v. Bush*,
   329 F.3d 1255 (11th Cir. 2003) ........................................................................ 21

*Adams v. Baker*,
   919 F. Supp. 1496 (D. Kan. 1996) .................................................................... 20

*Adams v. School Board of St. Johns County*,
   4 F.4th 1299 (11th Cir. 2021), *reh'g en banc granted*, (11th Cir. Aug. 23, 2021) .................. 12

*Adams v. School Board of St. Johns County*,
   968 F.3d 1286 (11th Cir. 2020) ........................................................................ 12

*Association for Children for Enforcement of Support, Inc. v. Conger*,
   899 F.2d 1164 (11th Cir. 1990) ........................................................................ 4

*Beattie v. Line Mountain School District*,
   992 F. Supp. 2d 384 (M.D. Pa. 2014) .............................................................. 20

*Beller v. Middendorf*,
   632 F.2d 788 (9th Cir. 1980) ............................................................................ 19

*Bonner v. City of Prichard, Alabama*,
   661 F.2d 1206 (11th Cir. 1981) ........................................................................ 25

*Bostock* v. *Clayton County, Georgia*,
   140 S. Ct. 1731 (2020) ........................................................................... passim

*Brenden v. Independent School District 742*,
   477 F.2d 1292 (8th Cir. 1973) .......................................................................... 20

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*,
   116 F.3d 1364 (11th Cir. 1997) ........................................................................ 14

*Busby v. City of Orlando*,
   931 F.2d 764 (11th Cir. 1991) .......................................................................... 23

*Califano v. Jobst*,
   434 U.S. 47 (1977) ............................................................................................ 19

*Cape v. Tennessee Secondary School Athletic Association*,
   563 F.2d 793 (6th Cir. 1977) ...................................................................... 4, 14

*Carnes v. Tennessee Secondary School Athletic Association*,
  415 F. Supp. 569 (E.D. Tenn. 1976) .................................................................. 20

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  468 U.S. 837 (1984) ........................................................................................... 6

*City of Cleburne v. Cleburne Living Center*,
  473 U.S. 432 (1985) ......................................................................................... 14

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ......................................................................................... 21

*Clark v. Arizona Interscholastic Association*,
  695 F.2d 1126 (9th Cir. 1982) ........................................................... 4, 13, 17, 20

*Clark v. Arizona Interscholastic Association*,
  886 F.2d 1191 (9th Cir. 1989) ..................................................................... 12, 20

*Clinton v. Nagy*,
  411 F. Supp. 1396 (N.D. Ohio 1974) ............................................................... 20

*Davis v. Monroe County Board of Education*,
  526 U.S. 629 (1999) ........................................................................................... 9

*Digital Properties, Inc. v. City of Plantation*,
  121 F.3d 586 (11th Cir. 1997) .......................................................................... 21

*Engineering Contractors Association of South Florida Inc. v. Metropolitan Dade County*,
  122 F.3d 895 (11th Cir. 1997) .......................................................................... 17

*Ensley Branch, NAACP v. Seibels*,
  31 F.3d 1548 (11th Cir. 1994) .......................................................................... 17

*Fadjo v. Coon*,
  633 F.2d 1172 (5th Cir. Unit B Jan. 1981) ...................................................... 23

*Florida High School Athletic Association v. Melbourne Central Catholic High School*,
  867 So. 2d 1281 (Fla. 5th DCA 2004) ........................................................ 25, 26

*Force v. Pierce City R-VI School District*,
  570 F. Supp. 1020 (W.D. Mo. 1983) ............................................................... 20

*Fortin v. Darlington Little League, Inc.*,
  514 F.2d 344 (1st Cir. 1975) ............................................................................ 20

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ........................................................................................... 9

*Gallardo v. Dudek,*
    963 F.3d 1167 (11th Cir. 2020) ........................................................................ 9

*Gilpin v. Kansas State High School Activities Association*, *Inc.,*
    377 F. Supp. 1233 (D. Kan. 1973) ................................................................... 20

*Glenn v. Brumby,*
    663 F.3d 1312 (11th Cir. 2011) ................................................................ 10, 17

*Harris v. Bush,*
    106 F. Supp. 2d 1272 (N.D. Fla. 2000) ........................................................... 27

*Holifield v. Reno,*
    115 F.3d 1555 (11th Cir. 1997) ...................................................................... 11

*Hoover v. Meiklejohn,*
    430 F. Supp. 164 (D. Colo. 1977) ............................................................ 13, 20

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ......................................................................................... 15

*Hunter v. Underwood,*
    471 U.S. 222 (1985) ......................................................................................... 16

*Irwin v. Miami-Dade County Public Schools,*
    No. 06-23029-CIV, 2008 WL 2741157 (S.D. Fla. July 14, 2008) ................... 24

*Jacobson v. Florida Secretary of State,*
    974 F.3d 1236 (11th Cir. 2020) ...................................................................... 22

*James v. City of Douglas*, *Georgia,*
    941 F.2d 1539 (11th Cir. 1991) ...................................................................... 23

*Jones v. Governor of Florida,*
    975 F.3d 1016 (11th Cir. 2020) ...................................................................... 19

*Kelley v. Board of Trustees,*
    35 F.3d 265 (7th Cir. 1994) .............................................................................. 6

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ......................................................................................... 23

*Kleczek v. Rhode Island Interscholastic League, Inc.*,
   768 F. Supp. 951 (D.R.I. 1991) ...................................................................... 13, 20

*Knight v. Baptist Hosp. of Miami, Inc.*,
   330 F.3d 1313 (11th Cir. 2003) ................................................................................ 11

*Kocsis v. Florida State University Board of Trustees*,
   788 F. App'x 680 (11th Cir. 2019) ........................................................................... 25

*Koziara v. City of Casselberry*,
   392 F.3d 1302 (11th Cir. 2004) ................................................................................. 3

*Lalli v. Lalli*,
   439 U.S. 259 (1978) .................................................................................................. 19

*Lantz v. Ambach*,
   620 F. Supp. 663 (S.D.N.Y. 1985) ........................................................................... 20

*Leffel v. Wisconsin Interscholastic Athletic Association*,
   444 F. Supp. 1117 (E.D. Wis. 1978) ........................................................................ 20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................... 3, 21, 22

*McCormick v. School District of Mamaroneck*,
   370 F.3d 275 (2d Cir. 2004) ....................................................................................... 6

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .................................................................................................... 9

*Michael M. v. Superior Court of Sonoma County*,
   450 U.S. 464 (1981) ............................................................................................ 17, 18

*Mississippi University for Women v. Hogan*,
   458 U.S. 718 (1982) .................................................................................................. 17

*Mitchell v. Louisiana High School Athletic Association*,
   430 F.2d 1155 (5th Cir. 1970) .................................................................................. 25

*O'Connor v. Board of Education of School District 23*,
   449 U.S. 1301 (1980) .......................................................................................... 4, 19

*O'Connor v. Board of Education of School District 23*,
   545 F. Supp. 376 (N.D. Ill. 1982) ............................................................................ 13

*O'Connor v. Board of Education of School District No. 23,*
   645 F.2d 578 (7th Cir. 1981) ........................................................ 18, 19

*Okpalobi v. Foster,*
   244 F.3d 405 (5th Cir. 2001) (en banc) ................................................ 22

*Osterback v. Scott,*
   782 F. App'x 856 (11th Cir. 2019) ..................................................... 26

*Pennhurst State School and Hospital v. Halderman,*
   451 U.S. 1 (1981) ...................................................................... 9

*Personnel Administrator of Massachusetts v. Feeney,*
   442 U.S. 256 (1979) ............................................................... 15, 16

*Platt v. Carroll,*
   452 F. Supp. 408 (S.D. Fla. 1978) ...................................................... 3

*Price Waterhouse v. Hopkins,*
   490 U.S. 228 (1989) .................................................................. 11

*Pritchard v. Florida High School Athletic Association, Inc.,*
   No. 2:19-CV-94, 2020 WL 2838852 (M.D. Fla. June 1, 2020) .............................. 26

*Reed v. Nebraska School Activities Association,*
   341 F. Supp. 258 (D. Neb. 1972) ...................................................... 20

*Ritacco v. Norwin School District,*
   361 F. Supp. 930 (W.D. Pa. 1973) ..................................................... 13

*Rowe v. City of Fort Lauderdale,*
   8 F. Supp. 2d 1369 (S.D. Fla. 1998) ................................................... 23

*S&M Brands, Inc. v. Georgia,*
   925 F.3d 1198 (11th Cir. 2019) ....................................................... 14

*Saint v. Nebraska School Activities Association,*
   684 F. Supp. 626 (D. Neb. 1988) ...................................................... 20

*Snowden v. Hughes,*
   321 U.S. 1 (1944) .................................................................... 16

*Socialist Workers Party v. Leahy,*
   145 F.3d 1240 (11th Cir. 1998) ....................................................... 26

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................ 21

*Steffan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) ............................................................................. 19

*Support Working Animals, Inc. v. Governor of Florida*,
    No. 20-12665, --- F.4th ----, 2021 WL 3556779 (11th Cir. Aug. 12, 2021) ............................ 26

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016) ................................................................. 9

*Texas v. United States*,
    523 U.S. 296 (1998) ........................................................................................... 21

*Thomas v. Union Carbide Agricultural Products Company*,
    473 U.S. 568 (1985) ............................................................................................. 4

*Tuan Anh Nguyen v. Immigration and Naturalization Service*,
    533 U.S. 53 (2001) ...................................................................................... 17, 18

*United States v. Dominguez*,
    997 F.3d 1121 (11th Cir. 2021) ........................................................................... 8

*United States v. Salerno*,
    481 U.S. 739 (1987) ........................................................................................... 13

*United States v. Virginia*,
    518 U.S. 515 (1996) ........................................................................................... 17

*Walsh v. Louisiana High School Athletic Association*,
    616 F.2d 152 (5th Cir. 1980) .............................................................................. 25

*Whalen v. Roe*,
    429 U.S. 589 (1977) ........................................................................................... 23

*Williams v. Board of Regents of University System of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) .................................................................... 24, 25

*Williams v. School District of Bethlehem, Pennsylvania*,
    998 F.2d 168 (3d Cir. 1993) ............................................................................. 6, 7

*Women's Emergency Network v. Bush*,
    323 F.3d 937 (11th Cir. 2003) ............................................................................ 27

*Wooden v. Board of Regents of the University System of Georgia*,
  247 F.3d 1262 (11th Cir. 2001) .................................................................................... 24

*Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association*,
  647 F.2d 651 (6th Cir. 1981) .................................................................... 4, 5, 7, 18

### STATUTES

§ 1006.20, Fla Stat. (2020) .......................................................................................... 25

§ 1006.20(1), Fla. Stat. (2020) .................................................................................... 25

§ 1006.20(2)(a), Fla. Stat. (2020) ............................................................................... 25

§ 1006.205(3)(a), Fla. Stat. (2020) ......................................................................... 1, 4

§ 1006.205(3)(b), Fla. Stat. (2020) ..................................................................... 1, 5, 20

§ 1006.205(3)(c), Fla. Stat. (2020) .............................................................................. 1

§ 1006.205(4), Fla. Stat. (2020) ........................................................................... 20, 22

20 U.S.C. § 1681(a) ................................................................................................. 5, 10

20 U.S.C. § 1682 .......................................................................................................... 6

20 U.S.C. § 1686 .......................................................................................................... 6

### REGULATIONS

34 C.F.R. § 106.32(b) ................................................................................................. 12

34 C.F.R. § 106.33 ..................................................................................................... 12

34 C.F.R. § 106.34(a) ................................................................................................. 12

34 C.F.R. § 106.41 ....................................................................................................... 6

34 C.F.R. § 106.41(b) ......................................................................................... 6, 7, 12

34 C.F.R. § 106.41(c) ............................................................................................... 6, 7

34 C.F.R. § 106.41(c)(1) .............................................................................................. 7

### RULES

Fed. R. Civ. P. 5.2(a) ................................................................................................. 21

Fed. R. Civ. P. 25(d) .................................................................................................. 24

Fla. R. Jud. Admin. 2.425(a)(1) ................................................................................. 21

OTHER AUTHORITIES

AMERICAN PSYCHOLOGICAL ASSOCIATION, 49 MONITOR ON PSYCHOLOGY (Sept. 2018)............. 8

Education Amendments of 1974,

  Pub. L. No. 93-380, 88 Stat. 484 (1974)................................................................... 6

Fla. H.B. 1475 (2021) ............................................................................................. 16

Fla. H.R. Jour. (Reg. Sess. 2021)............................................................................ 16

Fla. S. Jour. (Reg. Sess. 2021) ............................................................................... 16

Fla. S.B. 2012 (2021)........................................................................................ 15, 16

INTERNATIONAL OLYMPIC COMMITTEE, *IOC Consensus Meeting on Sex Reassignment*

  *and Hyperandrogenism* (Nov. 2015) ................................................................ 11, 14

Jack Drescher, *Transsexualism*, *Gender Identity Disorder and the DSM*,

  14 J. GAY & LESBIAN MENTAL HEALTH 109 (2010) ................................................. 8

Kristen Rogers, *Gender Identity: The Difference Between Gender*, *Sex and Other*

  *Need-to-Knows*, CNN (June 10, 2020) ..................................................................... 8

NATIONAL INSTUTES OF HEALTH, *Sex and Gender* ....................................................... 8

Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or

  Benefiting From Federal Financial Assistance,

  40 Fed. Reg. 24,128 (June 4, 1975) ..................................................................... 6, 7

Note, *Sex Discrimination and Intercollegiate Athletics: Putting Some Muscle on Title IX*,

  88 YALE L.J. 1254 (1979)...................................................................................... 5

OFFICE FOR CIVIL RIGHTS, U.S. DEPARTMENT OF EDUCATION, *Protecting Civil Rights*,

  *Advancing Equity* (2015) ..................................................................................... 12

PLANNED PARENTHOOD, *Sex and Gender Identity*........................................................ 8

THE AMERICAN HERITAGE DICTIONARY (1976) ........................................................... 8

THE RANDOM HOUSE COLLEGE DICTIONARY (rev. ed. 1980)........................................... 8

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1953)......................................... 8

WORLD HEALTH ORGANIZATON, *Gender and Health*.................................................... 8

<u>INTRODUCTION</u>

Men's and Women's athletic teams, separated by sex, are more than a long-standing social custom; they protect and foster the equal opportunity of girls and women to participate in athletics. Courts have long accepted that boys and men are physiologically different from girls and women, and that male athletes, if permitted to compete with, would displace and exclude female athletes. As female athletic participation has burgeoned over five decades, sex-separated athletic teams have secured the right of girls and women across America to participate and compete freely and fairly in athletics.

The Florida Legislature codified this commonsense policy when it enacted the Fairness in Women's Sports Act in 2021. That law requires public secondary schools and state colleges and universities to designate their athletic teams for males, for females, or for members of either sex. § 1006.205(3)(a), Fla. Stat. Only females, as determined by the individual's *sex*—that is, biological characteristics—may join a team designated for females. *Id*. § 1006.205(3)(c). Recognizing that males are not at risk of displacement and have not been historically under-represented in athletics, the law permits females to compete for places on teams designated for males. *Id*. § 1006.205(3)(b).

Until recently, this policy decision would not have been considered remotely controversial, let alone unlawful. But even this simple safeguard of the right of girls and women to participate in athletics now draws fire. D.N. argues that the United States Constitution and, ironically, Title IX—which accomplished a revolution in female athletic participation—forbid the State's policy choice and entitle biological males such as D.N. who *identify* as female to compete on teams designated for females. According to D.N., federal law compels States to assign students to athletic teams on the basis of *gender identity*, a criterion that, unlike sex, has nothing to do with athletic performance.

D.N.'s complaint fails to articulate the precise contours of the new right this Court is asked to recognize. D.N.'s complaint does not say, for example, whether *all* biological males who present socially as female for any period of time should be permitted to compete with biological females—or whether federal law confers this right *only* upon biological males who are diagnosed with gender dysphoria, who undergo testosterone suppression, who undergo testosterone suppression before puberty's onset (when testosterone impacts physical development in irreversible ways), or whose testosterone is suppressed for a particular period of time or to a particular nanomole-per-liter level.

Of course, federal law furnishes no answers to these line-drawing questions because it does not entitle biological males to compete in female athletics. Far from violating Title IX's prohibition

upon sex discrimination, sex-separated athletic teams safeguard the equal opportunity of girls and women to participate in interscholastic athletics. In fact, Title IX's regulations expressly recognize that sex-separated athletic teams are consistent with Title IX—not inimical to it. Nothing in Title IX requires students to be assigned to athletic teams according to gender identity, rather than sex.

Likewise, the challenged law does not violate equal protection because biological males are not similarly situated to females when it comes to athletics. D.N. fails, moreover, to allege that the Florida Legislature enacted the challenged law with discriminatory animus toward transgender students, rather than to exclude *all* biological males, no matter their gender identity, from female athletics. And as courts have recognized, sex-separated athletic teams are substantially related to the important governmental objective of affording girls and women, who were historically under-represented in athletics, the same opportunity to compete that biological males have long enjoyed. Equal protection does not constrain Florida from making a broad legislative classification between biological males and biological females.

D.N.'s due-process claim is equally defective. D.N. asks this Court to determine whether the compelled production of unspecified medical information in future litigation that has not been brought violates her right of privacy. But the alleged injury is too remote and speculative, and none of these defendants is authorized to bring—or to prevent others from bringing—the litigation that D.N. anticipates. D.N. has not, therefore, alleged traceability or redressability. On the merits too, D.N. alleges insufficient facts to plead a claim for relief on a due-process, right-of-privacy theory.

This Court need not address the complaint's separate counts, however, because D.N. lacks standing, and her claims are unripe. D.N. alleges that she attends middle school and plays soccer on her middle-school team. D.N. expects the challenged law will be enforced to prevent her from joining the girls soccer team once she is in high school. D.N. does not claim to have tried out for and been denied a place on any athletic team. D.N.'s claims are thus premature and not justiciable.

Last, the Court should dismiss the Superintendent of Broward County Schools, the Florida High School Athletic Association (the "FHSAA"), and Governor DeSantis. Because D.N. sued the School Board as well, the Superintendent is a redundant party. The FHSAA should be dismissed because the complaint does not allege that D.N. attends or will attend a member school regulated by the FHSAA—a voluntary association—or that the FHSAA has engaged or will engage in any

conduct that harms D.N.[1] And Governor DeSantis should be dismissed because he has no authority to enforce the challenged law, and his general executive authority to enforce state laws and oversee the executive branch does not render him a proper party to any litigation challenging a state statute.

**ARGUMENT**

## I.    D.N.'S CLAIMS ARE PREMATURE.

Because D.N. lacks standing and her claims are unripe, this litigation is fatally premature. D.N. alleges that she is an eighth grader in *middle school* who plays soccer and wants to continue to play soccer on the girls soccer team in *high school*. ECF No. 1 ¶¶ 1, 29. D.N. does not base her claims on a feared exclusion from a middle-school sports team. Rather, the face of the complaint makes evident that D.N.'s concerns revolve around her ability to play on girls teams *in high school*.

However, because D.N. is currently a middle-schooler, her complaint fails to show that she has suffered any redressable harm. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Platt v. Carroll*, 452 F. Supp. 408, 409–10 (S.D. Fla. 1978) ("The mere existence of a statute, regulation or articulated policy is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms."). As a middle-schooler, D.N. does not and cannot allege that she has tried out for any high-school team, or been denied a spot on a high-school team—the core injury she claims to face.

D.N.'s claims will not, therefore, be justiciable for at least another year. Because D.N. fails to plead an immediate threat of injury, D.N. lacks standing to assert all three of her claims. *See Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) ("[A] plaintiff seeking only injunctive or declaratory relief must prove not only an injury, but also a real and immediate threat of future injury . . . ." (internal marks omitted)). D.N.'s claims are premature and non-justiciable.

Even if D.N. had alleged a fear of exclusion from a middle-school team, her claims would be unripe. The complaint does not allege that D.N. tried out for but was denied the right to play on *any* school-sponsored athletic team. *See* ECF No. 1 ¶ 6 ("[D.N.] intends to try out for the middle school girls' volleyball team this coming fall."). To the contrary, D.N. alleges that she is an active member of the middle-school soccer team. *Id.* ¶¶ 1, 3, 5, 6, 26. That D.N. has not suffered harm is evident from the allegation that "soon enough she will not be able to participate in [sports] at the

---

[1] In addition to Part VI of this motion, the FHSAA joins in Parts I, V, and VII, but not the in its other sections or arguments. The county-level defendants do not join in the introduction to this motion.

school level," *id.* ¶ 3, and from the outline of harms that D.N. anticipates, *id.* ¶¶ 33, 48, 49, 53, 54.

D.N.'s claims are therefore unripe and should be dismissed as premature. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985) (explaining that the ripeness doctrine is meant "to prevent courts, through premature adjudication, from entangling themselves in abstract disagreements," and that a claim is unripe when it involves "contingent future events that may not occur as anticipated," or at all (internal marks omitted)); *Ass'n for Children for Enf't of Support, Inc. v. Conger*, 899 F.2d 1164, 1165 (11th Cir. 1990) (claim based on speculative harm is not ripe).

## II.   D.N.'S TITLE IX CLAIM SHOULD BE DISMISSED.

D.N.'s complaint fails to plead a plausible claim for relief under Title IX—or even to assert a coherent Title IX theory. D.N. inconsistently alleges that the challenged law discriminates solely on the basis of sex and also that it discriminates solely on the basis of transgender status. ECF No. 1 ¶ 63. Whatever the theory, D.N. has not plausibly alleged that Title IX entitles a biological male to join a female athletic team merely because the biological male identifies and presents as female. On the contrary, that result would exclude biological females from athletic participation and deny them the benefits of athletic competition, in direct violation of Title IX's most fundamental tenets.

### A.   Title IX Does Not Entitle Biological Males to Participate in Female Athletic Competition.

Courts have long recognized that males and females are physiologically different and that, if males were permitted to compete against females, females would quickly be excluded from most athletic competition.[2] Florida's law implements this recognition through a simple command that, until recently, was never considered remotely controversial: biological males may not compete on a female team. § 1006.205(3)(a), Fla. Stat. The challenged law protects biological girls and women

---

[2] *See, e.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team."); *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657–58 (6th Cir. 1981) ("[O]ne team at each age level might result in male dominance of all teams and cause a return to pre-Title IX conditions . . . ."); *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.").

from exclusion and discrimination and assures them an equal opportunity to participate in athletics.

Under Title IX, no person may, on the basis of sex, "be excluded from participation in, be denied the benefits of, or be subject to discrimination under" any education program that receives federal funds. 20 U.S.C. § 1681(a). The challenged law does not exclude D.N. from participation in, or deny D.N. the benefits of, the school soccer program, but rather assigns D.N., like all other biological males, to the male team. All biological makes are treated alike. Nor does the challenged law discriminate against D.N. when it prohibits biological males from competing against females. As the Supreme Court explained in a Title VII context, "discriminate" means to treat "worse than others who are similarly situated." *Bostock v. Clayton Cnty.*, *Ga.*, 140 S. Ct. 1731, 1740 (2020). Though the statute *classifies* on the basis of sex, it does not *discriminate* on the basis of sex because men and women, in light of their physiological differences, are not similarly situated with respect to most athletic competition. *See supra* note 1.

Not only does Title IX permit sex-separated athletic teams, but to permit biological males to compete with females would exclude females from participation and deny females the benefits of athletic participation. Because it threatens to exclude females from athletics, a policy that allows males to compete with females is "completely at variance" with Title IX, *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 658 (6th Cir. 1981), which Congress enacted in part "to determine the nature of equality for men and women in contexts in which their differences are particularly relevant," *id*. at 657 (quoting Note, *Sex Discrimination and Intercollegiate Athletics: Putting Some Muscle on Title IX*, 88 YALE L.J. 1254, 1263 (1979)).

Sex-separated athletic teams assure that female athletes are not excluded from participation and denied the benefits of athletic competition—including athletic scholarships and development of leadership and other life skills—while sex-integration of athletic teams would have the opposite effect and exclude and discriminate against girls and women. The provision of the challenged law that permits biological females, including those who identify as male, to compete on athletic teams designated for biological males confirms this justification of the challenged law. § 1006.205(3)(b), Fla. Stat.

### B.    Title IX's Regulations Expressly Permit Sex-Separated Athletic Teams.

Consistent with the statutory text and purpose, Title IX's regulations have long permitted recipients of federal funds to "operate or sponsor separate teams for members of each sex where

selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).[3] The challenged law does precisely what, for more than 45 years, Title IX's regulations have expressly authorized state and local governments to do. Contrary to D.N.'s claim, Title IX does not forbid what its regulations expressly permit.

34 C.F.R. § 106.41 was adopted in 1975 after Congress, responding to concerns that Title IX might disrupt intercollegiate athletics, directed the Secretary of Health, Education, and Welfare to promulgate regulations to implement Title IX, including "reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004).[4] In the same vein, Congress explicitly recognized that Title IX's general prohibition does not "prohibit any educational institution . . . from maintaining separate living facilities for different sexes." 20 U.S.C. § 1686.

Reflecting that men and women are not similarly situated when it comes to athletics, Title IX's regulations have long recognized that sex-separated athletic teams do not exclude either sex from participation in, or deny either sex the benefits of, an education program, or discriminate on the basis of sex. Rather, they maximize participation in and extend the benefits of athletic programs to students who were historically under-represented in athletics. Indeed, "it would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs." *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993); *see also Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994) (explaining that "discrimination in athletics presented a unique set of

---

[3] The regulation also refers to "male and female teams," 34 C.F.R. § 106.41(c)—language that has clear reference to the biological distinctions between the two sexes.

[4] Because Congress expressly authorized the adoption of Title IX regulations that carry the force of law, and because 34 C.F.R. § 106.41(b) reflects a reasonable construction of Title IX, the regulation is entitled to deference. *Kelley*, 35 F.3d at 270 (recognizing that 34 C.F.R. § 106.41(b) is entitled to *Chevron* deference). The regulations even received presidential approval, as Title IX required. 20 U.S.C. § 1682; Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting From Federal Financial Assistance, 40 Fed. Reg. 24,128, 24,137 (June 4, 1975). And pursuant to the Education Amendments of 1974, which afforded Congress 45 days to disapprove published regulations, the regulations were submitted to Congress, 40 Fed. Reg. at 24,128, which conducted committee hearings on the regulations over six days, but declined to disapprove them, *McCormick*, 370 F.3d at 287.

problems not raised in areas such as employment and academics," and that the regulation promotes Title IX's objectives).

Title IX does not, therefore, prohibit Florida's policy preference for sex-separated teams. The regulation appropriately recognizes that Title IX affords "flexibility to the recipient of federal funds to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met." *Williams*, 998 F.2d at 171; *accord* 34 C.F.R. § 106.41(c) (requiring federal-fund recipients to provide "equal athletic opportunity for members of both sexes"). "In Title IX, Congress struck a balance between the needs of the individual athlete and the group and determined that for purposes of the statute equality is to be measured by the opportunities offered to the group." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981).

In fact, in some circumstances, Title IX *requires* schools to provide sex-separated athletic teams to avoid sex discrimination. Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting From Federal Financial Assistance, 40 Fed. Reg. 24,128, 24,137 (June 4, 1975) ("[A]n institution would be required to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" (quoting 34 C.F.R. § 106.41(c)(1))). This long-standing interpretation of Title IX refutes any assertion that Title IX unambiguously prohibits sex-separated athletic teams and instead requires States to assign students to athletic teams on the basis of gender identity.

Because the regulations recognize that States may "operate or sponsor separate teams for members of each sex," 34 C.F.R. § 106.41(b)—that is, one team for biological males and another team for biological females—Title IX expressly authorizes the classification that D.N. challenges.

### C.  Title IX Does Not Require States to Assign Students to Athletic Teams on the Basis of Gender Identity.

In some ways, D.N. does not appear to challenge the long-standing interpretation of Title IX that generally permits the exclusion of biological males from participation in female athletic activities. Sex-neutrality in athletics would, after all, devastate female sports. Rather, D.N. argues that only exclusion of biological males *who identify as female*, but not those who identify as male, violates Title IX.

To the extent D.N. maintains that Title IX prohibits discrimination on the basis of gender identity, the argument finds no support in Title IX's text. Title IX prohibits discrimination on the basis of "sex." Statutory text is accorded its "ordinary public meaning at the time of enactment." *United States v. Dominguez*, 997 F.3d 1121, 1124 (11th Cir. 2021). When Title IX was enacted in 1972, the ordinary public meaning of "sex" centered on the biological distinction between male and female. *See* THE RANDOM HOUSE COLLEGE DICTIONARY 1206 (rev. ed. 1980) ("[T]he male or female division of a species, esp. as differentiated with reference to the reproductive functions."); THE AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions . . . ."); WEBSTER'S NEW INTERNATIONAL DICTIONARY 2296 (2d ed. 1953) ("One of the two divisions of organisms formed on the distinction of male and female."). "Sex," therefore, was not synonymous with "gender identity," which refers to an "internal sense of being male, female or something else," AM. PSYCH. ASS'N, 49 MONITOR ON PSYCH. 32 (Sept. 2018), https://www.apa.org/monitor/2018/09/ce-corner-glossary. In fact, the word "transgender" was not even coined before the early 1970s. Jack Drescher, *Transsexualism, Gender Identity Disorder and the DSM*, 14 J. GAY & LESBIAN MENTAL HEALTH 109, 110 (2010).

Even today, contemporary usage consistently differentiates "sex" from "gender identity." *See* NAT'L INSTS. OF HEALTH, *Sex and Gender*, https://newsinhealth.nih.gov/2016/05/sex-gender (last visited Aug. 14, 2021) ("Sex is biological. It's based on your genetic makeup. . . . Gender is a social or cultural concept."); PLANNED PARENTHOOD, *Sex and Gender Identity*, https://www.plannedparenthood.org/learn/gender-identity/sex-gender-identity (last visited Aug. 14, 2021) ("Sex is a label—male or female—that you're assigned by a doctor at birth based on the genitals you're born with and the chromosomes you have. . . . Gender is . . . a social and legal status, and set of expectations from society, about behaviors, characteristics, and thoughts."); WORLD HEALTH ORG., *Gender and Health*, https://www.who.int/health-topics/gender ("Gender interacts with but is different from sex, which refers to the different biological and physiological characteristics . . . ."); Kristen Rogers, *Gender Identity: The Difference Between Gender, Sex and Other Need-to-Knows*, CNN (June 10, 2020), https://www.cnn.com/2020/06/10/health/gender-identity-explainer-wellness/index.html ("Sex describes the biological sex a person was assigned at birth. . . . Gender identity . . . describes a person's psychological sense of their gender.").

Unsurprisingly, all nine Justices in *Bostock* either assumed or concluded that, under Title VII of the Civil Rights Act, "sex" refers to biological distinctions and not gender identity. 140 S. Ct. at 1739; *id*. at 1756 & app. A (Alito, J., dissenting); *id*. at 1828–29 (Kavanaugh, J., dissenting); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (explaining that "sex" is an "immutable characteristic determined solely by the accident of birth"); *Texas v. United States*, 201 F. Supp. 3d 810, 833 (N.D. Tex. 2016) (finding that, under Title IX and its regulations, "sex" is unambiguous and refers to "biological and anatomical differences"—not gender identity).

D.N.'s own complaint clearly distinguishes between "sex designation that occurs at birth" and "gender identity," which is part of a person's "self-concept" and may not "align[] with the sex that was assigned to them." ECF No. 1 ¶¶ 17, 18. While D.N. applies modifiers to the word "sex" to imply that it might have other meanings, *id*. ¶ 19 ("sex assigned at birth"); *id*. ¶ 45 ("biological sex"), D.N. has not articulated a non-biological definition of "sex" or established that the ordinary meaning of "sex" in 1972 concerned a person's internal sense rather than biological classifications.

Title IX does not, therefore, require schools to assign students to athletic teams according to gender identity. D.N's interpretation ignores Title IX's plain language and would result in the exclusion of biological females from athletic participation.

Moreover, because Congress enacted Title IX under the Spending Clause, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), Title IX cannot impose conditions that Congress did not unambiguously express, *id*. at 649–50; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (explaining that Spending Clause legislation must provide fair notice that enables fund recipients "to exercise their choice knowingly, cognizant of the consequences of their participation"). Similarly, a federal law such as Title IX does not preempt a state law in a domain traditionally regulated by States unless preemption was Congress' "clear and manifest purpose." *Gallardo v. Dudek*, 963 F.3d 1167, 1175 (11th Cir. 2020) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

Because Title IX does not unambiguously condition the acceptance of federal funds on the use of gender identity to assign students to athletic teams—or reveal a clear and manifest purpose to preempt state statutes that assign students to athletic teams without regard to gender identity—D.N.'s interpretation rings hollow.

### D. *Bostock* Does Not Support D.N.'s Title IX Claim.

*Bostock*—a Title VII case—does not dictate a different conclusion. Like *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), *Bostock* belongs to a discrete line of cases in which plaintiffs were subjected to differential treatment because their traits or actions were perceived not to align with, or conform to, societal norms and expectations associated with their sex. In *Bostock*, a biological male's employment was terminated after the biological male first began to identify as female. 140 S. Ct. at 1738. A "confluence of two factors" produced the employment decision: the individual's sex and the individual's non-conforming traits or actions. *Id*. at 1741–42, 1748. Because sex was at least one "variable" in the decision, the employment decision constituted sex discrimination. *Id*.

In *Bostock*, the plaintiff had been subjected to discrimination on the basis of transgender status. Here, by contrast, there is no transgender discrimination because the challenged law assigns D.N. to the male team based *solely* on D.N.'s sex, regardless of D.N.'s gender identity. In *Bostock*, the Court made clear that unlawful discrimination occurs when a person is penalized for "actions or attributes it would tolerate in an individual of another sex." *Id*. at 1740. But here, nothing in the challenged law penalizes D.N. because D.N. identifies as female. Whether D.N. identifies as male or as female, the law treats D.N. the same way; the non-conformity between D.N.'s sex and D.N.'s actions or attributes is irrelevant to the statute's assignment of D.N. to the male team. If, on the other hand, the State were to exclude D.N. from male athletic teams because D.N. dresses, behaves, and otherwise presents as a female, then the State might be engaged in unlawful discrimination under the reasoning of *Bostock* and *Glenn*.[5] But because Florida's statute is neutral with respect to gender identity and classifies *only* on the basis of sex—which is permissible as to athletic-team assignments—it does not implicate the theory of discrimination that *Bostock* and *Glenn* articulated.

*Bostock* also explained, in the Title VII context, that discrimination occurs when a person is treated "worse than others who are similarly situated," *id*.—that is, others who are "similarly situated in all *relevant* respects," *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th

---

[5] Of course, unlike this scenario, D.N. continues to have the same opportunity to participate in the activity (soccer) as all other biological males at the school. D.N. merely alleges in conclusory fashion that "it is not an option for her to be on the boys' team when she enters high school or goes to college because she is not a boy." ECF No. 1 ¶ 52. But where sex is concerned, D.N. has alleged the contrary; D.N. is a boy according to the "sex assigned to her at birth." *Id*. ¶¶ 17–19, 30. Such conclusory allegations regarding D.N.'s potential participation on the boys' team are insufficient to demonstrate that D.N. will be "excluded from participation in, be denied the benefits of, or be subjected to discrimination" based on sex in the high-school athletic program. 20 U.S.C. § 1681(a).

Cir. 2003) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997)) (emphasis added). *Bostock* noted that sex is categorically "*not relevant* to the selection, evaluation, or compensation of employees." 140 S. Ct. at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989)) (emphasis added). Given the irrelevance of sex in the employment context, the Supreme Court concluded that discrimination because of transgender status constitutes sex discrimination because "it is impossible to discriminate against a person for being . . . transgender without discriminating against the individual based on sex." *Id*. Thus, in the employment context, where sex is irrelevant, Title VII prohibits disparate treatment of individuals based on transgender status.

In the athletic context, however, the challenged law's classification is plainly rooted in the *relevant* biological differences between the sexes for purposes of protecting athletic opportunities in school settings. In the context of athletic competition, sex *is* a relevant consideration, and males and females are not similarly situated. That is why, as explained earlier, sex-separate athletic teams are permissible, and likely required in many instances to preserve equal opportunities for female athletes. Accordingly, where sex-based classifications are relevant and permissible, any disparate impacts that such classifications might cause—whether to cisgender or transgender athletes—must be permissible as well.

If anything, in demanding to play on the girls team, D.N. seeks preferential treatment on the basis of transgender status. D.N. agrees that biological males who identify as male may be excluded from female teams, *see* ECF No. 1 ¶ 52, but claims that biological males who identify as female may not. Despite having the opportunity to compete with members of the same biological sex, D.N. seeks a right to compete against females based solely on her gender identity. Unlike the plaintiff in *Bostock*, therefore, who *objected* to adverse treatment on the basis of transgender status, D.N. *demands* preferential treatment on that very basis. But unlike sex, gender identity has nothing to do with athletic performance and is thus not a relevant criterion in the assignment of students to athletic teams. D.N.'s extreme position might, however, entitle *all* biological males who identify as female—even those who have undergone no surgeries or hormone suppression, no matter their size, strength, or speed—to compete against biological females. Even the International Olympic Committee standards that D.N. champions exclude from female competition all biological males whose testosterone levels have not been at least partially suppressed. INT'L OLYMPIC COMM., *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism* (Nov. 2015), http://olympics. com/ioc/medical-research/consensus-statements (requiring biological males who seek to compete

against females to prove that their testosterone levels have been below ten nanomoles per liter for at least 12 months). D.N. may not rely on gender identity to invalidate Florida's law, which, under Title IX's plain text and *Bostock*'s reasoning, permissibly categorizes athletic teams according to sex.

Nothing in *Bostock* suggests that federal law requires transgender individuals to be treated for every purpose as members of the sex with which they identify. A panel of the Eleventh Circuit once embraced this interpretation, construing Title IX to require a biological female who identifies as male to be admitted to the boys' bathroom. *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1306 (11th Cir. 2020). But after the mandate was withheld, the panel, concededly seeking "broader support" from the full court, issued a new opinion that did not address Title IX. *Adams v. Sch. Bd. of St. Johns Cnty.*, 4 F.4th 1299 (11th Cir. 2021), *reh'g en banc granted*, (11th Cir. Aug. 23, 2021).

Finally, *Bostock* itself expressly disclaimed any intent to prejudge the validity of laws that require sex-separated "bathrooms, locker rooms, or anything else of the kind." 140 S. Ct. at 1753. This limitation on *Bostock* was appropriate because federal anti-discrimination laws recognize the peculiar interests that these settings implicate, and make special provision for them. *See, e.g.*, 34 C.F.R. § 106.32(b) (sex-separated housing); *id.* § 106.33 (sex-separated toilet, locker room, and shower facilities); *id.* § 106.34(a) (sex-separated contact sports in physical-education classes); *id.* § 106.41(b) (sex-separated athletic teams). To treat men and women differently in such areas—including athletics—is not "discrimination" at all because, in those areas, men and women are not similarly situated.

Over five decades, Title IX has dramatically expanded female athletic participation. From 1972 to 2011, female participation in high-school athletics increased thirteen fold—from 250,000 to 3.25 million students. Office for Civil Rights, U.S. Dep't of Educ., *Protecting Civil Rights, Advancing Equity* 32 (2015), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-secretary-of-education-2013-14.pdf. Once the rare exception, the female student athlete is now a fixture of American life. To reinterpret Title IX to *entitle* biological males to contend with females in athletics would transform Title IX into an instrument of the very discrimination it forbids. *Cf. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) ("If males are permitted to displace females . . . even to the extent of one player . . . , the goal of equal participation . . . is set back, not advanced."). Because Title IX does not entitle biological males to compete for places on the girls team, Count I does not plausibly state a violation of Title IX and should be dismissed.

III.    **D.N.'S EQUAL-PROTECTION CLAIM SHOULD BE DISMISSED.**

A.      **D.N.'s Complaint Fails to State a Plausible Facial Challenge.**

To the extent Count II asserts a facial challenge, it should be dismissed. D.N. cannot show that the challenged law is unconstitutional in all of its applications, *United States v. Salerno*, 481 U.S. 739, 745 (1987), and therefore cannot demonstrate that the challenged law is facially invalid.

Quite simply, the challenged law assigns students to athletic teams according to their sex. Many of the law's potential applications are wholly uncontroversial. For example, the challenged law prohibits *males* who identify as *male* from joining a girls team. Courts have long recognized that the exclusion of biological males from female athletic competition is constitutional. *See, e.g.*, *Kleczek v. R.I. Interschol. League, Inc.*, 768 F. Supp. 951, 956 (D.R.I. 1991); *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 545 F. Supp. 376, 381 (N.D. Ill. 1982); *Hoover v. Meiklejohn*, 430 F. Supp. 164, 170 (D. Colo. 1977); *Ritacco v. Norwin Sch. Dist.*, 361 F. Supp. 930, 932 (W.D. Pa. 1973).

In *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126, 1131 (9th Cir. 1982), the court concluded that "real differences" justify the exclusion of males from female competition. The court recognized that "physiological differences" would enable males to "displace females to a substantial extent," and that the State's interest in affording equal opportunities to female athletes and rectifying past under-representation of females in athletic competition supported the exclusion.

Indeed, D.N. does not appear to question the statute's application to males who identify as male.

The statute's unquestionably lawful applications do not end there. As D.N. recognizes, gender transition takes many forms. Some transgender individuals transition socially—changing their dress or their names—but not medically. ECF No. 1 ¶¶ 17–21. The challenged law applies here too, preventing a biological male who presents socially as a female, but who maintains the full physical capabilities and characteristics of a biological male, from competing against females. Similarly, a biological male who, unlike D.N., begins hormone-suppression therapy only after the onset of puberty will, as D.N. acknowledges, retain the "developmental impacts of testosterone" and therefore retain some physical advantages that, on average, biological males possess. *Id*. ¶ 21.

D.N. appears to concede the validity of these applications. Throughout the complaint, D.N. emphasizes her individualized circumstances: the hormone treatment she has received since the age of eleven—before puberty—and her alleged physical equivalence to biological females of her age. *See id*. ¶¶ 22–24, 30, 55, 71. And D.N. touts the standards established by the International

Olympic Committee, *id.* ¶ 30, which *exclude* biological males who identify as female from female competition *unless* they maintain for one year testosterone levels below ten nanomoles per liter, INT'L OLYMPIC COMM., *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism* (Nov. 2015), http://olympics.com/ioc/medical-research/consensus-statements.[6] D.N.'s allegations do not delineate precisely *which* biological males D.N. claims are entitled to participate in female athletics, but clearly admit that *some* biological males who identify as female *should* be excluded.

Because D.N. does not and cannot dispute the constitutionality of at least some applications of the challenged law, D.N.'s claim should be dismissed to the extent it presents a facial challenge.

**B.      D.N.'s Complaint Fails to State a Plausible Equal-Protection Claim.**

D.N.'s complaint does not plead a plausible equal-protection claim. D.N. contends that the challenged law impermissibly distinguishes between biological females (who may play on the girls team) and biological males who identify as females, such as D.N. (who may not). ECF No. 1 ¶ 70. On its face, the challenged law makes no such distinction. It makes no mention of gender identity or transgender status. Instead, it distinguishes between biological males and females, restricting participation on girls teams to biological females, and categorically excluding *all* biological males.

**1.      Biological Males Who Identify As Female Are Not Similarly Situated to Biological Females.**

First, D.N.'s allegations do not satisfy the "threshold inquiry" in an equal-protection case: whether the challenged law differentiates between "persons similarly situated." *S&M Brands, Inc. v. Georgia*, 925 F.3d 1198, 1203 (11th Cir. 2019) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

Biological males—even those who identify as female—are not similarly situated to females when it comes to athletic competition. Courts have long recognized that biological males possess physical advantages that would enable them to displace female athletes. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation."). Unlike sex, gender identity has nothing to do with athletic ability.

---

[6] In resolving a motion to dismiss, this Court may consider documents referenced in the complaint and central to the plaintiff's claims. *Brooks v. Blue Cross & Blue Shield of Fla.*, *Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

To be sure, *some* biological males might, through early hormone therapy, have minimized or eliminated their biological advantages. But it does not follow that, as a class, biological males who identify as female are similarly situated with biological females. As D.N. recognizes, some biological males who identify as female transition socially but undergo no medical intervention, while others undergo medical intervention only after puberty impacts their physical development irreversibly. ECF No. 1 ¶¶ 20–21. And while D.N. alleges that she has no physical advantages over biological females, *id*. ¶ 30, the same is true of some biological males who are *not* transgender. Some cisgender males have no athletic prowess and would never displace a female student athlete. Just as biological males as a class are not similarly situated with biological females as a class, the subset of biological males who identify as female are not similarly situated with biological females.

The differences are also historical. The opportunity to participate in interscholastic athletic competition has long been open to biological males such as D.N.—whatever their gender identity. In contrast, biological females were long excluded from participation and denied the same benefits. The challenged law assures that athletic teams are provided for biological females and promotes the full realization of long-denied opportunities. For this reason as well, when it comes to athletics, biological males—no matter their gender identity—are not similarly situated to biological females.

### 2. D.N.'s Complaint Fails Plausibly to Allege Discriminatory Animus Against Transgender Students.

Second, a plaintiff who challenges a classification that does not appear on the face of the statute must plead and prove that a discriminatory purpose motivated the law's enactment. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). This requirement applies where, as here, the challenged law expressly makes one classification, but the plaintiff challenges a different classification—one not apparent on the face of the statute. Thus, in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979), the Court held that, where plaintiffs alleged that a veterans preference affected women unequally, since veterans were predominantly men, the plaintiffs were required to establish that the disproportionate effect on women "can be traced to a discriminatory purpose."

D.N.'s complaint does not plausibly allege that the Legislature enacted the challenged law with a discriminatory purpose—that is, that there is "reason to infer antipathy" against biological males who identify as female. *Id*. The Legislature was confronted with a question of public policy that called for resolution. Different resolutions were proposed. Senate Bill 2012—which Senator Kelli Stargel sponsored, and which two Senate committees reported favorably, ECF No. 1 ¶ 36—

would have *permitted* transgender girls such as D.N. to join girls teams under the standard adopted by the International Olympic Committee, Fla. S.B. 2012, § 1 (2021)—a standard that D.N. extols, ECF No. 1 ¶ 30. By contrast, the proposal in the House limited participation on female teams to biological females. Fla. H.B. 1475, § 1 (2021). The House's approach prevailed. The challenged law passed by large majorities in both houses of the Florida Legislature: 80 to 39 in the House and 23 to 16 in the Senate. Fla. H.R. Jour. 1171 (Reg. Sess. 2021); Fla. S. Jour. 843 (Reg. Sess. 2021).

D.N. points to no evidence that animus toward transgender students, rather than a desire to exclude from female competition *all* biological males—cisgender or transgender—motivated large majorities of the Legislature. To support her allegation of discriminatory purpose, D.N. cites only two post-enactment statements. ECF No. 1 ¶¶ 40–41. Not only are these statements insufficient to establish the purpose of an entire legislative body, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (explaining that inquiries into the purposes of large legislative bodies are "hazardous" and that a legislative purpose cannot be divined from the statements of "fewer than a handful" of legislators), but they also manifest no animus toward, or intent to discriminate against, transgender individuals.

Senator Kelli Stargel's post-enactment statement merely acknowledged that, on average, "men are stronger," and cited an example that highlighted the importance of limiting participation by biological males in female athletic competition—an uncontroversial position that courts have long endorsed. ECF No. 1 ¶ 40. Governor DeSantis' statement merely affirmed that Florida will assign students to athletic teams on the basis of "biology," *id*. ¶ 41—a paraphrase of the challenged law. Neither statement suggests "antipathy" toward transgender students. *Feeney*, 442 U.S. at 272; *cf. Snowden v. Hughes*, 321 U.S. 1, 8 (1944) (noting that discriminatory purpose is not presumed).

Well-publicized examples of transgender girls competing against biological females might have brought this issue to the Legislature's attention. But D.N. alleges no facts to suggest that the Legislature's purpose was to single out transgender girls, rather than exclude *all* biological males from female competition. Nothing in the complaint suggests that the Legislature would have been less concerned by the participation of cisgender males in female competition and would not have enacted the same law to exclude cisgender males. Indeed, on its face, the challenged law manifests a purpose to exclude *all* biological males from female competition, with the goal of preserving biological female-only athletic teams. With no factual foundation for an inference of antipathy, the resolution of this policy question must be left to the democratic process. *Feeney*, 442 U.S. at 272.

### 3. The Statutory Classification Is Substantially Related to an Important Governmental Objective.

Third, even if D.N. could establish a discriminatory purpose, the challenged law would be constitutionally justified. Equal protection tolerates sex-based classifications that are substantially related to the achievement of important governmental objectives. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).[7] The purpose of intermediate scrutiny is not so much to relegate sex-based classifications to a last resort, but to assure that they are rooted in "reasoned analysis rather than archaic stereotypes." *Ensley Branch*, *NAACP v. Seibels*, 31 F.3d 1548, 1581 (11th Cir. 1994).

Intermediate scrutiny differs from strict scrutiny in important ways. It requires neither a compelling state interest, nor that the challenged law be narrowly tailored to promote that interest. And while some precedents suggest that intermediate scrutiny requires an "exceedingly persuasive justification," that formulation does not heighten the conventional intermediate-scrutiny standard. *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 907 (11th Cir. 1997).

In evaluating sex-based classifications, courts carefully differentiate between stereotypes and real differences between men and women. *United States v. Virginia*, 518 U.S. 515, 533 (1996); *accord Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001) (cautioning courts not to mechanically characterize all differences as stereotypes). "Physical differences between men and women . . . are enduring: The two sexes are not fungible." *Virginia*, 518 U.S. at 533 (internal marks omitted). "To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and disserving it." *Tuan Anh Nguyen*, 533 U.S. at 73; *see also Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality opinion) (noting that the Court has consistently upheld sex-based distinctions that "realistically reflect" actual differences).

Courts have long recognized the importance of the governmental objective to provide equal athletic opportunities for females and to remediate past under-representation of females in athletic competition. *See*, *e.g.*, *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). The exclusion of biological males from athletic competition against females is substantially related to that objective—not because all males are physically superior to all females, but because *enough* males possess physical advantages that would enable them to displace females on athletic teams.

---

[7] For purposes of this motion, the defendants assume that, if D.N. can show discriminatory purpose, then intermediate scrutiny would apply under the rationale of *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 658 (6th Cir. 1981) (explaining that competition between males and females "might result in male dominance of all teams"). Sex-separated athletic teams have therefore "received endorsement in many circuits." *O'Connor v. Bd. of Educ. of Sch. Dist. No. 23*, 645 F.2d 578, 581 (7th Cir. 1981).

The exclusion of biological males who identify as female advances the same objectives as the exclusion of all other biological males. Biological males are still biological males, even if they identify as female. Some—not all—have taken steps to minimize the physical differences between males and females. D.N. alleges, for example, that she has undergone hormone therapy and thus derives "no competitive advantage" from biology. ECF No. 1 ¶ 30. Some cisgender males likewise have no competitive advantage over biological females. But if a biological male is sufficiently athletic to take the place of a biological female on the girls team, then it makes little difference whether the biological male is the best player on the team, or only average and comparable in size, strength, and endurance to the other team members. The biological male has displaced a biological female and set back the cause of equal opportunity in athletic competition. And if the biological male is physically superior to the competition, and therefore denies success to female competitors, then the harm is only compounded. The objective of the challenged law is not to establish teams of players with comparable performance metrics, but rather to assure that biological males do not exclude from competition athletes who traditionally were under-represented: biological females.

Intermediate scrutiny, moreover, does not require a perfect fit between the means and the end. *Tuan Anh Nguyen*, 533 U.S. at 70 ("None of our gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance."); *id*. at 63 ("The Constitution does not require that Congress elect one particular mechanism from among many possible methods . . . , even if that mechanism arguably might be the most scientifically advanced method."); *Michael M*., 450 U.S. at 473 (plurality opinion) ("The relevant inquiry, however, is not whether the statute is drawn as precisely as it might have been . . . ."). The State need not make exceptions for every small subclass of biological males who might not possess competitive advantages over females, or who might suffer special hardships from the general classification. For example, the challenged law denies cisgender males who cannot make the boys team, but who could make the girls team, any opportunity to participate in sports. Still, the classification is substantially related to the important objective it serves. Unless biological males are excluded from competition with females, biological females will be excluded.

Just as the circumstances of a small subclass of biological males does not control the equal-protection analysis, D.N.'s own individualized circumstances do not control. The State need not prove, student by student, that the challenged law's application to each biological male who wishes to participate in female athletics is substantially related to an important governmental objective. In other words, the question here is not whether *the statute's application to D.N.* serves an important governmental objective, but whether the *statutory classification* serves an important governmental objective. If the statute's application to D.N. were all that mattered, then the analysis would no longer involve a comparison between and among persons and would lose the characteristic feature of equal-protection claims.

In *O'Connor v. Board of Education of School District 23*, 449 U.S. 1301 (1980) (Stevens, J., in chambers), a female athlete brought an equal-protection challenge to her exclusion from the boys team. After the Seventh Circuit stayed the district court's preliminary injunction, Justice Stevens declined to vacate the stay. He reasoned that, although the rule's application to the plaintiff was "arbitrary," its constitutionality did not depend on its apparent arbitrariness "in an individual case." *Id*. at 1306–07 & n.4. Justice Stevens concluded that there was "little question about the validity of the classification in most of its normal applications," and that, without the classification, "there would be substantial risk that boys would dominate the girls' program and deny them an equal opportunity to compete in interscholastic events." *Id*. at 1307. The Seventh Circuit embraced this conclusion. *O'Connor v. Bd. of Educ. of Sch. Dist. No. 23*, 645 F.2d 578, 581 (7th Cir. 1981).

Here too, the relationship between the broad classification and an important governmental objective determines the constitutional question—not the law's effect on a single plaintiff, or even a small subclass of biological males who identify as female. *See Lalli v. Lalli*, 439 U.S. 259, 273 (1978) ("But few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results."); *Califano v. Jobst*, 434 U.S. 47, 53 (1977) ("The broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples."); *Jones v. Governor of Fla.*, 975 F.3d 1016, 1036 (11th Cir. 2020) (en banc) (concluding that the justification for the challenged classification does not depend on the applicability of that justification to specific plaintiffs before the court); *Steffan v. Perry*, 41 F.3d 677, 686 (D.C. Cir. 1994) (en banc) ("Nearly any statute which classifies people may be irrational as applied in particular cases." (quoting *Beller v. Middendorf*, 632 F.2d 788, 808 n.20 (9th Cir. 1980))). The challenged law is constitutional for the simple reason that exclusion of

biological males from female athletics furthers the State's interest in promoting equal opportunity and in remediating the historical under-representation of biological females in athletic competition.

Finally, D.N. argues that the challenged law treats biological males who identify as female differently from biological females who identify as male. ECF No. 1 ¶ 70. Indeed, the challenged law permits schools to allow biological females, no matter their gender identity, to compete with biological males. § 1006.205(3)(b), Fla. Stat. The reason is obvious. The important governmental objectives that justify the exclusion of biological males from female competition do not justify the exclusion of biological females from competition against males. The risk that biological females will displace males in athletics bears no comparison to the risk that biological males will displace females. Nor have biological males been under-represented in athletics. Thus, courts have often sustained equal-protection claims brought by females who sought to compete against males,[8] while similar claims brought by biological males have been rejected, *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989); *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982); *Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 956 (D.R.I. 1991).[9]

## IV.    D.N.'S DUE-PROCESS CLAIM SHOULD BE DISMISSED.

Count III's allegations are less than precise. D.N. appears to anticipate that a future lawsuit might be filed under section 1006.205(4) to challenge her participation on the girls team, and that she, presumably in response to non-party discovery, will be compelled, without any confidentiality protections, to produce unspecified "sensitive medical information" that discloses her transgender status. ECF No. ¶¶ 48, 78. She claims the production would violate her due-process rights and asks

---

[8] *Fortin v. Darlington Little League, Inc.*, 514 F.2d 344 (1st Cir. 1975); *Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292 (8th Cir. 1973); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384 (M.D. Pa. 2014); *Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996); *Saint v. Neb. Sch. Activities Ass'n*, 684 F. Supp. 626 (D. Neb. 1988); *Lantz v. Ambach*, 620 F. Supp. 663 (S.D.N.Y. 1985); *Force v. Pierce City R-VI Sch. Dist.*, 570 F. Supp. 1020 (W.D. Mo. 1983); *Leffel v. Wis. Interscholastic Athletic Ass'n*, 444 F. Supp. 1117 (E.D. Wis. 1978); *Hoover v. Meiklejohn*, 430 F. Supp. 164 (D. Colo. 1977); *Carnes v. Tenn. Secondary Sch. Athletic Ass'n*, 415 F. Supp. 569 (E.D. Tenn. 1976); *Clinton v. Nagy*, 411 F. Supp. 1396 (N.D. Ohio 1974); *Gilpin v. Kan. State High Sch. Activities Ass'n, Inc.*, 377 F. Supp. 1233 (D. Kan. 1973); *Reed v. Neb. Sch. Activities Ass'n*, 341 F. Supp. 258 (D. Neb. 1972).

[9] In *O'Connor*, Justice Stevens explained why it would be appropriate to allow biological females to compete against males without affording biological males "reciprocal rights." 449 U.S. at 1306 n.4 (Stevens, J., in chambers) (illustrating the point by noting that seventh graders may be permitted to try out for an eighth-grade team without granting reciprocal rights to eighth graders).

the Court to rule on her due-process objections to discovery in litigation that has not yet been filed. These allegations fail not only to show standing, but also to plead a viable due process claim at all.

A.      **Count III Fails to Allege Actual or Imminent Injury.**

D.N. is without standing to pursue Count III. First, D.N. has not alleged the requisite injury. Standing requires an injury that is actual or imminent (not conjectural or hypothetical) and concrete and particularized. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Imminence implies a high degree of immediacy and probability. *31 Foster Children v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003). An imminent injury is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), or "likely to occur immediately," *31 Foster Children*, 329 F.3d at 1265. Concreteness requires that the injury be real—not abstract. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).

The scenario that D.N. describes is too remote and speculative to be adjudicated now. The litigation that D.N. anticipates has not been brought, and will not be brought unless D.N. first plays on a girls team in violation of the statute. Then, if litigation is ever filed, there must be a discovery request for D.N.'s sensitive medical information. If a discovery request is served, then D.N. would have every opportunity to raise her due-process objections *then*, in *that* court, or to seek appropriate confidentiality protections if the anonymity afforded by Federal Rule of Civil Procedure 5.2(a) or Florida Rule of General Practice and Judicial Administration 2.425(a)(1) is insufficient. It is not even clear whether the discovery will be sought by a state actor subject to due-process restrictions.

At this stage, moreover, without a concrete, factual context, this Court can hardly evaluate the nature of the information demanded, or the reasons that support and oppose disclosure. If and when disclosure of D.N.'s sensitive medical information is sought, the court in which the future litigation will be pending will be in the optimal position to rule on D.N.'s due-process objections.

Because D.N.'s due-process claim rests on hypothetical future events that might not occur as anticipated—or at all—D.N. has no standing to bring Count III. For the same reason, the claim is unripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). Count III is not ripe for this Court's consideration.

21

### B.    Count III Fails to Allege Traceability and Redressability.

Second, D.N. lacks standing to pursue the due-process claim because the alleged injury is not traceable to these defendants, nor can these defendants redress that injury. The challenged law confers a right of action *only* upon a "student," "school," or "public postsecondary institution," § 1006.205(4), Fla. Stat.—not on these defendants. None of these defendants, therefore, will bring the litigation that D.N. foresees, nor can these defendants prevent such litigation from being filed.

To establish standing, a plaintiff must show that the alleged injury is fairly traceable to the defendant's challenged actions and that a favorable decision is likely to redress the injury. *Lujan*, 504 U.S. at 560–61. In *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), the court held that the State's chief election officer, the Secretary of State, did not cause and could not redress an injury from a statute that regulated the order in which candidates' names are printed on election ballots. *Id*. at 1245. Because local election officials were responsible for carrying out the challenged statute, the injury was not traceable to, or redressable by, the Secretary. *Id*. at 1253–55.

In *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), the plaintiffs sought an injunction prohibiting the operation of a state statute that created a private cause of action against doctors who perform abortions. The Court concluded that the plaintiffs lacked standing to sue the Governor and Attorney General of Louisiana, who had no authority to bring, or to prevent others from bringing, the lawsuits authorized by the statute. *Id*. at 426–27. An injunction directed to them would therefore have been "utterly meaningless." *Id*. at 426. Because the injury was not traceable to, or redressable by, the Governor and Attorney General, the plaintiffs failed to establish standing.

For the same reasons, the injury that D.N. anticipates is not traceable to these defendants. These defendants have no authority to bring the actions authorized by section 1006.205(4), or to prevent others from bringing them. Any relief directed to these defendants would therefore have no effect. D.N.'s complaint fails to allege that the due-process injury she apprehends is traceable to, or redressable by, these defendants. This Court should therefore dismiss the due-process claim.

### C.    Count III Does Not State a Plausible Due-Process Claim.

Count III also fails on its merits. D.N. purports to state an invasion-of-privacy claim based on the potential disclosure of her sex in future litigation. But an unlawful invasion of privacy does not occur simply because medical information is disclosed for a limited purpose, even when such disclosure is compelled by the State.

In *Whalen v. Roe*, 429 U.S. 589, 602–03 (1977), the Court held that a state law that required physicians to disclose to the State the identity and prescribing information of all patients prescribed certain classes of "dangerous" drugs did not infringe on the right to privacy. The Court recognized that, while this information was indeed sensitive, "[r]equiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." *Id*. In addition to acknowledging the legitimacy of the State's objective to curtail the prescription-drug abuse, the Court emphasized that this information is routinely disclosed in rendition of healthcare, *id*. at 602–03, which is analogous to the regularity with which individuals must disclose birth certificates to enroll in school or obtain a driver license.

The Eleventh Circuit also recognizes an informational right of privacy. *See James v. City of Douglas*, *Ga*., 941 F.2d 1539, 1543–44 (11th Cir. 1991); *Fadjo v. Coon*, 633 F.2d 1172, 1175–76 (5th Cir. Unit B Jan. 1981). But these decisions chiefly concern the public disclosure of private information without consent, or the misuse of information provided confidentially, both of which imply a failure of procedural safeguards designed to maintain privacy—not discovery of records akin to a birth certificate. It is far from settled that the right to privacy is even implicated, let alone violated, by the controlled disclosure of a birth record within the confines of a judicial proceeding.

To the extent that this privacy right would even be triggered, D.N. fails to state a plausible claim. In evaluating an alleged violation of the right of privacy, the Eleventh Circuit balances the nature of the invasion against the State's legitimate interest in disclosure. *James*, 941 F.2d at 1543–44; *Fadjo*, 633 F.2d at 1175–76. D.N. has not alleged that such a limited disclosure outweighs the legitimate state interests discussed in this motion—namely, preservation of female participation in school-sponsored athletics in Florida. Because D.N. cannot plausibly allege that these defendants have violated or will violate her due-process right of privacy, this Court should dismiss Count III.

## V.      THE SUPERINTENDENT OF BROWARD COUNTY PUBLIC SCHOOLS SHOULD BE DISMISSED AS A REDUNDANT DEFENDANT.

An official-capacity action against a public official is an action against the governmental entity that the official represents. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). To sue both the public official and the governmental entity in which the official serves is redundant. *Rowe v. City of Fort Laud.*, 8 F. Supp. 2d 1369, 1375 n.7 (S.D. Fla. 1998). Courts routinely dismiss redundant, public-official defendants. *See*, *e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

Here, D.N. sued the Superintendent of Broward County Public Schools, Robert Runcie, in his official capacity.[10] D.N. concedes that the Superintendent is an employee of the School Board, which D.N. has also sued. ECF No. 1 ¶ 10. Since D.N. also names the School Board as a defendant, maintaining the same claims against Runcie in his official capacity is redundant. All claims against the Superintendent should be dismissed with prejudice. *See Irwin v. Miami-Dade Cnty. Pub. Schs.*, No. 06-23029-CIV, 2008 WL 2741157, at *2 (S.D. Fla. July 14, 2008) (dismissing with prejudice the Superintendent of Miami-Dade County Public Schools where the School Board was also sued).

## VI.     THE FHSAA SHOULD BE DISMISSED.

### A.     D.N. Lacks Standing to Sue the FHSAA.

D.N. seeks an injunction prohibiting enforcement of the challenged law or "any other law, policy or bylaw that would preclude [D.N.] from participation in any girls' sports team in Florida." ECF No. 1 at 19. To establish standing to seek declaratory and injunctive relief, D.N. must show that (1) the alleged injury arises from the invasion of a legally protected interest that is sufficiently concrete and particularized, and not abstract and indefinite; (2) a causal connection between the asserted injury-in-fact and the challenged action of the defendant; and (3) it is likely, rather than speculative, that a favorable decision will redress her injury. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1302 (11th Cir. 2007). Additionally, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001).

D.N. lacks standing to sue the FHSAA because she alleges no facts showing she attends or will attend a *member school* of the FHSAA. As to the FHSAA, D.N. alleges that (1) the FHSAA is a nonprofit that sets regulations and policies for *high school* athletics in the State of Florida; (2) the Broward County Schools, in the district where plaintiff attends school, are *members* of the FHSAA; (3) D.N. is thirteen years old and an *eighth grader* at a *middle school* in Broward County; (4) D.N. is a *middle-school student* and is currently an active member of the middle-school soccer team; (5) D.N. plays volleyball in the summer and intends to try out for the *middle-school* girls' volleyball team this coming fall; (6) D.N. plays on the girls' team in her current school and wants

---

[10] Dr. Vicki Cartwright has since succeeded Superintendent Runcie and now serves as the interim Superintendent of Broward County Public Schools. Dr. Cartwright is therefore substituted for Superintendent Runcie pursuant to Federal Rule of Civil Procedure 25(d).

to continue to play on the girls' team *when she starts high school*, and *dreams of being on high-school sports teams*, whether in soccer or volleyball. ECF No. 1 ¶¶ 1, 6, 8, 29 (emphasis added).

As noted in the complaint, section 1006.20 of the Florida Statutes authorizes the FHSAA to adopt bylaws relating to student participation in interscholastic athletic teams. *Id*. ¶ 8. However, as set forth in section 1006.20, the FHSAA is responsible for establishing eligibility requirements for students who participate in *high school* athletic competition in the FHSAA's *member schools*, § 1006.20(2)(a), Fla. Stat., and membership in the FHSAA is *not* mandatory for any school, *id*. § 1006.20(1). While D.N. alleges that the schools in the district in which she attends school are members of the FHSAA, ECF No. 1 ¶ 8, D.N. does not allege that her current *middle school* is a member school of the FHSAA, nor does it appear from D.N.'s allegations that her current school would be a member school of the FHSAA, as it is a *middle school*. By statute, FHSAA regulates only *high school* interscholastic sports programs. The complaint also contain no facts showing that D.N. will attend a member high school of the FHSAA. *See Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 684 n.3 (11th Cir. 2019) (concluding that a plaintiff who no longer attended the university that she had sued, and who had indicated no intent to return, had no standing to seek injunctive relief because she was not actually and imminently under any threat of suffering injury); *Williams*, 477 F.3d at 1302–03 (concluding that plaintiff lacked standing to obtain injunctive relief where she no longer attended the university and merely alleged she may pursue undergraduate or graduate studies if the university adopted an equal and more protective sexual-harassment policy).

Next, D.N. fails to allege any concrete and particularized injury arising from the invasion of a legally protected interest. The opportunity to participate in interscholastic athletic activities, standing alone, is not a constitutionally protected right. *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159–60 (5th Cir. 1980); *Mitchell v. La. High Sch. Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970);[11] *Fla. High Sch. Athletic Ass'n v. Melbourne Cent. Cath. High Sch.*, 867 So. 2d 1281, 1288 (Fla. 5th DCA 2004). Even if it were, D.N.'s complaint lacks any allegations showing that D.N. has sought participation in any interscholastic athletic program regulated by the FHSAA. In fact, according to the complaint, D.N. is currently playing sports at her school on the girls' team.

Finally, D.N. alleges no causal connection between the asserted injury and any action of the FHSAA. D.N.'s complaint contains no allegations showing the FHSAA has taken any steps or

---

[11] *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981).

engaged in any conduct to prohibit D.N. from playing in any FHSAA-regulated athletic program. Because she lacks standing, D.N.'s claims against the FHSAA should be dismissed with prejudice.

### B.   Counts II and III Do Not Allege Any Wrongful Conduct By the FHSAA.

Counts II and III of D.N.'s complaint alleging deprivation of equal protection and violation of the right to privacy should be dismissed with prejudice as to the FHSAA because D.N. fails to allege (1) any facts showing the FHSAA engaged in conduct depriving D.N. of a constitutionally protected right; or (2) any wrongful invasion of privacy by the FHSAA. As discussed above, there is no constitutional right to participate in high-school athletics. *Pritchard v. Fla. High Sch. Athletic Ass'n, Inc.*, No. 2:19-CV-94, 2020 WL 2838852, at *3 (M.D. Fla. June 1, 2020). "Unless athletic association regulations deny an athlete a protected fundamental right or classify him or her on a suspect basis, *e.g.*, religion or race, athletic programs are not subject to federal scrutiny." *Fla. High Sch. Athletic Ass'n v. Melbourne Cent. Cath. High Sch.*, 867 So. 2d 1281, 1289 (Fla. 5th DCA 2004).

D.N.'s complaint lacks any facts showing the FHSAA deprived D.N. of a constitutionally protected right and fails to allege the FHSAA has classified D.N. on a suspect basis. Moreover, D.N.'s complaint lacks any facts showing the FHSAA has engaged in any conduct amounting to an invasion of D.N.'s privacy. Consequently, Counts II and III should be dismissed with prejudice as to the FHSAA.

## VII.   GOVERNOR DESANTIS SHOULD BE DISMISSED AS AN IMPROPER DEFENDANT.

Finally, Governor DeSantis is not the public official responsible for enforcing the particular provisions of law at issue in this case. Therefore, Governor DeSantis must be dismissed under the doctrine of sovereign immunity, the doctrine of standing, or both. *See Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) ("[A] state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with the enforcement of the provision at issue." (quoting *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998))); *Support Working Animals, Inc. v. Governor of Fla.*, No. 20-12665, --- F.4th ----, 2021 WL 3556779, at *2 (11th Cir. Aug. 12, 2021) ("[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual.").

To be sure, Governor DeSantis' status and authority as Governor of Florida do not, as a matter of law, make him a proper party to this case. The Governor's general executive authority to enforce state laws and oversee the executive branch, standing alone, "is insufficient to make him the proper party whenever a plaintiff seeks to challenge the constitutionality of a law." *Harris v. Bush*, 106 F. Supp. 2d 1272, 1276 (N.D. Fla. 2000) (collecting multiple cases supporting this principle); *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) ("A governor's 'general executive power' is not a basis for jurisdiction in most circumstances."). Accordingly, Governor DeSantis should be dismissed from this action entirely.

### CONCLUSION

For these reasons, the defendants respectfully move the Court to dismiss D.N.'s complaint with prejudice.

Respectfully submitted,

/s/ *Raymond F. Treadwell*
James W. Uthmeier (FBN 113156)
General Counsel
Raymond F. Treadwell (FBN 93834)
Chief Deputy General Counsel
Joshua E. Pratt (FBN 119347)
Deputy General Counsel
EXECUTIVE OFFICE OF THE GOVERNOR
Office of General Counsel
The Capitol, PL-5
400 South Monroe Street
Tallahassee, FL 32399
Phone: (850) 717-9310
Facsimile: (850) 488-9810
James.Uthmeier@eog.myflorida.com
Ray.Treadwell@eog.myflorida.com
Joshua.Pratt@eog.myflorida.com
Gov.Legal@eog.myflorida.com
*Attorneys for Governor Ron DeSantis*, *in his official capacity as Governor of the State of Florida*

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
Ashley H. Lukis (FBN 106391)
ashley.lukis@gray-robinson.com
GRAYROBINSON, P.A.
P.O. Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
*Attorneys for Defendants*, *Florida State Board of Education and Commissioner Corcoran*

/s/ *Anastasia Protopapadakis*
Anastasia Protopapadakis, FBN 051426
anastasia.protopapadakis@gray-robinson.com
GRAYROBINSON, P.A.
333 S.E. 3rd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
*Attorneys for Defendants*, *Broward County*
*School Board and Superintendent of Broward*
*County Public Schools*

/s/ *Leonard E. Ireland, Jr.*
Leonard E. Ireland, Jr.
Florida Bar No. 104630
18 Northwest 33rd Court
Gainesville, Florida 32607
(352) 376-4694 (Telephone)
(352) 371-7366 (Facsimile)
Lireland@Clayton-Johnston.com
Tbrehm@Clayton-Johnson.com
*Attorneys for Defendant*, *Florida High School*
*Athletic Association*

/s/ *Barry A. Postman*
BARRY A. POSTMAN
*TRIAL COUNSEL*
Fla. Bar No: 991856
/s/ *Jessica DeBono Anderson*
JESSICA DEBONO ANDERSON
Fla. Bar No.: 58503
Cole, Scott & Kissane, P.A.
Tower Place, Suite 400
1900 Summit Tower Boulevard
Orlando, Florida 32810

Primary Email:
Barry.Postman@csklegal.com
Secondary Email:
Jessica.Anderson@csklegal.com
Secondary Email:
Cynthia.Acuna-Nelson@csklegal.com
Telephone: (321) 972-0034
Facsimile: (321) 972-0099
*Attorneys for Defendant*, *Florida High School*
*Athletic Association*