UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

D.N., by her next friends, JESSICA N.,
mother, and GARY N., father,

       Plaintiff,            Civil Case No. 21-CV-61344

       v.

FLORIDA STATE BOARD OF EDUCATION
and COMMISSIONER MANNY DIAZ, JR.,

       Defendants.
_____/

**BRIEF AMICUS CURIAE OF**
**CHRISTIAN FAMILY COALITION (CFC) FLORIDA, INC.,**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE COMPLAINT IN THIS ACTION**

    Christian Family Coalition (CFC) Florida, Inc. ("Amicus" or "CFC"), hereby submits its Brief Amicus Curiae in support of Defendants' motion to dismiss the complaint in this action pursuant to Fed.R.Civ.P. 12(b)(6).  This is the identical Amicus Brief which this Court already authorized (ECF 43) and which Amicus previously filed (ECF 45) in support of Defendants' earlier motion to dismiss the identical complaint.

**INTEREST OF AMICUS**

    Amicus, a non-profit Florida corporation, is a human rights and social justice advocacy organization representing over 500,000 fair-minded voters and citizens in the State of Florida.  Amicus actively seeks to protect human rights and social justice in litigation, political forums, schooling and education, and society generally.  Amicus and the 500,000+ citizens it represents have an acute interest in ensuring fairness, equality of opportunity, justice, and human rights in the forums and institutions of society and

-1-

government.  In pursuit of these interests, Amicus and the 500,000+ citizens it represents have a special interest in ensuring the fairness in education and sporting activities that the legislation at issue in this action was designed to protect.  Amicus lobbied heavily in the Florida State Legislature in support of the legislation which is under attack in this action.

Amicus addresses two levels of concern in this Amicus Brief – (1) the legal deficiencies in the complaint and the (2) irreversible physical differences between biological males and biological females which severely prejudice – and potentially endanger – biological females if forced to compete in sports against physically superior males who have transgendered to identify as female.

## **LEGAL DEFICIENCIES IN THE COMPLAINT**

Legally, plaintiff has no bona fide claim of sexual discrimination.  Neither Title IX nor the Equal Protection or Due Process Clauses of the U.S. Constitution prevents the State legislature from enacting the present legislation which protects biological females from unfair competition by biological males who identify as female.  Indeed, the legal discrimination which exists is the diametric opposite of that which plaintiff asserts. Requiring biological females to compete directly against biological males in sporting events – the relief plaintiff seeks – far from removing discrimination against biological males who identify as female, would instead impose discrimination against biological females who, by reason of *their* sex, would be forced to compete directly against a physically superior sex in form of biological males who have transgendered to identify as female (physical superiority addressed at pp.6-9 *infra*).

Simply stated, the complaint places the shoe on the wrong foot.  It is not the plaintiff who will suffer sexual discrimination under the disputed legislation but rather

biological females who will suffer from it by reason of *their* sex if the statute is overturned. Such a ruling would force biological females to suffer competitive disadvantages by reason of *their* sex in competition with physically superior biological males who have transgendered to identify as female.

Indeed, it would be ironic if Title IX would avail plaintiff. Title IX was enacted to protect biological women from sexual discrimination in sports, not to subject them to discrimination by reason of *their* sex in direct competition with biological males who are physically superior.

In short, far from supporting plaintiff's claim, the anti-discrimination provisions of Title IX and the Equal Protection and Due Process Clauses directly cut against the claim plaintiff asserts.

Nor do the complaint's conclusory allegations pass muster. Under Fed.R.Civ.P. 12(b)(6), plaintiff must allege more than conclusory allegations of pertinent matters but, more stringently, must include in the complaint's allegations sufficient "factual enhancement" to show a plausible basis for a claim. The need to allege a plausible case via specific non-conclusory allegations is a fundamental, bed-rock requirement of basic pleading. *Ashcroft v. Iqbal,* 556 U.S. 662, 678-80 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-57 (2007).

Plaintiff fails to comply. In a pivotal allegation, plaintiff alleges in conclusory fashion that she in particular has "no competitive advantage" by reason of her biological sex (male) (complaint ¶ 30). However, plaintiff then broadens the allegations of the complaint to avail all "transgender girls" generally (*id.,* ¶ 42) and on behalf of any "girl or woman who is transgender" (*id.,* ¶ 44) and again multiple times for all "transgender girls" generally (*id.,* ¶¶ 48 & 49) and for "other transgender girls" (*id.,* ¶¶ 51 & 55), culminating

in plaintiff's claims for relief seeking a Court judgment invalidating the statute generally (*id.,* ¶¶ 56-80).

In effect, plaintiff seeks to conflate plaintiff's own situation with those of "other transgender girls" (*id.,* ¶ 51) and with any "girl or woman who is transgender" (*id.,* ¶ 44) in plaintiff's conclusory allegation of "no competitive advantage" (*id.,* ¶ 30). But plaintiff offers no "factual enhancement" of her conclusory allegation of "no competitive advantage" as to "transgender girls and women" generally for whom plaintiff effectively seeks a declaration of the statute's invalidity. Indeed, any holding of the statute's invalidity – the remedy plaintiff seeks – would necessarily avail "other transgender girls" without the necessary "factual enhancement" required by *Iqbal* and *Twombly* to show a plausible basis for plaintiff's claim that "other transgender girls or women" in general would have "no competitive advantage" as plaintiff alleges in conclusory fashion (*id.,* ¶ 30).

This is the danger and unfairness of any ruling sustaining plaintiff's complaint. Plaintiff posits her own particular factual situation, but any ruling in plaintiff's favor would, by plaintiff's own admission, necessarily benefit any "girl or woman who is transgender" (*id.,* ¶ 44) and all "other transgender girls" (*id.,* ¶ 51) regardless of how this Court may try to narrow the precedential effect of a ruling in plaintiff's favor. The beneficiaries of a ruling in favor of plaintiff will, unfairly, be any "girl or woman who is transgender" (*id.,* ¶ 44) and all "other transgender girls" (*id.,* ¶ 51) who will then use in their own favor the conclusory allegation of "no competitive advantage" (*id.,* ¶ 30) without the necessary "factual enhancement" under *Iqbal* and *Twombly* needed to make the allegation plausible for the broad swath of "other transgender girls" and any "girl or

women who is transgender." Plaintiff should not be permitted to circumvent the clear mandate of *Iqbal* and *Twombly* ("factual enhancement") in such a circuitous fashion.

Indeed, as shown below, the likely reason why plaintiff has failed to allege the "factual enhancement" which *Iqbal* and *Twombly* require – which alone is ground for dismissing the complaint – is because common sense and the available evidence refute any allegation that transgender athletes who are biologically male but who identify as female somehow have "no competitive advantage" over biologically female athletes. This is an inherently implausible allegation, apart from plaintiff's failure to elaborate with the necessary "factual enhancement." Amicus addresses this below (pp.6-9 *infra*).

Nor may plaintiff claim the benefit of *Bostock v. Clayton County,* 140 S.Ct. 1731 (2020). This is so for two reasons. First, *Bostock* held that gay and transgender persons were protected from sexual discrimination under Title VII of the 1964 Civil Rights Act. *Bostock* merely extended rights of equal treatment in employment to gay and transgender persons without depriving others of the same. By contrast, the relief which plaintiff seeks in the context of sports **would deprive** biological females of equal treatment. It would discriminate against biological females, by reason of their sex, in sporting competitions by forcing them to compete against physically superior biological males who identify as female (pp.6-9 *supra*). *Bostock* does not countenance such an inequitable and discriminatory result.

Second, as mentioned above, the very purpose of Title IX runs counter to the relief plaintiff seeks (p.3 *supra*). It would be absurd to extend *Bostock* to force biological females to compete against physically superior biological males – and thus discriminate against biologically female athletes by reason of their sex – when the very purpose of Title IX was to protect biological females from exactly this discrimination.

One or more of these serious legal deficiencies in the complaint warrants its dismissal.

**THE INHERENT PHYSICAL DIFFERENCES BETWEEN BIOLOGICAL MALES AND BIOLOGICAL FEMALES REFUTE PLAINTIFF'S CLAIM AND <u>SUSTAIN THE PROTECTIVE PURPOSES OF THE STATUTE</u>**

Basic biology also refutes plaintiff's claim.  Persons born biologically as males have intrinsic and irreversible biological and physical advantages over persons born biologically as females in terms of skeletal mass, muscle mass, and lung capacity.  These physical advantages give persons born biologically as males intrinsic, built-in and irreversible competitive advantages over natural-born females in sporting competitions of virtually every sort.  It is inherently unfair and unjust to pit biological females against biological males whose physical superiority skews the playing field enormously and necessarily diminishes the award-winning opportunities for biological females.  These built-in, irreversible physical advantages remain regardless of testosterone-reduction therapy or changes in post-partum psychological identity.

Take lung capacity, for example.  The inherent differences between biological males and biological females are enormous.   Overall, biological males have 38.1% greater lung capacity than biological females, with some of the constituent measures of lung capacity showing that biological males have 54.8% more lung capacity than biological females.  See https://www.easycalculation.com/medical/lung-volume-capacities.php.  The percentage differences shown in the cited website are as follows:

**Percentage by Which Lung Capacity of Average Male
Exceeds Lung Capacity of Average Female**

(see cited online chart p.6 *supra* for different lung capacities in liters)

| Type of Capacity | Meaning of Type of Capacity | Percentage by Which Lung Capacity of Average Male Exceeds Lung Capacity of Average Female |
|---|---|---|
| **Vital Capacity** Men = 4.8 liters Women = 3.1 liters | **Maximum Amount of Air That is Inhaled or Exhaled** | Men's (4.8 liters) Exceeds Women's (3.1 liters) by 54.8% |
| **Inspiratory Capacity** Men = 3.5 liters Women = 2.4 liters | **Amount of Air That is Inhaled After Normal Expiration** | Men's (3.5 liters) Exceeds Women's (2.4 liters) by 45.8% |
| **Functional Residual Capacity** Men = 2.3 liters Women = 1.8 liters | **Volume of Air That is Left in The Lungs After Normal Expiration** | Men's (2.3 liters) Exceeds Women's (1.8 liters) by 27.8% |
| **Total Lung Capacity** Men = 5.8 liters Women = 4.2 liters | **Maximum Amount of Air That is Filled by the Lungs** | Men's (5.8 liters) Exceeds Women's (4.2 liters) by 38.1% |

**Note** – A liter is a measure of volume that is approximately 5% larger than a quart. Thus 1 liter = 1.05 quart (approx.).

With these enormous differences in average lung capacity – between biological males and biological females – it is patently absurd to claim that biological women have a fair chance in physical competition against biological males who identify as female. These differences are permanent and irreversible. There is no evidence that counsel or Amicus could find indicating that testosterone-reduction therapy or any other therapy alters this enormous advantage. These differences persist for the unfair benefit of biological males who identify as female in sports competitions against biological females. The Legislature had more than ample evidence to support the statute under review.

The same obtains for differences in skeletal and muscle mass. After puberty the average male has 50% greater skeletal and muscle mass than the average female – see, e.g., https://healthyliving.azcentral.com/much-muscle-mass-male-female-1709.html – a difference this Court may judicially notice merely by observing the differences among pedestrians on the sidewalk or among attorneys appearing in this Court. This is not a shocking or surprising observation. Neither counsel nor Amicus is aware of any evidence that testosterone-suppression therapy or any other therapy reduces the difference in skeletal mass or comes anywhere close to eliminating the difference in muscle mass.

Reports abound of transgender females, formerly males, who identify as female and who displace female athletes after previously competing without distinction in male sporting events. Transgender athletes Cece (formerly Craig) Telfer and June (formerly Jonathan) Eastwood transitioned from male to female sporting events in NCAA competition and materially bettered their results. This necessarily displaced biological females whom the transgender competitors bettered. Andrea Jones and Clare Hepler, *Males Don't Belong in Women's Sports – Even If They Don't Always Win,* www.heritage.org/gender/commentary/males-dont-belong-womens-sports-even-if-they-dont-always-win (Nov. 27, 2019). The internet is replete with hundreds of similar stories.

Other commentators put the matter well:

> "This is not a distinction of value, but a distinction of difference. Men are not smarter, more valued, or more worthy of praise than women – their biological makeup simply renders them stronger, faster, and bigger than women."

Wilbon and Williams, *Transgender Athletes Will Spell The End of Women's Sports,* https://www.dailysignal.com/2019/04/15/transgender-athletes-will-spell-the-end-of-womens-sports/ (April 15, 2019).

-8-

In addition to physical superiority generally in virtually all sports, natural-born males have especial built-in physical superiority and advantages over natural-born females in sports which involve physical contact, whether intentional or unavoidable. These include wrestling, boxing, basketball, soccer, football, lacrosse, ice hockey, field hockey, and numerous other sports which intrinsically or inescapably involve physical contact between members of opposing teams. These contact sports present inherent dangers of serious physical injury to biological females solely by reason of their sex when in competition with physically stronger, larger, more muscular biological males who identify as female. Neither testosterone-reduction therapy nor post-partum psychological identity reduces the potential for serious physical injuries.

The dangers are real and likely to increase if biological males who identify as female are permitted to compete against biological women in sports involving any kind of physical contact. The infamous tale of Fallon Fox, a transgender mixed-martial-arts (MMA) competitor, involves Fox's braking the skull of a female competitor. Chang, *Transgender Fighter Who Broke Woman's Skull in MMA Ring Has Now Been Called the "Bravest Athlete in History,"* https://www.westernjournal.com/transgender-fighter-broke-womans-skull-mma-ring-now-called-bravest-athlete-history/ (Feb. 16, 2021).

## CONCLUSION

These inherent physical differences, as well as well as the legal issues discussed above, warrant this Court's dismissal of the complaint. The competitive disadvantages and potential life-shattering physical injuries to which biological females are vulnerable, solely by reason of their sex in competition with physically larger, faster and stronger biological males, clearly entitles the State Legislature to have enacted the protective statute at issue in this case. Defendants' motion to dismiss should be granted.

-10-

Dated:  February 10, 2023					Respectfully submitted,

                                                               LAW OFFICE OF DENNIS GROSSMAN
                                                               Attorney for Amicus, Christian Family
                                                               Coalition (CFC) Florida, Inc.

                                                               by: <u>/s/ Dennis Grossman</u>
                                                                     Dennis Grossman
                                                              6701 Sunset Drive (#104)
                                                               Miami, Florida 33143
                                                               (516) 466-6690
                                                               dgrossmanlawoffice@aol.com
                                                               Florida Bar No. 0841811