UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-61344-ALTMAN/Hunt

**D.N.**, *by her next friends*, **JESSICA N.**,
*mother*, and **GARY N.**, *father*,

      *Plaintiff*,

*v.*

**GOVERNOR RONALD DESANTIS**,
*in his official capacity as Governor of*
*Florida, et al.*,

      *Defendants.*

_____/

## ORDER GRANTING MOTION TO DISMISS

Our Plaintiff (D.N.)—who was born male but identifies as female—wants to play on her high school girls' sports teams. The State of Florida has passed a law that, in the interest of preserving and promoting the integrity of girls' sports leagues, prohibits D.N. from doing that. D.N. has sued the State, claiming that the State's law violates her rights under a federal law (known as Title IX) and the Fourteenth Amendment to the U.S. Constitution. Our Defendants—Florida Commissioner of Education Manny Diaz, Jr., and the Florida State Board of Education—have now moved to dismiss the Plaintiff's Complaint. *See* Commissioner Diaz and the State Board of Education's Renewed Motion to Dismiss (the "Motion to Dismiss") [ECF No. 108]. For the reasons set out below, the Motion to Dismiss is **GRANTED**.

## THE FACTS[1]

D.N. is a teenager who lives and attends public school in Broward County, Florida. *See* Complaint [ECF No. 1] ¶¶ 6, 33. Although D.N. was born as a biological male, D.N. identifies as a "girl" and has "[f]rom a very young age[.]" *Id.* ¶ 22. "D.N.'s pronouns are she, her and hers and that is how friends, family, and people she encounters in her daily life refer to her." *Id.* ¶ 25. "As early as three years old, D.N. exhibited behavior that traditionally is associated with being a girl and would insist on wearing clothes and colors (pink) that girls wore. She saw herself as a girl and conveyed that to her parents in clear terms. At five or six, her parents realized, based on D.N.'s behavior and statements, that their daughter was transgender. D.N. took on a name that was more typically associated with girls and that is the name she has used since second grade." *Id.* ¶ 22. D.N. began taking hormone blockers at the age of eleven to "stop testosterone" and stave off male puberty. *Id.* ¶ 23. In 2021, she "began receiving estrogen, and will continue to do so for the rest of her life." *Id.* ¶ 24.

Sports are an important part of D.N.'s life. *Id.* ¶ 26. When she was younger, she played basketball and softball. *Ibid.* Throughout middle school, she played on her school's girls' soccer team, as well as a "girls' travel team and . . . a girls' recreational league." *Id.* ¶ 1. D.N. is now in high school— and, "[a]lthough [she] was primarily playing soccer when the complaint was filed, she now is playing volleyball as her primary sport." Response to the Motion to Dismiss (the "Response") [ECF No. 123] at 21.

On June 1, 2021, Governor DeSantis signed into law Senate Bill 1028 ("SB 1028"), a statute that includes the "Fairness in Women's Sports Act" (FLA. STAT. § 1006.205 (2021)). *See* Complaint ¶ 39. The law became effective on July 1, 2021. *Ibid.* "As enacted, the law prohibits transgender girls from participating, at any public secondary school or public postsecondary institution, in any school-

---

[1] We take the following facts from the Plaintiff's Complaint [ECF No. 1] and accept them as true for purposes of this Order.

sponsored girls' sports. It mandates that interscholastic, intercollegiate, intramural, or club athletics teams or sports that are sponsored by a public school must be 'expressly designated' as male (men or boys) or female (women or girls) based on the 'biological sex at birth of team members.' It also provides for coed or mixed teams, which can include both males and females." *Id.* ¶ 42 (quoting § 1006.205(2)–(3)). "Section 3(b) states that athletic teams or sports designated for males, men or boys may be open to students of the female sex. Section 3(c) provides that athletic teams or sports designated for females, women or girls may not be open to students of the male sex. Section 3(d) provides that 'a statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex at birth if the statement was filed at or near the time of the student's birth.'" *Id.* ¶ 43 (quoting § 1006.205(3)).

On June 29, 2021, the Plaintiff filed her Complaint, asserting three claims for relief: Violation of Title IX (Count I); Deprivation of Equal Protection (Count II); and Violation of Due Process Right of Privacy (Count III). In addition to Governor DeSantis, the Plaintiff named the following Defendants: the Florida High School Athletic Association (the "FHSAA"), the Broward County School Board, Superintendent Robert Runcie, the Florida State Board of Education, and Commissioner of Education Richard Corcoran. According to the Plaintiff, the FHSAA is "a nonprofit that sets regulations and policies for high school athletics in the State of Florida." *Id.* ¶ 8. It "enforces eligibility regulations that have been adopted by its member schools or enacted into law by the Florida legislature. The Broward County Schools, in the district where [D.N.] attends school, are members of the FHSAA. Florida Statute Section 1006.20 provides the FHSAA with the authority to adopt bylaws relating to student participation in interscholastic athletic teams." *Ibid.* The Broward County School Board "has authority under Florida Statute Section 1006.195 to establish student eligibility for participation in extracurricular activities and set student disciplinary policies" and "will be required to implement any regulations set by the State Board of Education and the FHSAA under SB 1028." *Id.*

¶ 9. The Florida State Board of Education "sets statewide educational policy in Florida. Florida Statute Section 1001.03(8) gives the State Board of Education the authority to enforce compliance with [SB 1028] as it relates to all school districts and public postsecondary institutions, except the State University System." *Id.* ¶ 11. Finally, Robert Runcie is the former Superintendent of the Broward County School Board, and Richard Corcoran is the former "leader" of the Florida State Board of Education. *Id.* ¶¶ 10, 12. Both men were sued in their official capacities. *Ibid.*

The Defendants filed their first Motion to Dismiss [ECF No. 33] on August 23, 2021. On September 16, 2021, the parties submitted a Stipulation of Dismissal with Prejudice as to the Defendant Superintendent of Broward County Public Schools [ECF No. 42], after which we dismissed the claims against Superintendent Robert Runcie, *see* September 24, 2021, Order of Dismissal with Prejudice [ECF No. 53].

On January 31, 2022, we denied without prejudice the first Motion to Dismiss and stayed the case pending the Eleventh Circuit's en banc ruling in *Adams v. School Board of St. Johns County. See* Paperless Order Staying Case [ECF No. 87]. A few days later, the parties filed a Stipulation of Dismissal without Prejudice as to the Defendants FHSAA, Governor Ronald DeSantis, and the Broward County School Board [ECF No. 89], and we dismissed all claims against these Defendants, *see* February 7, 2022, Order of Dismissal without Prejudice [ECF No. 90].

The en banc court issued its decision in *Adams* on December 30, 2022. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc). On January 6, 2023, the parties filed a Joint Motion to Reopen the Case [ECF No. 92], which we granted, *see* January 6, 2023, Paperless Order Granting Motion to Reopen [ECF No. 93]. On January 18, 2023, we directed the Clerk of Court to remove Richard Corcoran, the former Commissioner of Education, from the docket and to "amend the caption to reflect that Manny Diaz, Jr., is a defendant in his official capacity as the Commissioner of Education." Paperless Order [ECF No. 97]. The remaining Defendants—the Florida State Board

of Education and Commissioner Diaz—filed their Renewed Motion to Dismiss on February 10, 2023, asking us to dismiss all three of the Plaintiff's claims. *See generally* Motion to Dismiss. The Motion to Dismiss is now ripe for resolution.[2]

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## ANALYSIS

### I.    Equal Protection (Count II)

The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

---

[2] *See* Plaintiff's Response to the Motion to Dismiss (the "Response") [ECF No. 123]; Defendants' Reply in Support of the Motion to Dismiss (the "Reply") [ECF No. 126].

Count II of the Complaint alleges that SB 1028 violates the Equal Protection Clause because it impermissibly classifies people based on their gender. According to the Plaintiff, SB 1028 discriminates against "transgender girls and transgender women based on their sex and transgender status[.]" Complaint ¶ 70. "The only individuals impacted by the law," the Plaintiff continues, "which focuses on girls' and women's gender as determined at birth, are members of the transgender community. The law also allows other individuals who claim that they have been denied athletic opportunities to bring claims against transgender girls and women based solely on their sex and transgender status." *Id.* ¶¶ 72–73.

### A.  Facial vs. As-Applied Challenge

Before we go any further, we must first decide whether to analyze Count II as a facial or as-applied challenge. In our view, the Plaintiff is advancing *both*. In her Response, the Plaintiff explicitly asks us to evaluate Count II in light of her individual circumstances:

> [D.N.] has been recognized as a girl for years by her friends, teammates, coaches, local school district, and the State. She has not experienced male endogenous puberty, has been on puberty-blocking medications and female hormones for years and cannot safely play on the boys' teams or be in the boys' locker rooms . . . . Defendants should be required to proffer a rationale as to why it would ever be safe for Plaintiff to play on a boys' team, and why her compelled exposure to a group of boys would be appropriate if, as the Defendants argue here, schools must act to protect student privacy and student safety . . . . [T]he Defendants have not shown . . . how allowing Plaintiff to play on the girls' team is substantially related to preserving overall female participation in athletics.

Response at 10, 13; *see also id.* at 10 (arguing that the "disconnect between the governmental objective and the policy at issue in this case, *especially* as applied to Plaintiff, warrants denial of the Motion"). And, in her Complaint, the Plaintiff alleges that "SB 1028 treats transgender girls and transgender women differently from both cisgender girls and women and transgender boys and men by precluding them from engaging in school-sponsored athletics based on their sex and transgender status." Complaint ¶ 70. She also avers that "[t]he State and the Defendants have no legitimate, important or compelling state interest in regulating school sports in the manner at issue here based solely on gender

assigned at birth . . . . Although defendants contend that the law is not aimed at transgender individuals, the wording of the law and defendants' own contemporaneous public statements refute that claim." *Id.* ¶¶ 71–72. As relief, she "respectfully requests that this Court enter an order and judgment . . . . [d]eclaring that the provisions of and enforcement by Defendants of SB 1028 violate Plaintiff's rights under the Equal Protection Clause[.]" *Id.* at 19. These allegations appear to advance both a facial and an as-applied challenge to the law.

The Supreme Court has said that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010); *see also Am. Fed'n of State, Cnty., & Mun. Emps. Council v. Scott*, 717 F.3d 851, 865 (11th Cir. 2013) ("[T]he line between facial and as-applied challenges is a fluid one, and many constitutional challenges may occupy an intermediate position on the spectrum between purely as-applied relief and complete facial invalidation."). That said, "[t]he distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331.

Notably, though, the Court has made clear that "classifying a lawsuit as facial or as-applied . . . *does not speak at all to the substantive rule of law necessary* to establish a constitutional violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (emphasis added). "Indeed, an as-applied challenge merely 'affects the extent to which' a plaintiff must demonstrate 'the invalidity of the challenged law' or constitutional violation and 'the corresponding 'breadth of the remedy.'" *Adams*, 57 F.4th at 800 n.3 (quoting *Bucklew*, 139 S. Ct. at 1127). Here, as in *Adams*, "an alleged violation of one individual's constitutional rights under the Equal Protection Clause would necessarily constitute a violation of the Equal Protection

Clause and the Constitution at large, regardless of the individually-applied remedy." *Ibid.*[3] We thus "do not find merit in [the Plaintiff's] attempt to cabin the lawsuit to [her] particular circumstances," *ibid.*, and will—as *Adams* did—apply "the substantive rule of law necessary to establish a constitutional violation," *Bucklew*, 139 S. Ct. at 1127, *without* regard to the "breadth of the remedy" she's seeking, *Adams*, 57 F.4th at 800 n.3.

  In a "facial constitutional challenge," we consider "only the text of the law, not its specific application to a particular set of circumstances." *828 Mgmt., LLC v. Broward Cnty.*, 508 F. Supp. 3d 1188, 1195 (S.D. Fla. 2020) (Singhal, J.) (cleaned up); *see also Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) ("A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual."); *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449–50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). So, as we'll explain, the Defendants needn't show that, *as applied to D.N.*, the law is substantially related to the state's important interest in promoting female participation in athletics.

---

[3] This was true in *Adams* even though the plaintiff there, like D.N., tried to differentiate himself from other transgender boys. *See* En Banc Brief of Appellee Drew Adams, *Adams v. Sch. Bd. of St. John's Cnty.*, 18-13592 (11th Cir. Nov. 26, 2021), ECF No. 251 at 54–56 ("[T]he evidence is that Drew Adams poses no threat to the privacy or safety of any of his fellow students . . . . The policy . . . places a boy who happens to be transgender in a restroom with girls—despite the fact that Andrew had medical treatment giving him masculine secondary sex characteristics . . . . Although this is unrelated to Andrew . . . Defendant references students who identify as gender-fluid. In addition to being wholly irrelevant to Andrew, who consistently, persistently, and insistently identifies as male, the trial revealed nothing but speculation on this point."); *see also id.* at 45 ("Andrew's medical transition included carefully-monitored hormone therapy, and eventually a mastectomy in 2017 to create a typically masculine chest. Andrew's legal transition included correcting his driver's license and birth certificate to reflect his male gender, pursuant to guidelines established by the Florida Department of Highway Safety and Motor Vehicles and the Florida Department of Health Office of Vital Statistics, respectively.").

### B. The Level of Scrutiny

Our next task is to fit the Plaintiff's claim into one of the well-established levels of scrutiny. "In considering whether state legislation violates the Equal Protection Clause . . . we apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "All statutory classifications must, at a minimum, satisfy rational basis review. Classifications based on race or national origin . . . are reviewed under the 'most exacting' level of scrutiny: strict scrutiny. Between rational basis review and strict scrutiny lies 'a level of intermediate scrutiny,' which applies to classifications based on sex or illegitimacy." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1226 (11th Cir. 2023) (quoting *Clark*, 486 U.S. at 461). "Thus, a government policy that distinguishes on the basis of sex is permissible under the Equal Protection Clause 'only if it satisfies intermediate scrutiny.'" *Ibid.* (quoting *Adams*, 57 F.4th at 801). For a gender-based classification to satisfy equal protection under the intermediate-scrutiny test, the government "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up).

The Plaintiff contends that "discrimination against transgender individuals is *per se* subject to intermediate scrutiny, as it is discrimination on the basis of sex." Response at 16. The Defendants counter that only rational-basis review applies here because the Plaintiff's challenge "is not to sex-segregated sports teams, but to how Florida defines the sexes." Motion to Dismiss at 11. Even if intermediate scrutiny applies, however, the Defendants insist that "Florida's sex-based classification for interscholastic sports easily survives[.]" *Ibid.*

We find that intermediate scrutiny applies here. The plaintiff in *Adams*, a transgender student who identified as male, sued the School Board of St. Johns County, alleging that its bathroom policy—which "separat[ed] bathrooms based on biological sex, while providing sex-neutral bathroom

accommodations for transgender students"—violated the Equal Protection Clause and Title IX. *Adams*, 57 F.4th at 798. The Eleventh Circuit held that, "because the policy that Adams challenges classifies on the basis of biological sex, it is subject to intermediate scrutiny." *Id.* at 803. So too here. SB 1028 explicitly classifies students on the basis of biological sex:

> (3) DESIGNATION OF ATHLETIC TEAMS OR SPORTS.—
> (a) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public secondary school or public postsecondary institution must be expressly designated as one of the following based on the biological sex at birth of team members:
> > 1. Males, men, or boys;
> > 2. Females, women, or girls; or
> > 3. Coed or mixed, including both males and females.
> (b) Athletic teams or sports designated for males, men, or boys may be open to students of the female sex.
> (c) Athletic teams or sports designated for females, women, or girls may not be open to students of the male sex.
> (d) For purposes of this section, a statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex at birth if the statement was filed at or near the time of the student's birth.

§ 1006.205(3)(a–d). No less than the law in *Adams*, therefore, the statute at issue here is subject to intermediate scrutiny.

## C.  The Merits

Now, onto the merits. By its own terms, SB 1028 aims to "maintain opportunities for female athletes to demonstrate their strength, skills, and athletic abilities and to provide them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that result from participating and competing in athletic endeavors." § 1006.205(2)(a). The Plaintiff is right to say that the statute treats transgender girls differently from both cisgender girls and transgender boys. Under the law, after all, biological females (whether cis or trans) can play on both girls' and boys' sports teams. Transgender girls, by contrast, considered male by birth, cannot play on girls' sports teams. *See* § 1006.205(3)(b–d) ("Athletic teams or sports designated for males, men, or boys may be open to students of the female sex. Athletic teams or sports designated for

females, women, or girls may not be open to students of the male sex . . . . [A] statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex at birth[.]"). But not all gender-based classifications violate the Equal Protection Clause. And, given *Adams*'s unambiguous view that the "practice of separating school bathrooms based on biological sex . . . . does not unlawfully discriminate on the basis of sex," 57 F.4th at 795, 808, we find the gender-based classifications at issue here constitutionally permissible. In saying so, we hew closely to the two-step test the Supreme Court has laid out for laws subject to intermediate scrutiny.

*First*, we find that promoting women's equality in athletics is an important governmental interest.[4] This interest is well-established. In *O'Connor v. Board of Education of School District 23*, Justice Stevens, reviewing a preliminary injunction "in chambers," evaluated a middle school program that required "separate teams for boys and girls for contact sports," including boxing, wrestling, rugby, ice hockey, football, and basketball. 449 U.S. 1301, 1302 (1980) (Stevens, J., in chambers). Justice Stevens held that "there can be little question about the validity of the classification in most of its normal applications. Without a gender-based classification in competitive contact sports, there would be a

---

[4] The Government also contends that SB 1028 furthers the "'important objective' in protecting students' desire to 'shield[ ] their bodies from the opposite sex,' underscoring the long-recognized interest in maintaining sex-separated 'places to disrobe, sleep, [and] perform personal bodily functions[.]'" Motion to Dismiss at 7 (quoting *Adams*, 57 F.4th at 804). But we needn't decide today whether the rule SB 1028 employs is substantially related to the achievement of *that* objective because, "[w]hen conducting an intermediate scrutiny analysis, . . . . [w]e may not propose hypothetical governmental interests, as in a rational basis analysis; rather we must look to the precise interests put forward by the State." *Wollschlaeger v. Governor of Fla.*, 797 F.3d 859, 896 (11th Cir. 2015) (cleaned up), *vacated on other grounds by Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159 (11th Cir. 2015); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 70 (2017) ("It will not do to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation." (cleaned up)). And, in passing SB 1028, the State advanced only one governmental purpose: to "maintain opportunities for female athletes to demonstrate their strength, skills, and athletic abilities and to provide them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that result from participating and competing in athletic endeavors." § 1006.205(2)(a).

substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *Id.* at 1307.

Courts around the country have similarly held that—given the historic (and ongoing) imbalance in the athletic opportunities that are available to male and female students—the government has an important interest in protecting and promoting athletic opportunities for girls. *See, e.g.*, *Clark, By & Through Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is a legitimate and important governmental interest."); *Kleczek on Behalf of Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 956 (D.R.I. 1991) ("It is beyond question that redressing the disparate athletic opportunities available to males and females is an important governmental interest."); *B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220, 230 (S.D. W. Va. 2023) (holding that the state has an "important government interest [in] providing equal athletic opportunities for females"); *Petrie v. Ill. High Sch. Athletic Ass'n*, 75 Ill. App. 3d 980, 989–90 (Ill. App. Ct. 1979) (holding that the state has an "important governmental objective of maintaining, fostering and promoting athletic opportunities for girls"—both "because of past disparity of opportunity and because of innate differences.").

And Congress codified this important interest in Title IX, which was "Congress's response to significant concerns about discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999). In the words of the legislation's primary sponsor, Senator Birch Bayh, Title IX was enacted to "provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work." 118 CONG. REC. 5808 (1972); *see also Neal*, 198 F.3d at 767 ("The drafters of [Title IX] recognized a situation that Congress well understood: Male athletes had been

given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field."); *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 171 (3d Cir. 1993). ("[A]lthough Title IX and the regulation apply equally to boys as well as girls, it would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges."). And, while "Title IX has gone a long way in changing society's view of female athletes by providing females with the opportunity to showcase their athletic ability and competitiveness and encouraging female participation and interest in sports," it "has not ended the long history of discrimination against females in sport programs [as] many educational institutions continue to place male sport programs in a position of superiority." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012). For all these reasons, we join our colleagues in holding that the state has an important interest in protecting and promoting athletic opportunities for girls.

While the Plaintiff acknowledges that the law's *stated* objective is to "maintain opportunities for female athletes," she insists that the statute is tacitly "motivated by discriminatory animus" and that its *real* purpose is to "categorical[ly] exclu[de] . . . transgender girls from school sports." Response at 15 n.11, 17. In saying so, she argues that SB 1028 "must be viewed against the backdrop of the avalanche of anti-transgender, and anti-LGBTQ legislation across the country and also in the context of ever increasing legislative hostility in Florida towards LGBTQ individuals." *Id.* at 17. As proof of this animus, the Plaintiff points to several things. *One*, she notes that the Florida Legislature "explicitly rejected a competing bill" to SB 1028 "that would have permitted transgender girls to join girls' teams under the standard adopted by the International Olympic Committee." *Id.* at 18. *Two*, she points to the following statement by Florida State Senator Kelli Stargel at a "press conference in connection with the signing of the bill": "We all know that men are stronger than women. Watching the video [of

a race in Connecticut involving a transgender athlete], I kept thinking to myself, I've always heard as a kid, 'you run like a girl.' And when you're looking at that video, it's even evident the transgender woman who competed, or self-identified woman ran very differently than the others in the competition. It's physiologically different. Men are stronger." Complaint ¶ 40. *Three*, she quotes Governor DeSantis as saying (at the same press conference): "We're going to go based off biology, not based off etiology . . . when we're doing sports." *Id.* ¶ 41.

The Plaintiff is right that "neutral terms" in a statute can sometimes "mask discrimination that is unlawful." *Nguyen v. I.N.S.*, 533 U.S. 53, 64 (2001). But she hasn't come close to showing any such masked discrimination here.[5] If anything, the statements by Senator Stargel and Governor DeSantis support the State's claim—which is that the law was enacted to maintain opportunities for biologically-female athletes (just as the statute suggests). In their statements, Senator Stargel and Governor DeSantis emphasized the inherent *biological* differences between men and women in a way that comports with SB 1028's express interest in giving female athletes an opportunity "to demonstrate their strength, skills, and athletic abilities," § 1006.205(2)(a)—without having to compete with biological men. This isn't a stereotype: "While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general

---

[5] Obviously, it would also be unconstitutional for the State of Florida to apply SB 1028 in a discriminatory manner by enforcing it only against transgender girls—rather than against all biological boys. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."). The Plaintiff may be alluding to a discriminatory-enforcement claim when she says that "the only individuals impacted by the law, which focuses on girls' and women's gender as determined at birth, are members of the transgender community." Complaint ¶ 72. But the Plaintiff never suggests—in either her Complaint or in her Response—that Florida's public schools are violating the statute's unambiguous directives by allowing cisgender boys to play on girls' sports teams. So, we don't construe her pleading as advancing a discriminatory-enforcement claim here.

principle that realistically reflects the average physical differences between the sexes." *B.P.J.*, 649 F. Supp. 3d at 231; *see also Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring) ("[A] commingling of the biological sexes in the female athletics arena would significantly undermine the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams. This is because it is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports. While pre-puberty physical differences that affect athletic performance are 'not unequivocally negligible' between males and females, measurable physical differences between males and females develop during puberty that significantly impact athletic performance."). Nor does the legislature's rejection of a competing bill that would have allowed transgender girls to play on girls' sports teams somehow suggest that the legislature was prejudiced against transgender students. In fact, the Complaint acknowledges that the competing bill, "SB 2012," was "introduced and filed" by Senator Stargel, Complaint ¶ 36—the very same legislator the Plaintiff now accuses of discriminatory animus.

The Plaintiff objects to Senator Stargel's and Governor DeSantis's remarks. She also disputes the scientific validity of those remarks. *See* Complaint ¶ 40 ("[These] statement[s] [are] counter to scientific research and evidence."). She may even disagree with the statement that keeping transgender girls off of girls' sports teams serves the government's important interest in promoting women's athletics. "To plead animus," however, "a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). And D.N. has failed to do that here. The law, after all, *doesn't* discriminate against transgender students. In addition to allowing transgender athletes of both sexes to play on coed (or mixed) teams, the law *explicitly* allows transgender boys to try out and play for boys' sports

teams. If the law had intended to discriminate against transgender student-athletes, in other words, it's done a very poor job of it.

Having found an important governmental objective, we must now determine whether the means the law employs are substantially related to the achievement of that objective. *See Virginia*, 518 U.S. at 533 (holding that, for a sex-based classification to pass constitutional muster, the government "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives" (cleaned up)). "Intermediate scrutiny is satisfied when a policy 'has a close and substantial bearing on' the governmental objective in question." *Adams*, 57 F.4th at 805 (quoting *Nguyen*, 533 U.S. at 70). Unlike strict scrutiny, intermediate scrutiny does *not* require a statute to employ the least restrictive means of furthering a compelling governmental interest. Nor does intermediate scrutiny require narrow tailoring. *See Nguyen*, 533 U.S. at 70 ("None of our gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance."); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1582 (11th Cir. 1994) (holding that "gender goals need be only 'substantially related' (rather than 'narrowly tailored') to their goal"). Our question, then, is whether SB 1028's gender-based classifications substantially serve the state's important interest in protecting and promoting athletic opportunities for girls. We find that it does.

As we've said, SB 1028 requires public schools and universities to "designate" their sports teams "based on . . . biological sex." § 1006.205(3)(a). Teams must be designated as male, female, or "coed or mixed." § 1006.205(3)(a)(1). Sports teams designated for males "may be open to students of the female sex," while sports teams designated for females "may not be open to students of the male sex." § 1006.205(3)(a)(1)(b–c). Sex is determined using the biological sex listed on a student's official birth certificate—the document that's filed at (or near) the student's birth. § 1006.205(3)(a)(1)(d).

These classifications are substantially related to the goal of fostering and promoting athletic opportunities for girls.

On the one hand, the Supreme Court has held that intermediate scrutiny "does not make sex a proscribed classification" because "[p]hysical differences between men and women . . . are enduring." *Virginia*, 518 U.S. at 533; *see also Nguyen*, 533 U.S. at 64, 73 ("Just as neutral terms can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction . . . . Here, the use of gender specific terms takes into account a biological difference [between men and women] . . . . To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it."); *Ballard v. United States*, 329 U.S. 187, 193 (1946) ("[T]he two sexes are not fungible."). This "real differences" doctrine acknowledges that, generally speaking, males and females are constructed differently (biologically). As the Eleventh Circuit explained in *Adams*, "the biological differences between males and females are the reasons intermediate scrutiny applies in sex-discrimination cases in the first place." 57 F.4th at 809.

On the other hand, the Supreme Court tends to invalidate laws that discriminate based on gender "stereotypes . . . when more accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 582 U.S. 47, 63 n.13 (2017); *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724–25 (1982) ("Although the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions. Thus, if the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate."). In *Sessions*, for example, the Court struck down a law that treated unwed mothers differently than unwed fathers because it was rooted in a stereotype that women are natural caregivers and an "assumption . . . that unwed fathers care little about, indeed are strangers to, their children."

17

*Sessions*, 582 U.S. at 67, 70. "Lump characterization[s] of that kind," the Court reasoned, "no longer pass[ ] equal protection inspection." *Id.* at 67.

In our case, SB 1028's gender-based classifications are rooted in real differences between the sexes—*not* stereotypes. In requiring schools to designate sports-team memberships on the basis of biological sex, the statute adopts the uncontroversial proposition that most men and women *do* have different (and innate) physical attributes. Ignoring those real differences would disserve the purpose of the Equal Protection Clause, which is to safeguard the principle that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981) ("[I]n order to measure equal opportunity, present relevant differences cannot be ignored. When males and females are not in fact similarly situated and when the law is blind to those differences, there may be as much a denial of equality as when a difference is created which does not exist.").

In other cases involving sex-separated sports teams, our colleagues around the country have recognized that "real differences exist between boys and girls[,] which justify the exclusion" of biological males from girls' sports teams. *Clark*, 695 F.2d at 1131; *see also Petrie*, 75 Ill. App. 3d at 987 ("[I]n general, high school boys are substantially taller, heavier and stronger than their girl counterparts and have longer extremities. Although we recognize that high school girls have no general disadvantage as to balance, coordination, strategic acumen, or quickness (as distinguished from running speed), we agree that they are generally at a substantial physical disadvantage in playing volleyball."); *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."); *O'Connor*, 449 U.S. at 1302 ("Without a gender-based classification in

18

competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events.").

Nor does the statute rely on impermissible stereotypes about transgender girls. The separation of sports teams into girls' teams, boys' teams, and co-ed teams "does not depend in any way on how students act or identify," *Adams*, 57 F.4th at 809, and there's no evidence that the "statutory objective itself reflects archaic and stereotypic notions" about biological women *or* transgender girls, *Miss. Univ. for Women*, 458 U.S. at 725. We therefore disagree with the Plaintiff that SB 1028 is "based on stereotypes about what women and girls should look like" and that it perpetuates a "stereotypical 'feminine' aesthetic." Response at 16. As the Supreme Court has explained, "[m]echanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real." *Nguyen*, 533 U.S. at 73. "At most," to crib from the Eleventh Circuit's en banc opinion in *Adams*, D.N.'s "challenge amounts to a claim that [SB 1028] has a disparate impact" on transgender girls—who *may* want to play on girls' sports teams at a higher rate than male students (who are also subject to the law). *Adams*, 57 F.4th at 810. But "disparate impact alone does not violate the Constitution. Instead, a disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by 'purposeful discrimination.'" *Ibid.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)). And, as we've said, D.N. has failed to (plausibly) allege any such "purposeful discrimination" here.

In short, when we take the Complaint's factual allegations as true—and when we view them in the light most favorable to the Plaintiff—we find that SB 1028's sex-based classifications are substantially related to the State's important interest in promoting women's athletics. We, therefore, **GRANT** the Defendants' Motion to Dismiss the Plaintiff's facial challenge (Count II).

As we've indicated, the Plaintiff also advances an as-applied challenge to SB 1028. *See* Complaint ¶ 71 ("[SB 1028] fails to take into account individuals, such as plaintiff D.N., who begin

such treatments at a young age."). In her Response, the Plaintiff says that her Complaint "challenges

the law's exclusion of *her* from the girls' teams based on discrimination against people who are

transgender . . . . Defendants have not shown . . . how allowing Plaintiff to play on the girls' team is

substantially related to preserving overall female participation in athletics." Response at 12–13

(emphasis in original). But there's no textual or historical reason for us to conclude that the same

provision of the Constitution has different meanings depending on how artful the plaintiff's pleading

happens to be. As the Supreme Court explained (in the context of an Eighth Amendment challenge):

> A facial challenge is really just a claim that the law or policy at issue is unconstitutional
> in all its applications. So classifying a lawsuit as facial or as-applied affects the extent
> to which the invalidity of the challenged law must be demonstrated and the
> corresponding "breadth of the remedy," but it does not speak at all to the substantive
> rule of law necessary to establish a constitutional violation. *Citizens United v. Federal
> Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Surely it
> would be strange for the same words of the Constitution to bear entirely different
> meanings depending only on how broad a remedy the plaintiff chooses to seek. *See
> Gross v. United States*, 771 F.3d 10, 14–15 (CADC 2014) ("'[T]he substantive rule of law
> is the same for both [facial and as-applied] challenges'"); *Brooklyn Legal Servs. Corp. v.
> Legal Servs. Corp.*, 462 F.3d 219, 228 (CA2 2006) (the facial/as-applied distinction
> affects "the extent to which the invalidity of a statute need be demonstrated," not "the
> substantive rule of law to be used"). . . .
>
> Here's yet another problem with [the argument that a different standard governs as-
> applied challenges]: It invites pleading games. The line between facial and as-applied
> challenges can sometimes prove "amorphous," *Elgin v. Department of Treasury*, 567 U.S.
> 1, 15, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012), and "not so well defined," *Citizens United*,
> 558 U.S. at 331, 130 S.Ct. 876. Consider an example. Suppose an inmate claims that
> the State's lethal injection protocol violates the Eighth Amendment when used to
> execute anyone with a very common but not quite universal health condition. Should
> such a claim be regarded as facial or as-applied? In another context, we sidestepped a
> debate over how to categorize a comparable claim—one that neither sought "to strike
> [the challenged law] in all its applications" nor was "limited to plaintiff's particular
> case"—by concluding that "[t]he label is not what matters." *Doe v. Reed*, 561 U.S. 186,
> 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010). To hold now, for the first time, that
> choosing a label changes the meaning of the Constitution would only guarantee a good
> deal of litigation over labels, with lawyers on each side seeking to classify cases to
> maximize their tactical advantage. Unless increasing the delay and cost involved in
> carrying out executions is the point of the exercise, it's hard to see the benefit in placing
> so much weight on what can be an abstruse exercise.

*Bucklew*, 139 S.Ct. at 1127–28.

And, indeed, in very similar circumstances, the *Adams* Court (quoting *Bucklew*) refused to analyze the plaintiff's equal-protection challenge to a sex-segregated-bathroom policy "as applied" to the plaintiff's "particular circumstances" because "an alleged violation of one individual's constitutional rights under the Equal Protection Clause would necessarily constitute a violation of the Equal Protection Clause and the Constitution at large, regardless of the individually-applied remedy." 57 F.4th at 800 n.3. We thus follow the Supreme Court—and the en banc Circuit—in declining to apply a different substantive rule of constitutional law to a plaintiff who's tried to circumscribe her claims to her own individual circumstances.

*     *     *

One more thing: As we've indicated, in the world of equal protection, we must distinguish between permissible and impermissible classifications. In resolving an equal-protection challenge, in other words, the careful judge must decide whether the law's classification is like "most laws[,] [which] differentiate in some fashion between classes of persons," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992), or whether the classification "constitute[s] an arbitrary and invidious discrimination," *Loving v. Virginia*, 388 U.S. 1, 10 (1967). Laws that fall into this second category—*i.e.*, laws that, in a manner of speaking, create a caste system in our society—cannot withstand equal-protection scrutiny.[6] In the words of Professor Akhil Amar:

> Not all laws that distinguish on the basis of birth status are unconstitutional. Some distinctions may be justifiable if genuinely and unavoidably necessary to prevent harm to others. For example, although some persons are born blind, the law may generally prohibit blind persons from flying airplanes; persons born with the HIV virus may be legally prohibited from donating blood; and so on. But judges must carefully scrutinize all such laws to ensure that they do not create an improper caste-like system in which some are legally demeaned and degraded while others are legally honored and exalted merely on the basis of birth status.

---

[6] In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, however, the Supreme Court held that "racial discrimination is invidious in all contexts." 600 U.S. 181, 214 (2023) (cleaned up).

AKHIL REED AMAR, THE CONSTITUTION TODAY 242 (2016).

Having carefully reviewed the text of SB 1028, the statements of the various politicians quoted in the Complaint, and the Plaintiff's other factual allegations, we disagree that the statute comes anywhere close to creating the sort of caste-like system the Constitution forbids—a system in which transgender girls are legally demeaned and degraded *because of* their gender identity. The statute, after all, only applies in one very discrete scenario—where a biological boy (whether transgender or not) wants to play on the girls' sports team of a public school. And, far from singling out transgender girls for special treatment, the law applies equally to the (almost) fifty percent of the population who are born as biological boys—and who *don't* transition. It thus doesn't "legally honor[ ] and exalt[ ] merely on the basis of birth status" boys who do *not* identify as transgender. Most importantly, like laws prohibiting the blind from flying airplanes or the HIV-infected from donating blood, SB 1028 is tailored to an important and well-established governmental interest—the promotion of gender equality through the preservation of athletic opportunities for girls. In this respect, it's not at all like the kinds of laws the Equal Protection Clause unambiguously disallows—laws that, for instance, prohibited black Americans from eating at the same restaurants, drinking from the same water fountains, attending the same schools, and swimming in the same beaches as white Americans. Those laws—untethered from any legitimate governmental interest—degraded blacks (*because of* their race) across broad swathes of American social life. SB 1028 (it goes without saying) does nothing of the sort: It doesn't, in other words, prevent transgender girls from eating at the same restaurants, drinking from the same water fountains, attending the same schools, or swimming in the same beaches as cisgender girls (or cisgender boys). It, in fact, doesn't have any effect on any other social, political, or commercial aspect of a transgender person's life. It simply provides that, consistent with the inherent biological differences between the sexes, biological boys (of whatever gender identity) *cannot* play on girls' sports teams.

22

We acknowledge that the statute creates a difficult (and perhaps unfair) situation for D.N., who identifies as a girl in all respects and who may be prohibited from playing on the teams *of her choice*. But, contra the Plaintiff's claim that the Defendants are trying to "categorical[ly] exclu[de] . . . transgender girls from school sports," Response at 17, SB 1028 gives transgender girls like D.N. the option to play on either boys' or "coed or mixed" teams, *see* § 1006.205(3)(a); *see also B.P.J.*, 649 F. Supp. 3d at 233 ("[D]espite [the plaintiff's] repeated argument to the contrary, transgender girls are not excluded from school sports entirely. They are permitted to try out for boys' teams [or coed teams], regardless of how they express their gender."); *cf. Adams*, 57 F.4th at 797 ("In August 2015, Adams entered ninth grade at Allen D. Nease High School ('Nease')[.] Nease provides female, male, and sex-neutral bathrooms for its 2,450 students. The communal female bathrooms have stalls, and the communal male bathrooms have stalls and undivided urinals. In addition to performing bodily functions in the communal bathrooms, students engage in other activities, like changing their clothes, in those spaces. Single-stall, sex-neutral bathrooms are provided to accommodate any student, including the approximately five transgender students at Nease, who prefer not to use the bathrooms that correspond with their biological sex."). In any event, "few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results." *Lalli v. Lalli*, 439 U.S. 259, 273 (1978). And "[t]o prevail in a facial challenge, . . . it is not enough for a plaintiff to show 'some' overbreadth." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 584 (2002).

We are, in the end, a democracy—made up of three coequal branches. As unelected judges within that democratic framework, our job isn't to decide whether a law is good or bad, smart or silly, fair or unfair. We don't even get to say whether we like the law—whether, in short, *we* would've voted for it if we had been in the legislature. Our job is to apply the law as it's been expressed through the will of a democratically-elected legislature and the signature of a democratically-elected governor—unless (of course) the law violates some more fundamental (call it constitutional) law. "We are not at

liberty," the Supreme Court admonished us many years ago, "to inquire into the motives of the legislature. We can only examine into its power under the Constitution." *Ex Parte McCardle*, 74 U.S. 506, 514 (1868); *see also Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say *what the law is*." (emphasis added)); *Oklahoma v. Castro-Huerta*, 597 U.S. ----, 142 S.Ct. 2486, 2504 (2022) ("[The] [c]ourt's proper role under Article III of the Constitution is to declare what the law is, not what we think the law should be."). Today, we were asked whether a law that separates public-school sports teams by biological sex violates the Equal Protection Clause of the Fourteenth Amendment. We find that it does not.

## II.    Title IX (Count I)

Passed as part of the Education Amendments of 1972, "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The statute was "patterned after Title VI of the Civil Rights Act of 1964," *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979), and provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Pursuant to a congressional grant of authority, the Department of Health, Education, and Welfare (now the Department of Health and Human Services) promulgated regulations implementing Title IX. *See Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264, at *2 (M.D. Fla. Feb. 17, 2023) (Mendoza, J.). "These regulations, which appear in Part 106 of the Code of Federal Regulations, bar sex discrimination in a wide variety of education programs and facilities, including interscholastic athletics." *Williams*, 998 F.2d at 171. In *Cannon*, the Supreme Court held that Title IX creates an implied private right of action, which allows litigants to enforce the law's ban on intentional sex discrimination. 441 U.S. at 690–93.

Count I of the Plaintiff's Complaint alleges that SB 1028 violates Title IX because it "segregates transgender girls based solely on their status as transgender girls or women" and "creat[es] different rules for transgender boys versus transgender girls." Complaint ¶¶ 63–64. Title IX applies, the Plaintiff says, because the Florida "State Board of Education and the Broward County School Board are educational programs and constitute programs receiving federal financial assistance. The Florida High School Athletic Association regulates and enforces policies involving school athletics in the State of Florida and either directly or indirectly receives federal funding because local school boards are members of the Association. All of the named [Defendants] will be required to enforce SB 1028 and to issue regulations and policies enforcing the same." *Id.* ¶¶ 58–60.

In *Adams*, the Eleventh Circuit held that Title IX's reference to "sex" does *not* include "gender identity":

> Title IX explicitly provides a statutory carve-out for "maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. So, if "sex" were ambiguous enough to include "gender identity," as Adams suggests and as the district court ultimately concluded, then this carve-out, as well as the various carveouts under the implementing regulations, would be rendered meaningless. This is because transgender persons—who are members of the female and male sexes by birth—would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status. If sex were ambiguous, it is difficult to fathom why the drafters of Title IX went through the trouble of providing an express carve-out for sex-separated living facilities, as part of the overall statutory scheme. For this reason alone, reading in ambiguity to the term "sex" ignores the overall statutory scheme and purpose of Title IX, along with the vast majority of dictionaries defining "sex" based on biology and reproductive function.

57 F.4th at 813. The Eleventh Circuit also distinguished *Bostock*, where the Supreme Court held that, in the context of Title VII, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1741 (2020). In the Eleventh Circuit's view: "[T]his appeal requires us to interpret the word 'sex' in the context of Title IX and its implementing regulations. We cannot, as the Supreme Court did in *Bostock*, decide only whether discrimination based on transgender status necessarily equates to

discrimination on the basis of sex . . . . This is because Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others." *Adams*, 57 F.4th at 811. Bound by Eleventh Circuit precedent, we similarly hold that Title IX prohibits discrimination on the basis of biological sex—*not* gender identity.

The Plaintiff insists that she isn't "seeking to add provisions into Title IX by requiring schools to consider gender identity as part of the school sports selection process." Response at 19. Instead, she says, "defendants are discriminating against her based on sex by treating her differently than cisgender girls," *ibid.*—and differently from transgender boys, who are permitted to play on *both* girls' *and* boys' teams, *see* Complaint ¶ 64. She also contends that the "majority opinion in *Adams* did not address the issue here, which is whether a statute that relies on an original birth certificate issued at the time of birth can be the sole basis on which to assign sex for purposes of sports teams, and whether exclusion of someone whom the State has legally recognized and acknowledged as female would violate Title IX." Response at 19–20.

The latter claim is easy to dispense with. *Adams* could not have been clearer that Title IX defines "sex" "based on biology and reproductive function." *Adams*, 57 F.4th at 812; *see also id.* at 814 ("There simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX."). And, "while [the] litigation was pending" in *Adams*, the plaintiff there "obtained an amended birth certificate with a male designation," which didn't impact the court's analysis at all. *Id.* at 798. Under *Adams*, then, Title IX doesn't preclude the state from using a person's original birth certificate—issued at (or near) birth—to determine that person's biological sex. For similar reasons, *Adams* also forecloses the Plaintiff's first argument—that the Defendants are "discriminating against her based on sex by treating her differently than cisgender girls." Response at 19. As *Adams* made pellucid, the Plaintiff's sex for purposes of Title IX—defined as biological sex—

is male, and Title IX does not "establish dual protection . . . based on *both* sex and gender identity when gender identity does not match sex." *Adams*, 57 F.4th at 814.

Lastly, SB 1028 doesn't violate Title IX by treating transgender girls differently from transgender boys. Title IX's implementing regulations include a carve-out for sex-separated sports teams. *See* 34 C.F.R. § 106.41(b) (providing that "a recipient [of federal funds] may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport"). At first blush, then, our analysis appears to flow naturally from *Adams*, where the Eleventh Circuit cited Title IX's "sex-based carve-outs" for its view that Title IX prohibits discrimination on the basis of biological sex—not gender identity. *Adams*, 57 F.4th at 813–14. Unlike the bathroom policy in *Adams*,[7] however, SB 1028 allows "teams or sports designated for males, men, or boys" to be "open to students of the female sex," while "teams or sports designated for females, women, or girls may not be open to students of the male sex." § 1006.205(3)(a)(1)(b–c). Because of this one-sided proscription, some of *Adams*'s logic doesn't apply here:

> Think of a biological female student, who does not identify as transgender and who sued her school under Title IX to gain access to the male bathroom. Regardless of whether preventing the female student from using the male bathroom would constitute separation on the basis of sex—and it plainly would—the carve-out for bathrooms under Title IX would provide the school a safe harbor. In other words, because Title IX explicitly provides for separate bathrooms on the basis of sex, the student's claim would fail. So, too, must Adams's claim, because the carve-out for bathrooms provides the School Board a safe harbor for the same reasons.

*Adams*, 57 F.4th at 814. Because the bathroom policy in *Adams* treated transgender boys and transgender girls the same, the Eleventh Circuit didn't have to address our Plaintiff's claim that SB 1028 "violates Title IX by creating different rules for transgender boys versus transgender girls."

---

[7] "The School Board, like many others, maintains a longstanding, unwritten bathroom policy, under which male students must use the male bathroom and female students must use the female bathroom." *Adams*, 57 F.4th at 797.

Complaint ¶ 64. And our Plaintiff is right that Title IX "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

Still, we don't think the Plaintiff has done enough on her claim that SB 1028 treats transgender girls differently. The Plaintiff, after all, chose not to make the only viable argument still available to her—that, as a biological male, she's being treated differently (and worse) than biological females. She, instead, and understandably, has focused her arguments on her position that she's been treated differently because she's a *transgender* girl. *See* Complaint ¶ 63 ("Neither Title IX nor any federal regulations permit a state or locality to discriminate based solely on a person's gender assigned to them at birth. Because this law contains a definition of sex that directly contradicts federal law, and segregates transgender girls based solely on their status as transgender girls or women, it violates Title IX."); Response at 20 ("Plaintiff's position is that she belongs on the girls' team because she is a girl, and the State of Florida has already recognized her as such by issuing an amended birth certificate that identifies her as a girl."). Unfortunately, this argument—that the Plaintiff is a *girl* and that treating her differently than a "cisgender" girl or a transgender boy violates Title IX—is plainly foreclosed by the Eleventh Circuit's holding in *Adams. See Adams*, 57 F.4th at 814 ("[T]ransgender persons fall into the preexisting classifications of sex—i.e., male and female. Thus, they are inherently protected under Title IX against discrimination on the basis of sex. But reading 'sex' to include 'gender identity' . . . would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity. Such a reading would thereby establish dual protection under Title IX based on *both* sex and gender identity when gender identity does not match sex. That conclusion cannot comport with the plain meaning of 'sex' at the time of Title IX's enactment and the purpose of Title IX and its implementing regulations, as derived from their text.").

We therefore **GRANT** *without prejudice* the Defendants' Motion to Dismiss Count I.

### III.    Due Process (Count III)

In Count III, the Plaintiff alleges that SB 1028 violates her "right of privacy" under the Due Process Clause of the Fourteenth Amendment. In support of this theory, the Plaintiff argues that the "Defendants' enforcement of the law would require Plaintiff to disclose sensitive medical information that would otherwise not be available, including to third parties, parents and other students who might file claims under this law." Complaint ¶ 78. And (the Plaintiff adds) the statute "would require such disclosure even if her legal documents, and in particular her birth certificate, identified her gender as female since she would have to produce information as to her assigned gender at the time of birth." *Ibid*. We're not entirely sure what D.N. means here. She seems to be envisioning a bizarre hypothetical scenario in which a different plaintiff sues her school (or the school board) under SB 1028's private right of action—and then requests (presumably in a third-party subpoena) "sensitive medical information" from D.N. (who would be a non-party to that suit).

The Defendants move to dismiss Count III on two grounds. *First*, they say that "D.N. is without standing to pursue Count III" because the "scenario that D.N. describes is too remote and speculative to be adjudicated now . . . . D.N.'s due-process claim," they continue, "rests on hypothetical future events that might not occur as anticipated—or at all—[so] D.N. has no standing to bring Count III." Motion to Dismiss at 19–20. *Second*, they attack Count III on the merits: "D.N.," they contend, "purports to state an invasion-of-privacy claim based on the potential disclosure of her sex in future litigation." *Id*. at 21. But, they maintain, "an unlawful invasion of privacy does not occur simply because medical information is disclosed for a limited purpose, even when such disclosure is compelled by the State." *Ibid*. We agree with the Defendants on both points. As we'll explain, the Plaintiff doesn't have standing to assert a pre-enforcement challenge on the basis of speculative threats

to her privacy. And, since the Plaintiff fails to oppose the Defendants' merits position, she's forfeited any response she might've had.[8]

Starting with standing, the Defendants argue that Count III "fails to allege actual or imminent injury." *Id.* at 19. We agree. To establish her standing under Article III of the U.S. Constitution, a plaintiff must have suffered an "injury in fact" that's "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). "An injury is imminent if it is likely to occur, and likely to do so immediately." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1365 (11th Cir. 2003); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565 n.2 (1992) ("Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (cleaned up)).

In the pre-enforcement context, "we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129 (2007). "Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent. Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). "Speculative or imaginary threats will not confer standing." *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000).

D.N. hasn't satisfied the standing test's injury-in-fact requirement because the injury she's imagined lies at the very end of a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l*

---

[8] As we'll see, her due-process claim would've failed even if she had opposed the Defendants' merits contentions.

*USA*, 568 U.S. 398, 410 (2013). Her theory of injury is that (1) some unknown person *might* sue her

high school at some unknown future time, at which point (2) that unknown plaintiff (or the school-

defendant) *might* subpoena her and (3) specifically demand sensitive medical information, which (4)

she *might* be forced to turn over. In her words:

> SB 1028 grants "[a]ny student who is deprived of an athletic opportunity or suffers
> any direct or indirect harm as a result of a violation of [SB 1028]" with the right to
> bring "a private cause of action for injunctive relief, damages, and any other relief
> available under law against the school or public secondary institution." FLA. STAT. §
> 1006.205(4)(a). SB 1028 then goes even further and grants "[a]ny student who is
> subject to retaliation or other adverse action . . . as a result of reporting a violation of
> [SB 1028]" a private cause of action. *See id.* § 1006.205(4)(b). SB 1028's broad language
> therefore invites a "universe of potential complainants" who, upon learning (or
> suspecting) that Plaintiff is a transgender girl, could easily bring a claim and thereby
> trigger onerous and invasive discovery that undermines Plaintiff's constitutional due
> process right to privacy.
>
> Defendants again argue that Plaintiff should sit idly by and wait until an action is filed
> by "any student" who objects to her playing high school girls' sports and then further
> wait until a discovery request seeking her sensitive medical information is filed . . . .
> However, Defendants have not even been willing to assure Plaintiff that, if asked by
> another student if Plaintiff were a transgender student playing on the girls' team, they
> would refrain from revealing her identity.

Response at 22–23.

This potential injury—if we can call it that—is so speculative (and lies so far down a

hypothetical chain of imaginary future events) that it cannot support D.N.'s Article III standing here.

*See Clapper*, U.S. 398 at 410 ("[R]espondents' theory of standing, which relies on a highly attenuated

chain of possibilities, does not satisfy the requirement that threatened injury must be certainly

impending."); *City of South Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023) ("This highly attenuated

chain of possibilities which rests on speculation about the decisions of independent actors . . . does

not satisfy the requirement that threatened injury must be certainly impending[.]" (cleaned up)); *John*

*& Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023) ("The Supreme Court

has repeatedly held that harms lying at the end of a highly attenuated chain of possibilities are too

speculative to support standing[.] The risk of a future injury must be substantial, not just conceivable."

(cleaned up)); *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 833 (6th Cir. 2001) (finding four-step chain of events too attenuated to establish an injury in fact).

Even if a third party were to file a future lawsuit against D.N.'s school—and there's no reason to believe that anyone will[9]—and even if the Plaintiff is, for whatever reason, subpoenaed in that future case, D.N. would *still* have suffered *no concrete injury*. That's because she would have every right (if that subpoena comes) to negotiate a protective order with the suing plaintiff—under the terms of which her sensitive medical information would be guarded against public exposure. Barring that, she would have every right to move to quash the subpoena—advancing, in that motion, all the due-process arguments she's made here. The Defendants are thus right to say that, "[i]f a discovery request is served, then D.N. would have every opportunity to raise her due-process objections *then*, in *that* court, or to seek appropriate confidentiality protections if the anonymity afforded by Federal Rule of Civil Procedure 5.2(a) or Florida Rule of General Practice and Judicial Administration 2.425(a)(1) is insufficient." Motion to Dismiss at 19. Since D.N. has failed to plausibly plead a concrete—that is, non-speculative—violation of her due-process rights, we **DISMISS** Count III for lack of standing.[10]

Standing aside, the Defendants also say that Count III fails to state a claim on the merits because "D.N. cannot plausibly allege that the[ ] defendants have violated or will violate her due-process right of privacy." *Id.* at 22. In the Defendants' view, "an unlawful invasion of privacy does not occur simply because medical information is disclosed for a limited purpose, even when such disclosure is compelled by the State." *Id.* at 21. For reasons we don't understand, the Plaintiff *never* contests this position in her Response.[11] She's thus forfeited any argument she might have raised in

---

[9] NB: To our knowledge, no such lawsuit has been filed thus far.

[10] Because the Plaintiff has failed to plausibly allege actual or imminent injury, we needn't delve into the other two elements of the standing test (traceability and redressability) here.

[11] After responding to the Defendants' standing arguments, the Plaintiff says only this: "[D.N.] has standing to assert a due process claim and has adequately alleged such a claim in her Complaint." Response at 25. She thus never addresses the Defendants' merits position.

opposition to the Defendants' merits contention. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."). In sum, "we generally don't consider arguments the parties elected, for whatever reason, not to raise in federal court[.]" *Renford v. Dixon*, 2022 WL 2046849, at *8 n.6 (S.D. Fla. June 7, 2022) (Altman, J.).

But here's the thing: Even if the Plaintiff *hadn't* forfeited her merits arguments, her due-process claim would still fail. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. Substantive due process—unlike its *procedural* cousin—is a legal concept "untethered from the text of the Constitution," *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020), and protects only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty," *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997) (cleaned up); *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) ("[The Due Process Clause] has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." (quoting *Glucksberg*, 521 U.S. at 721)).

The Due Process Clause thus encompasses only a limited set of "fundamental" rights. This limited set includes "the rights to marry, *Loving v. Virginia*, 388 U.S. 1 (1967); to have children, *Skinner*

*v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, (1965); [and] to use contraception, *ibid.*; *Eisenstadt v. Baird*, 405 U.S. 438 (1972)." *Glucksberg*, 521 U.S. at 720 (cleaned up). In addition to these, the Supreme Court has recognized two types of fundamental privacy rights: the right to shield information from disclosure and the right to make and implement important personal decisions without governmental interference. *See Dobbs*, 142 S. Ct. at 2267. But the Court has expressed its "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).

Still, the Supreme Court has been clear that "there is no 'right of privacy' found in any specific guarantee of the Constitution[.]" *Paul v. Davis*, 424 U.S. 693, 712 (1976). Rather, the Supreme Court "has recognized that zones of privacy may be created by more specific constitutional guarantees and thereby impose limits upon government power." *Id.* at 712–13 (cleaned up). In other words, the Constitution includes no *general* right of privacy. *See Dobbs*, 142 S. Ct. at 2257 ("The [*Roe*][12] Court did not claim that this broadly framed right [of privacy] is absolute, and no such claim would be plausible. While individuals are certainly free to think and to say what they wish about 'existence,' 'meaning,' the 'universe,' and 'the mystery of human life,' they are not always free to act in accordance with those thoughts. License to act on the basis of such beliefs may correspond to one of the many understandings of 'liberty,' but it is certainly not 'ordered liberty.'").

As relevant here, then, the Supreme Court *has* recognized a right of privacy that includes a person's "interest in the nondisclosure of private information." *Whalen v. Roe*, 429 U.S. 589, 591 (1977).

---

[12] *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs*.

Although the Complaint is not at all clear on this point, Count III appears to advance a claim under this right:

> The right to liberty under the Due Process Clause provides individuals with a right to be free from unnecessary government intrusion into their private affairs and from unnecessary interference with their private conduct. Defendants' enforcement of the law would require Plaintiff to disclose sensitive medical information that would otherwise not be available, including to third parties, parents and other students who might file claims under this law. It would require such disclosure even if her legal documents, and in particular her birth certificate, identified her gender as female since she would have to produce information as to her assigned gender at the time of birth. Defendants cannot justify this discriminatory action because it is not related to any compelling or important governmental interest.

Complaint ¶¶ 78–79.

The Plaintiffs' due-process claim fails on the merits. As a threshold matter, the Plaintiff says that her due-process rights would be implicated by the disclosure of her "sensitive medical information," but she doesn't tell us what that information might look like. We're thus left to guess at what she has in mind—and that's just not our job. *See Ballard Hosp., LLC v. DGD Transp., LLC*, 2019 WL 12372063, at *2 (S.D. Fla. Mar. 28, 2019) (Jordan, J.) ("'[I]t is not the court's obligation to scour the record' to support a party's motion." (quoting *Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1329 (S.D. Fla. 2012) (Goodman, Mag. J.)). In any event, her reference to "sensitive medical information" is a red herring because SB 1028 provides that "a statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex at birth if the statement was filed at or near the time of the student's birth." § 1006.205(3)(d). In other words, the only document the Plaintiff *might* be compelled to "disclose" is her original birth certificate—*not* any "sensitive medical information that would otherwise not be available." Complaint ¶ 78.

And, as to that birth certificate, the Plaintiff has failed to state a viable claim under the Due Process Clause. If the Plaintiff is arguing that her right of privacy would be violated if she were forced to "disclose" her original birth certificate to officials at her public school, then she's plainly failed to state a claim because her own Complaint recognizes that the State of Florida *already* has access to its

residents' birth certificates, which are collected and maintained by the Florida Department of Health. *See id.* ¶ 44 ("*See* Fla. Stat. Ann. § 382.016 (directing the [Florida] Dept. of Health to 'amend or replace the original [birth] certificate as necessary' when a proper request is made 'as specified by rule'); *see also* Fla. Stat. Ann. § 382.002(3) (providing that a 'certified' birth certificate is one 'which, when issued by the [Florida] State Registrar, has the full force and effect of the original vital record').").

If, on the other hand, the Plaintiff is suggesting that her right of privacy would be violated by having to disclose her original birth certificate in potential lawsuits brought by other students against her high school, she's likewise failed to state a *plausible* claim. As we've explained, no such lawsuit has been filed—and the hypothetical situation D.N. has envisioned seems implausible on its face. *Cf. Tucker v. Bradshaw*, 2012 WL 13018687, at *1 (S.D. Fla. Jan. 19, 2012) (Ryskamp, J.) ("While the [c]ourt takes the plaintiff's allegations as true on a motion to dismiss, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal . . . . Under *Iqbal*, district court judges should dismiss lawsuits that seem 'implausible' to them."); *Krush Commc'ns, LLC v. Network Enhanced Telecom, LLP*, 2014 WL 12625758, at *3 (M.D. Fla. Apr. 29, 2014) (Moody, J.) ("[A]t the motion to dismiss stage, a claim that is not plausible on its face cannot state a claim upon which relief may be granted."). Drawing on our "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, Count III fails to state a claim upon which relief may be granted.

\*       \*       \*

The Plaintiff has asked for leave to amend her Equal Protection claim to redress any insufficiencies in her allegations of animus. *See* Response at 18 n.13 ("While Plaintiff believes she has alleged sufficient facts to support a finding of animus, to the extent the Court concludes that there are insufficient allegations of animus in Plaintiff's Complaint to support this argument, Plaintiff respectfully requests leave to amend her Complaint. Leave to amend should be 'given freely when justice so requires.' Fed. R. Civ. Pro. 15(a)."). Our Circuit has laid out eight factors for courts to

consider in determining whether a law was motivated by tacit discriminatory intent: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators[;] (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) (citing *Arlington Heights*, 429 U.S. at 267–68). According to the Eleventh Circuit, these factors "require a fact intensive examination of the record." *Id.* at 1322 n.33. We'll therefore give the Plaintiff *one more chance* to amend Count II of her Complaint (if she can) in a way that raises a "plausible inference that an invidious discriminatory purpose was a motivating factor" in the passage of SB 1028. *Dep't of Homeland Sec.*, 140 S. Ct. at 1915 (cleaned up).

We'll also give the Plaintiff leave to amend Count I. As we've said, *Adams* forecloses the Plaintiff's claim that Title IX precludes the state from using a person's original birth certificate—issued at (or near) birth—to determine that person's biological sex. For similar reasons, as we've highlighted, *Adams* precludes the Plaintiff's argument that the Defendants are "discriminating against her based on sex by treating her differently than cisgender girls." Response at 19. As *Adams* made clear, the Plaintiff's sex for purposes of Title IX—defined as biological sex—is male, and Title IX does not "establish dual protection . . . based on *both* sex and gender identity when gender identity does not match sex." *Adams*, 57 F.4th at 814. But we'll allow D.N. to amend Count I to advance the only potential claim *Adams* left unaddressed—which is that Title IX prohibits the State from treating D.N., as a biological male, differently (and worse) than biological females.[13]

---

[13] In saying this, we're in no way trying to disparage the Plaintiff. We recognize that D.N. identifies as female, and we've done our best to honor that identity throughout this Order. At the same time, we're duty-bound to follow the pronouncements of our Circuit, and our Circuit has, sitting en banc, unambiguously held that a plaintiff's Title IX claim must be determined only on the basis of biological sex—without regard to gender identity. *See Adams*, 57 F.4th at 813, 817 ("[R]eading in ambiguity to the term 'sex' ignores the overall statutory scheme and purpose of Title IX, along with the vast majority

We won't, however, give D.N. leave to amend Count III. For one thing, she hasn't asked for leave to amend that claim—either in her Response or in a separate motion for leave to amend—and the Eleventh Circuit has been clear that a "district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002); *see also Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend."). For another, any such amendment "would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). As we've shown, D.N. lacks standing to assert the claim she's brought in Count III—and she never even bothered to oppose the Defendants' arguments on the merits. We needn't grant leave to amend in these circumstances. *See Coast v. Bank of N.Y. Mellon Tr. (N.Y. BMT), N.A.*, 2013 WL 5945085, at *7 (N.D. Ga. Nov. 6, 2013) (granting motion to dismiss *with* prejudice because the plaintiffs' claims were "implausible" and any "amendment would be futile"); *Lively v. Ala. State Bar*, 2013 WL 1117742, at *3 (M.D. Ala. Mar. 18, 2013) ("Because Mr. Lively lacks standing to pursue his proposed amended complaint, his motion to amend is due to be denied for futility.").

## CONCLUSION

After careful review, therefore, we hereby **ORDER and ADJUDGE** that the Defendants' Motion to Dismiss [ECF No. 108] is **GRANTED** as follows:

---

of dictionaries defining 'sex' based on biology and reproductive function . . . . Whether Title IX should be amended to equate 'gender identity' and 'transgender status' with 'sex' should be left to Congress—not the courts."). As a result, if D.N. hopes to advance a viable Title IX claim, she'll have to fit that claim into *Adams*'s clear holding by showing that she (as a biological boy) was treated differently than biological girls. She is, of course, by no means required to advance any such claim.

1. Count I of the Complaint is **DISMISSED** with leave to amend to advance the only potential claim *Adams* left unaddressed—*viz.*, whether Title IX prohibits the state from treating D.N., as a biological male, differently than biological females.

2. Count II of the Complaint is **DISMISSED** with leave to amend on the issue of discriminatory animus.

3. Count III of the Complaint is **DISMISSED** with prejudice and without leave to amend.

4. If the Plaintiff wishes to file an amended complaint, she must do so by November 21, 2023.

**DONE AND ORDERED** in the Southern District of Florida on November 6, 2023.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record