## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Fort Lauderdale Division

| | |
|---|---|
| D.N., by her next friends, JESSICA N., mother, and GARY N., father, | **Case No. 21-61344-CIV-ALTMAN/HUNT** |
| Plaintiff, | Hon. Roy K. Altman |
| v. | First Amended and Supplemental Complaint for Declaratory and Injunctive Relief |
| FLORIDA STATE BOARD OF EDUCATION; COMMISSIONER MANNY DIAZ JR., in his official capacity as Commissioner of Education; FLORIDA HIGH SCHOOL ATHLETIC ASSOCIATION; BROWARD COUNTY SCHOOL BOARD; and SUPERINTENDENT PETER LICATA, in his official capacity as Superintendent of Broward County Public Schools, | |
| Defendants. | |

## INTRODUCTION

1.      D.N. is a sixteen-year-old girl and a sophomore in high school in Broward County.  She has enjoyed playing team sports for most of her childhood, and decided to focus on volleyball in high school.  She has been on the girls' volleyball team at her high school and wants to continue to play on the girls' team.

2.      D.N. has invested significant time and effort to hone her volleyball skills, and being a member of her school's volleyball team and its community matters deeply to her.  The team is a source of pride, confidence and friendship for her.  Her family, who continue to use only an initial for their last name to protect their child's privacy, has invested significant time and financial resources to provide D.N. with the opportunity to enjoy and benefit from the team sports she loves.

1

3.      SB 1028, the challenged Florida law in this complaint, has barred D.N. from participating in the team sports she loves and that have been a pivotal part of her physical, mental, and social development as a child.  SB 1028 bars D.N. from participating in girls' team sports with her peers at school simply because she is a girl who is transgender, depriving her of the joy and positive social and academic development afforded to her peers.  SB 1028 unlawfully stigmatizes D.N. and other transgender girls because they are transgender and forcibly separates them from their peers and teammates.

4.      SB 1028, ironically titled the "Fairness in Women's Sports Act," is one of many state laws passed in recent years, both in Florida and across the country, that single out and target transgender people.  This pattern of discriminatory laws is the result of a concerted effort by activists and legislators who do not believe gender identity is real and have coordinated passing restrictions on transgender people, and transgender girls in particular based on their animus for transgender people.  *See* Casey Parks, , *Her story fueled anti-trans bills. Now, she's fighting them*, The Washington Post (Dec. 27, 2023),  https://www.washingtonpost.com/dc-md-va/2023/12/27/ohio-transgender-carey-callahan-detransitioner/.  SB 1028 was one of the first embodiments of this effort in Florida.  These efforts have accelerated dramatically since that time.

5.      By excluding transgender girls from playing on girls' sports teams, regardless of physical ability and development, and forcing them to play on a boys' team if they want to participate in school sports at all, SB 1028 evidences the discriminatory animus against transgender girls which motivated its enactment.  The same animus which has motivated subsequent bills in Florida as part of this national strategy to deny transgender people recognition under the law.

**PARTIES**

**PLAINTIFF**

6.      D.N. is a sixteen-year-old who lives in Broward County, Florida.  She is a high

school student and, for the past two seasons, has been a member of the girls' volleyball team at her school.  She practiced and played in games and tournaments four nights each week from August through October.  She also played with a club team during the offseason and spent one summer playing with the team at her community recreation center.   Her life revolved around volleyball, in addition to her schoolwork and other extracurricular activities, and team sports were integral to her scholastic pursuits.  She brings this suit through her next friends, her mother Jessica N. and her father Gary N.

**DEFENDANTS**

7.     The Florida State Board of Education sets statewide educational policy in Florida.  Florida Statute Section 1001.03(8) gives the State Board of Education the authority to enforce compliance with the law as it relates to all school districts and public postsecondary institutions, except the State University System.  The Florida State Constitution, Article IX, Section 2, gives the Board the responsibility of supervision of the system of free public education, and it selects the Commissioner of Education.  The Florida State Board of Education is directly involved in the enforcement of SB 1028 at local schools.

8.     Commissioner Manny Diaz Jr. is the chief educational officer of the State and operates all functions necessary to support the Florida Board of Education and is being sued in his official capacity.

9.     Defendant Florida High School Athletic Association ("FHSAA") is a nonprofit organization that sets regulations and policies for high school athletics in the State of Florida.  It enforces eligibility regulations adopted by its member schools or enacted into law by the Florida legislature.  The Broward County Schools, in the district where Plaintiff D.N. attends school, are members of the FHSAA.  Florida Statute Section 1006.20 provides the FHSAA with the authority to adopt bylaws relating to student participation in interscholastic athletic teams.  The FHSAA is directly involved in the enforcement of SB 1028 at member schools.

10.    Defendant Broward County School Board has authority under Florida Statute

Section 1006.195 to establish student eligibility for participation in extracurricular activities and set student disciplinary policies.  It establishes policies and practices for treatment of transgender students in general in the school district and is required to implement any regulations set by the State Board of Education under SB 1028.  It is also responsible for enforcement of SB 1028 at its schools.

11.     Superintendent Peter Licata is the Superintendent of the Broward County School Board and is being sued in his official capacity.

## JURISDICTION AND VENUE

12.     This action arises under the United States Constitution, and 42 U.S.C. § 1983.

13.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States, and because Plaintiff brings this action to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because some of the Defendants reside in this jurisdiction and all reside in the State of Florida and because a substantial part of the events giving rise to Plaintiff's claim occurred in this District.

15.     This Court can enter a declaratory judgement and provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

**OVERVIEW OF GENDER IDENTITY**

16.     Everyone has a gender identity.  Although the detailed mechanisms are unknown, there is medical consensus that there is a biological component underlying gender identity.

17.     A person's gender identity is a fundamental and enduring component of their identity that reflects a deeply rooted sense of self.  It cannot be changed.

18.     At birth, an infant is usually assigned a binary sex designation based on a visual assessment of their external genitalia at that time.  Most people have a gender identity which aligns with their assigned birth sex.

19.     A person whose gender identity does not align with their sex designation at birth is transgender.

20.     Gender dysphoria, a diagnosis recognized in the DSM-5, is defined as clinically significant psychological distress that results from an incongruence between the birth sex and the person's gender identity.  Gender dysphoria may begin in childhood, though for some people it does not manifest itself until puberty or adulthood.

21.     A social transition involves social, cosmetic, and legal changes, without regard to medical interventions.  An individual who socially transitions may ask others to refer to them by a name and pronouns that align with their gender identity, and some may legally change their name.  An individual who does not identify with the gender assigned to them at birth may socially transition so that their name and appearance match their gender identity.  This promotes

healthy living and allows them to fit in with their peers, minimizing experiences with depression, isolation, or stigma.

22.     As endogenous puberty approaches for transgender youth, they may receive medically necessary puberty-delaying treatment.  For a transgender girl, she will not experience the developmental impacts of testosterone that would occur without this intervention.  As a girl who is transgender approaches mid-adolescence, she may require estrogen treatment so that she develops secondary sex characteristics like other girls.

**D.N.'s GENDER IDENTITY DEVELOPMENT**

23.     From a very young age, D.N. identified and lived as a girl.  When she was three years old, D.N. exhibited behavior that is traditionally associated with being a girl and would insist on wearing clothes and colors (pink) that girls wore.  She saw herself as a girl and conveyed that to her parents in clear terms.  Around five or six years of age, D.N.'s parents realized that based on her behavior and statements, their daughter was transgender.  D.N. took on a different name, which she has used since second grade.

24.     At age seven, D.N. was diagnosed with gender dysphoria.  She also joined a girls' soccer team at that time.  Her family fully supports her in her gender identity and cares deeply about their daughter.

25.     When D.N. was 11 years old, she began taking hormone blockers at the recommendation of her endocrinologist to stop her body's production of testosterone and prevent the onset of endogenous male puberty.

26.     D.N.'s pronouns are she, her, and hers, and that is how friends, family, and people she encounters in her daily life refer to her.  Her parents have legally changed her gender marker to female on her birth records and obtained a legal name change to a name that reflects her

female gender identity.  All of D.N.'s academic records in her school district reflect her female gender identity.



**SCHOOL ATHLETIC ACTIVITIES**

27.    Sports have played an integral role in D.N.'s social and academic development. She now plays volleyball at her high school.  She has also previously played soccer, basketball and softball both in school and during the summer.  Sports provide D.N. with a sense of belonging, peer support, and life success, and are an essential part of her wellbeing and school experience.

28.    D.N.'s family has spent many hours taking her to sports practices, matches, and traveling games.  Her sports activities, and the travel involved, have consumed a significant part

of the family's time, but they do this because it means so much to their daughter.  D.N.'s friends

are her fellow teammates, and she is nurtured and supported by being part of these teams.

29.     Team sports provide D.N. and other young people with opportunities to learn

important life skills such as cooperation, leadership, and how to deal with adversity and success.

Sports improve self-esteem and decrease the isolation that adolescents often feel.  They help

D.N. plan and be organized.  They also allow her to meet people across the State of Florida.

Sports expand her horizons.  It is widely accepted by school administrators, psychologists and

other professionals who work with young people that participation in sports reduces the use of

illegal substances and increases graduation rates.  Sports are a vital part of the educational

experience.

30.     D.N. dreamed of being on a high school sports team—a dream she finally fulfilled

by playing on one of her high school's girls' volleyball teams.  She cannot imagine life without

these experiences and feels it would be cruel to take this opportunity away from her.  D.N. has

lived as a girl for over half her young life now—this is who she is.

31.     D.N. has blossomed socially and academically in high school because of her

participation on the volleyball team.  She has consistently made the academic honor roll and she

was selected by her peers as the Freshman and Sophomore class president and Freshman

Homecoming Princess.  She is also a member of the student council.

32.     D.N.'s identity and development are that of a girl and she is taking estrogen.  She

never underwent endogenous male puberty nor developed any of the muscular or cardiovascular

traits of a teenage boy.  She has no innate competitive advantage over other girls merely because

of the sex that was assigned to her at birth.  From an athletic perspective, she is similarly situated

to her female teammates who are not transgender.  The National Collegiate Athletic Association

("NCAA"), World Athletics, and the International Olympic Committee (the "Olympics") all

allow women who are transgender to play in women's athletics after their levels of testosterone

have been suppressed for a period of time or after the levels fall below a particular threshold. D.N.'s testosterone levels have been suppressed for several years.

**BROWARD COUNTY SCHOOL POLICY**

33.     Prior to SB 1028, the Broward County Public Schools issued an LGBTQ Critical Support Guide and a specific non-discrimination policy regarding gender identity.  These policies sought to guarantee equal treatment and opportunity for transgender students at school. The non-discrimination policy states that the School Board is "committed to the provision of equal access in all student . . . activities" and established the policy to "provide an environment free from discrimination and harassment based upon . . . gender identity [and] gender expression[.]"  Sch. Bd. Of Broward Cnty., Fla., § 4001.1, NONDISCRIMINATION POLICY STATEMENT (2017).

34.     These policies cannot be reconciled with SB 1028.  Indeed, since SB 1028 was enacted, the Broward County Public Schools have been forced to backtrack and violate their own non-discrimination policy by banning D.N. from playing girls' sports at school.  The LGBTQ Critical Support Guide has been rescinded.

35.     SB 1028 has eviscerated the positive, supportive aspects of D.N.'s educational environment and has resulted in significant distress for her and her family.  The plan and goals D.N. had for future sports participation will be destroyed if SB 1028 remains in place.  This will apply regardless of the sport, regardless of the coach's wishes, and regardless of how much time she has already spent on girls' sports teams before this unnecessarily restrictive and discriminatory law was enacted.

**RECENT HISTORICAL BACKGROUND**

36.     In 2020, the U.S. Supreme Court held in *Bostock v. Clayton County* that discrimination on the basis of transgender status is discrimination on the basis of sex.  This

ruling set off alarm bells among a growing network of activists and legislators who do not believe gender identity is real and had been working for several years to remove transgender people from public life.

37.     Transgender people make up an estimated 0.6% of the U.S. population, a figure which has remained steady over time.  J. HERMAN, A. FLORES, & K. O'NEILL, HOW MANY ADULTS AND YOUTH IDENTIFY AS TRANSGENDER IN THE UNITED STATES (2022), https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/ (last visited Jan. 11, 2024).  Transgender people are a small group lacking political power.  The growing network of anti-trans activists and legislators realized that, despite *Bostock*, there was ample opportunity to shape a narrative that would motivate their political base around targeting transgender people through the passage of laws aimed at restricting their rights, activities, and support systems.

38.     This network began its work targeting state legislatures prior to the *Bostock* decision .  In 2016, North Carolina passed the nation's first bill banning transgender people from using bathrooms that aligned with their gender identity.  In 2018, bills were introduced in New Hampshire banning insurance coverage for medically necessary gender-affirming health care.  In 2019, Georgia introduced one of the first bills to ban transgender youth from participating in sports teams that aligned with their gender identity.  In March 2020, Idaho became the first state to pass a law restricting transgender student athletes' sports participation.

39.     The proliferation of bills banning transgender people from living their lives in accordance with their gender identity only accelerated after *Bostock*.  This occurred alongside attempts to publicly censor other aspects of LGBTQ culture seen as gender nonconforming, such as a variety of bans involving public drag performances.

40.     Like elsewhere in the country, anti-trans activists and legislators in Florida began targeting transgender people with restrictive new laws.  This was part of a concerted political strategy to whip up hostility against a small, vulnerable group based upon a narrative of

misinformation and manufactured urgency.  *See* Casey Parks, , *Her story fueled anti-trans bills. Now, she's fighting them*, The Washington Post (Dec. 27, 2023), https://www.washingtonpost.com/dc-md-va/2023/12/27/ohio-transgender-carey-callahan-detransitioner/.

41.     Sponsors and supporters of SB 1028 were part of these networks and efforts.  For example, by at least the 2020 legislative session, Rep. Anthony Sabatini actively sought assistance lining up legislative witnesses for anti-trans bills from an email distribution group which worked to attempt to pass anti-trans laws across the U.S., including Florida.  Rep. Sabatini would later be a co-sponsor one of SB 1028's predecessor bills.

42.     These witness lists were reused in multiple states by this anti-trans network. These networks repeat and amplify discriminatory tropes about transgender persons and disinformation and misinformation around gender transition medical care, that gender identity does not exist, and revels in purposefully misgendering transgender people.

43.     In 2021, Florida enacted SB 1028, the law challenged in this case.  It bans transgender girls and women from participating in school sports on teams which align with their gender identity.  This is without regard to their physical ability, hormone levels, or whether they ever experienced endogenous male puberty.  This was just the opening salvo in a flood of laws targeting transgender people and girls in Florida pushed by a concerted group of activists and legislators.

44.     SB 1028 is part of a pattern of discriminatory laws targeting transgender people, especially girls.  These laws are pushed and enacted by networks of anti-trans activists and legislators.  While SB 1028 was one of the first such bills in Florida, its success has emboldened anti-trans activists to introduce more and more such bills in Florida.

45.     Continuing the pattern of discriminatory laws targeting transgender people and girls, in 2022, Florida enacted HB 1557, known as the "Don't Say LGBTQ+" bill.  This law prevents teachers and school employees from providing any instruction about sexual orientation or gender identity and raises serious questions about whether a teacher can even respond to direct questions from students about these topics.  In 2022, Florida also enacted HB 7, which would allow employees to file discrimination claims against their employer if the employer engages in trainings or discussions about LGBTQ issues or discrimination.

46.     This discriminatory pattern targeting transgender people accelerated in 2023. That year, Florida enacted six new anti-transgender laws: HB 1069 expanded HB 1557 to ban any instruction on sexual orientation or gender identity from Pre-K through eighth grade; SB 254 bans gender transition care for transgender minors and created access barriers for transgender adults; HB 1521 bans transgender people from using the bathroom corresponding to their gender identity; SB 266 bans state funding for college programs seen as promoting LGBTQ identity; SB 1580 allows healthcare providers to refuse to provide services to LGBTQ individuals if they claim it violated their religious, moral or ethical beliefs; and SB 170 restricts the ability of municipalities from passing their own non-discrimination ordinances.

47.     So far in 2024, the Florida legislature has at least two new anti-LGBTQ bills to consider: HB 599 (introduced in November 2023) would ban all government employees, contractors, and agencies receiving government funding from having people change their pronouns or honorifics to a gender which does not align with their birth sex and prohibit these same entities from providing any education, training, or messaging related to pronouns, gender identity, and sexuality; HB 1233, a wide-ranging bill, would define "sex" throughout all Florida laws to exclude transgender, non-binary, or any other non-male or non-female designation, would require affidavits about sex listed on original birth certificates to obtain a driver's license, and essentially erase the existence of transgender and non-binary people in Florida.  The result of all this is that Florida would effectively outlaw LGBTQ nonprofits.  The state would suppress

wide swathes of individual and organizational free speech, but only relating to LGBTQ people and issues.  Florida will be one of the most restrictive and repressive jurisdictions in the world when it comes to transgender and LGB rights.

48.     All of these laws, including SB 1028, are part of a pattern of a concerted effort by those with power in state legislatures, with the support and collaboration of known anti-trans actors behind the scenes, to target transgender people, especially girls who are transgender.  SB 1028 is similar to laws banning the participation of transgender girls in girls' sports in other states.  Among the consequences is that these laws have sanctioned anti-trans hysteria among certain segments of the public, just as a law designed to activate a political base would.

49.     Incidents in which parents of student athletes have questioned the sex of another team member or an opposing team member who may not conform to gender stereotypes are increasing with frequency in states with laws like SB 1028.  *See, e.g.*, Marjorie Cortez, *After a girl beat their daughters in sports, Utah parents triggered investigation into whether she was transgender,* DeseretNews (Aug. 17, 2022, 10:20 PM ET), https://www.deseret.com/utah/2022/8/17/23310668/school-investigates-female-athlete-transgender-complaint (last visited Jan. 11, 2024); *see also* Winston Szeto & Brady Strachan, *9-year-old's gender questioned in 'gobsmacking' track-and-field incident, family says,* CBC News (June 14, 2023), https://www.cbc.ca/news/canada/british-columbia/kelowna-short-hair-girl-gender-identity-1.6875738 (last visited Jan. 11, 2024); Clay Wirestone, *Kansas anti-trans sports law opens door for genital inspections of kids. That's the simple truth,* Kansas Reflector (Apr. 9, 2023, 3:33 AM), https://kansasreflector.com/2023/04/09/kansas-anti-trans-sports-law-opens-door-for-genital-inspections-of-kids-thats-the-simple-truth/ (last visited Jan. 11, 2024).

**PASSAGE OF SB 1028**

50.     In 2021 Florida legislators introduced two different bills, one in each chamber, aimed at preventing transgender youth from participating in youth sports and playing on teams that align with their gender identity.

51.     First, in the Florida House of Representatives, Representative Kaylee Tuck sponsored HB 1475, "Sex-specific Student Athletic Teams or Sports," on February 26, 2021. Rep. Tuck carried the bill and supported it throughout its debate.  After multiple amendments, the Florida House of Representatives passed HB 1475, as amended, by a vote of 77-40. However, this measure ultimately was not reported out of the Senate Rules Committee.

52.     Similarly, State Senator Kelli Stargel, Chairwoman of the Senate Appropriations Committee, introduced and filed SB 2012, "Promoting Equality of Athletic Opportunity," on March 2, 2021.  This bill was reported out of the Education Committee on March 23, 2021, and the Health Policy Committee on March 31, 2021.  This measure, like HB 1475, was not reported out of the Senate Rules Committee.

53.     Legislative sponsors claimed that these bills, and ultimately SB 1028, were needed to protect girls from being hurt by playing with boys, and to protect fair competition in girls' sports.  However, the statements of its legislative sponsors and supporters show that the purportedly rational opportunity and safety concerns served as pretext over what had motivated these bills.  Sponsors and supporters repeatedly stoked fear by claiming the legislation was urgently needed to "protect girls" from serious injury and death at the hands of full-grown men. They repeatedly painted outlandish scenarios completely ungrounded from the reality of girls like D.N. playing girls' sports.

54.     These fearmongering fantasies, rooted in discriminatory tropes, demonstrate that unlawful discriminatory animus towards transgender girls was the true motivation for SB 1028

and other bills like it.  Similarly, the exclusive focus on how "our girls" will be put in danger by letting "men" play girls' sports revives a classic virtue signal about the need to protect "our women" from dangerous "others."  This discriminatory signaling, based on well-trod stereotypes about protecting the virtue of delicate women and girls, provided the strategic reason for the exclusive targeting of transgender girls by SB 1028.

55.     On March 17, 2021, in a House Secondary Education and Career Development Subcommittee hearing, Rep. Tuck said HB 1475 would allow girls to "[compete] in sports without fear that they will have to compete against biological males."

56.     On March 23, 2021, in a Senate Committee Hearing on Education, Sen. Stargel admitted that she "[had] not received any complaints" about transgender athletes, but she still "believe[d] that there is a problem that needs to be settled with this bill."

57.     On March 23, 2021, in a Senate Committee of Education hearing, Sen. Doug Broxson said the thought that his "four foot eleven . . . less than 100 pound" granddaughter would "[be] struck by a six foot five or six foot six male terrifies [him]."

58.     On March 31, 2021, in a Senate Committee on Health Policy hearing, Sen. Dennis Baxley voiced his support because "young women [] are in serious physical danger of being harmed . . . which could cost someone their life. . . . I have a lot of granddaughters.  I do not want to see some big male who thinks he's a woman or is convinced he's a woman, knocking them down on the ground  . . . We cannot just let these social winds blow us into corners that are dangerous for people's lives."

59.     These statements show that the sponsors and supporters of SB 1028 were motivated by fear of transgender people based on stereotypes about transgender people.  Sen. Stargel and others also made comments directly revealing their prejudice against transgender

people by doubting their very existence or assuming they are choosing to be transgender to have an advantage in playing sports.

60.     On March 17, 2021, in the House Secondary Education and Career Development Subcommittee hearing, Rep. Jason Schoaf said he was concerned about boys deciding to be transgender in order to have an advantage in sports.  "If my son decided tomorrow that he is now a girl, he could use his natural biological advantages to take opportunities away from biological girls."

61.     On March 31, 2021, in a Senate Committee on Health Policy hearing, Sen. Baxley said he was concerned about "a male body who believes they are a woman—or are posing as a woman—I don't know how you actually discern those two. . . . I can stand out here in the garage all day convinced that I am an automobile, but it does not make me an automobile."

62.     On April 28, 2021, in a session of the Florida Senate, Sen. Stargel revealed her inner thoughts and bias against gay and transgender people, stating that she believes being gay or transgender is a choice:  "And I embrace a child who would like to be trans – that's their choice. If they are a LGB- LGB…gay – they have that choice."

63.     These comments are counter to established scientific, medical, and psychosocial understanding, but tap into a narrative commonly used by those who would discriminate against transgender people.

64.     With the 2021 legislative session scheduled to end on April 30, 2021, and legislators running out of time, both SB 2012 and HB 1475 appeared unlikely to pass. However, in a contested, eleventh-hour procedural move three days before the end of the 2021 legislative session, on April 28, 2021, Rep. Tuck introduced House Amendment 649221 as a rider to a different bill (concerning charter schools), SB 1028.  This House Amendment created

the "Fairness in Women's Sports Act".  After just over an hour and a half of debate, the House adopted Amendment 649221.

65.     On the same day (April 28, 2021), the Senate passed SB 1028 as amended, incorporating Amendment 649221.

66.     Governor Ron DeSantis chose to sign the "Fairness in Women's Sports Act" (SB 1028), which amends Florida Statute Section 1006.205, on June 1, 2021, the first day of Pride month in Florida.  The law became effective on July 1, 2021.

**SB 1028'S IMPACT AS ENACTED**

67.     As enacted, SB 1028 targets and prohibits transgender girls from participating, at any public secondary school or public postsecondary institution, in any school-sponsored girls' sports.  It mandates that interscholastic, intercollegiate, intramural, or club athletics teams or sports that are sponsored by a public school must be "expressly designated" as male (men or boys) or female (women or girls) based on the "biological sex at birth of team members."  It also provides for coed or mixed teams, which can include both males and females.

68.     Section 3(b) states that athletic teams or sports designated for males, men or boys may be open to students of the female sex.  Section 3(c) provides that athletic teams or sports designated for females, women or girls may not be open to students of the male sex.  Section 3(d) provides that "a statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex at birth if the statement was filed at or near the time of the student's birth."

69.     A girl or woman who is transgender could never play on a girls' or women's team under this statute, even if she has received an amended birth certificate such that her prior certificate no longer has any legal significance.  *See* Fla. Stat. Ann. § 382.016 (directing the Department of Health to "amend or replace the original [birth] certificate as necessary" when a

proper request is made "as specified by rule"); *see also* Fla. Stat. Ann. § 382.002(3) (providing that a "certified" birth certificate is one "which, when issued by the State Registrar, has the full force and effect of the original vital record").

70.     Section 2(b) of SB 1028 states that the Legislature has determined that "requiring the designation of separate sex-specific athletic teams or sports is necessary to maintain fairness for women's athletic opportunities." The bill, as enacted, makes no findings as to how using the criteria of "biological sex" at birth, recorded on a birth certificate issued "at or near the time of the student's birth," furthers this legislative goal.

71.     Section 4(a) of SB 1028 provides private rights of action for any student who is deprived of an athletic opportunity or suffers "direct or indirect harms" as a result of a violation of the statute. It contains no criteria as to how a student would establish that he or she had been deprived of such an opportunity. It also does not explain how a student bringing such a claim would learn the gender identity of another student at the school.

72.     Section 4(b) of SB 1028 provides a private right of action, including the right to seek money damages, for any student who is subject to retaliation or other adverse action as a result of reporting a violation of this section, including to any state or federal agency. As with Section 4(a), it provides no detail as to how damages would be calculated. Section 4(c) also provides a private right of action to any school or public postsecondary institution that suffers any direct or indirect harm as a result of this section. It allows the school to bring an action against any governmental entity, licensing or accrediting organization, or athletic association or organization.

73.     Transgender girls who want to participate or continue to participate in school-sponsored girls' sports now much face the risk that their participation will be subject to legal challenge. They and their families could be compelled into protracted and invasive litigation. Any such suit would, by necessity, require production of private medical and academic records,

which in any other context would not be available to other students, their families, or other public postsecondary entities.

74.     Transgender girls such as D.N. will also be forced to defend their achievements when non-transgender students claims that they were "deprived" of an athletic opportunity or suffered "indirect harm" because the transgender student was accepted onto the team and the student who is not transgender was not.  They may have to answer questions whenever the team wins a game because someone erroneously suspects that it happened simply because a transgender girl was playing.  Although the decision to accept transgender girls on the team would be based on factors unrelated to the student being transgender, including personality and leadership skills, this law will involve the courts in a myriad of suits over what generally has been a matter best left to team coaches and school administrators.

75.     Although SB 1028 would bar D.N. and other transgender girls from participating on girls' sports teams, it would allow a boy who is transgender to play on the girls' sports teams even if the boy had received masculinizing hormone therapy as part of necessary gender transition medical care.

76.     D.N.'s focus, besides her schoolwork, is sports, and in particular her school volleyball team.  It is not an option for her to be on the boys' team because she is not a boy.  She would be subjected to an invasion of privacy if she had to be on the boys' team and use the boys' locker room.  She is receiving estrogen and as she continues through female puberty, is developing as a girl.  Her social network and support system are built around the girls on her team.  She would be ostracized and bullied if she were forced to play on a boys' team. Compelling D.N. to be on the boys' team also would force her to disclose her transgender status to the entire school.

77.     If D.N. cannot play girls' sports in high school, she will not be able to play sports at all and will lose the benefits of being part of the team environment that has supported her

emotionally and psychologically.  She may be isolated and experience confusion and emotional distress during this critical period of her social and psychological development.  She will be stigmatized since for all other purposes she will be living as a girl, but unable to play sports with her peers.  She may also lose the opportunity to continue playing on travel teams.  If D.N. cannot play school sports, her volleyball skills will certainly decline.

78.     D.N. was developing significant leadership skills as the result of her volleyball and other sports participation.  These leadership skills will benefit her as she approaches adulthood.  If she is unable to play volleyball or other sports in high school, her skills will decline, and she may not be able to participate even in recreational leagues.  Depriving her of these opportunities will have a long-term impact on her future.  It may create a sense of shame and diminish her positive sense of self, which can have lifelong consequences.

79.     SB 1028 also sends a message to D.N.'s current and future teammates that there is something wrong with her and is contrary to the Broward County School Board's stated policies on inclusion.  By targeting transgender girls, the law sends a message that they should be isolated instead of embraced and treated with suspicion instead of acceptance.  It sends a false message that these students are taking opportunities away from others instead of being rewarded for their hard work and hours of practice and dedication to their sport.  It is contrary to the values and policies that Broward County has established and is contrary to the values that we want young people to follow.  D.N. has worked hard for her success at athletics and it is not attributable to her transgender status.  This law will take all that away from her and other transgender girls and upend the official and education goals of Broward County schools.

**FORESEEABILITY OF SB 1028'S IMPACT**

80.     By design and on its face, the only group of people whose sports participation was altered by SB 1028 are transgender girls and women.  Everyone else can continue to play for the

teams on which they were playing prior to SB 1028.  Only transgender girls will be forced off their current teams and denied access to playing sports aligned with their gender identity.

81.     Comments by sponsors and supporters of SB 1028 and its predecessor bills also make clear they knew of, indeed intended, this targeted impact on transgender girls alone.  There was no doubt.  Florida Rep. Randy Fine, co-sponsor of SB 1028 precursor HB 1475 and sponsor of other anti-trans bills including, HB 1421 (banning gender affirming care for minors) and HB 1423 (banning drag shows in public), has made a career out of loudly displaying his discriminatory motivations in public.

82.     On March 30, 2022, in response to a Disney executive stating they wanted to include more gender and sexual minority characters in their movies, Rep. Randy Fine stated that Disney "[is] going to destroy their company on the altar of grooming five year olds to mutilate their bodies."  "Grooming" is now a common term used by anti-transgender activists to describe their belief that children are being mentally prepared to be sexually exploited.

83.     In 2023, in rebuke to a legislative opponent of HB 1423, which would ban drag performances in public, the bill's sponsor Rep. Fine said that "[i]f it means erasing a community because you have to target children-then, damn right, we out to do it!"

84.     A few days earlier, during a House committee vote on HB 1521, a bill banning transgender people from using the bathroom aligned with their gender identity, Rep. Webster Barnaby unleashed a vitriolic tirade against transgender people.  "The Lord rebuke you, Satan, and all of your demons and all of your imps who come parade before us," he said to speakers at that hearing. "That's right, I called you demons and imps who come and parade before us and pretend you are part of this world."  He continued: "We have people that live among us today on planet Earth that are happy to display themselves as if they were mutants from another planet."

**AVAILABILITY OF LESS DISCRIMINATORY ALTERNATIVES**

85.     Contrary to claims by its supporters, SB 1028 was not reasonably designed to protect fairness in women's sports.  It is rather, a solution in search of a problem.  Prior to SB 1028, the FHSAA already had in place a policy to ensure this.

86.     The 2020-2021 FHSAA Handbook's "Gender Identity Participation" policy affirmed that "[a]ll eligible students should have the opportunity to participate in interscholastic athletics in a manner that is consistent with their gender identity and expression, irrespective of the gender listed on a student's birth certificate and/or records."  2020-2021 FHSAA Administrative Policies § 16.8

87.     At the same time, the FHSAA balanced concerns about fairness in women's and girls' sports.  It created a procedure whereby a transgender student's request to play a sport aligned with their gender identity would be reviewed by a committee.  That committee would consider the totality of an individual's circumstances to arrive at a reasoned, individual determination.

88.     This was not a rubber-stamping process.  Transgender students would need to submit identity documents, personal statements, written statements from parents and others, medical records showing all medications and treatments they are receiving, written statements form a treating medical provider, and other information to the FHSAA committee.  2020-2021 FHSAA Administrative Policies § 16.8.2.

89.     The committee would then evaluate all this information to confirm "a student's consistent gender identity and expression," and the review of medications and medical treatments would allow for the committee to see whether a transgender student was taking

medications such as puberty-blockers, which would pause male puberty and associated muscular and cardiovascular changes.  2020-2021 FHSAA Administrative Policies § 16.8.6.

90.     The FHSAA policy also provided exemptions for private religious schools where "profoundly held religious beliefs" would be in conflict with this policy.  FHSAA, § 16.8.7, 2020-2021 ADMINISTRATIVE POLICIES (2020).

91.     The National Collegiate Athletics Association ("NCAA") has a similarly rigorous policy which allows for transgender athletes to play with their identified gender while ensuring fair and meaningful competition.

92.     The NCAA's Transgender Student-Athlete Participation Policy requires that a transgender woman student athlete submit laboratory results showing that her blood serum testosterone levels are within allowable limits.  This limit is determined individually for each sport, and the laboratory results must be dated within 28 days of the competition in which the athlete wishes to compete in.

93.     There are reasonable ways to ensure fair and meaningful competition in girls' sports; a categorical ban on transgender girls is not one of them.  The FHSAA and NCAA policies protect fairness in women's sports while also affording transgender people the substantial benefits of participating in sports.

94.     Claims by SB 1028 proponents, such as Rep. Tuck, that they tried but could not come up with another option to allow for fair competition ring hollow in the face of these

existing alternatives to a total ban.  Their penchant for hyperbolic and misleading statements about transgender girls and sports only buttress this conclusion.

**RECENT ENFORCEMENT OF SB 1028**

95.     D.N.'s mother, Jessica, is a clerical employee at D.N.'s school. On November 27, 2023, Jessica was informed that she was under investigation and administratively reassigned by the Broward County Public Schools' Police Special Investigation Unit ["SIU"] for an alleged violation of SB 1028.  The school's Principal, Vice Principal, and Volleyball Coach were also placed under investigation and administratively reassigned.

96.     Jessica was escorted off school property by police.  She was told that she is banned from entering school property.  Despite being D.N.'s parent, she was initially told this included dropping off and picking up her daughter, attending parent-teacher conferences, and any other reason related to her rights as a parent.

97.     While Jessica was eventually told she could drop off and pick up her daughter, she must obtain pre-clearance from the SIU before she can attend a parent-teacher conference. She remains banned from school property under all other circumstances.

98.     Despite a school district policy that requires confidentiality in employee investigation, Jessica's name and the subject matter of the investigation was publicly released and subsequently reported by media.  Jessica was forced to reveal herself as the parent of D.N. and her involvement in this lawsuit, compromising her daughter's privacy and the confidentiality she is afforded in this case.

99.     Shortly thereafter, the school district confirmed that it had informed the State Education Department of an anonymous allegation involving D.N.'s participation on the volleyball team.  A spokesperson for the Department stated that "[under] Governor DeSantis, boys will never be allowed to play girls' sports.  It's that simple."

100.    On December 12, 2023, the Florida High School Athletic Association banned D.N. from participation in sports for 11 months and levied a $16,500 fine against her school.

101.    Jessica and her family have experienced extreme distress as a result.  Photos of her family were published online and D.N.'s gender identity is now the topic of online community forums.  Jessica is fearful that her family will be targeted for further harassment in what can only be described as a hostile and emotionally charged political environment.  Most of all, Jessica is afraid of how this targeted retaliation will continue to impact her daughter.

102.    As a result of the enforcement of SB 1028 and the forced outing that resulted, D.N. has not attended school in person since November 27, 2023.  She fears she will not be safe at school.  While she plans to continue school online for the rest of her current school year, D.N. would like to return to her current school and resume her academic and student leadership pursuits.  However, she fears that the stigma resulting from the enforcement of SB 1028 has taken away that option for her.

## CLAIMS FOR RELIEF

## COUNT I

## DEPRIVATION OF EQUAL PROTECTION
US Const. Amend. XIV
Plaintiff Against All Defendants

103.    Plaintiff D.N. incorporates all of the preceding paragraphs and the facts contained therein.  Plaintiff brings this Claim against all Defendants.

104.    The Fourteenth Amendment of the U.S. Constitution contains the Equal Protection Clause, enforceable through 42 U.S.C. § 1983.  That clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

105.    Defendants are all government actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

106.    Laws which are enacted for a discriminatory purpose targeting a class of people are prohibited by the Equal Protection Clause of the Fourteenth Amendment.

107.    SB 1028 was designed to only impact transgender girls by forcing them to play sports on teams that do not align with their gender identity.  No other class of people is so impacted by this law.

108.    SB 1028 was passed with invidious discrimination as a motivating factor, as demonstrated by statements made by the bill's sponsors and supporters. They demonstrate both ill-will towards transgender girls and a conscious, misleading effort to characterize transgender girls as a threat to the lives and safety of girls who are not transgender.

109.    SB 1028 is part of a pattern and practice in recent history of anti-LGBTQ legislators targeting transgender girls, a vulnerable minority class, with laws designed to erase their identity, remove their rights, and deny them the ability to live with dignity in Florida.

110.    For all these reasons, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment, which is enforced against the states through 42 U.S.C. § 1983.

111.    D.N. is irreparably harmed by Defendants' unconstitutional action in violation of the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgement as follows:

A.    Declaring that the provisions of and enforcement by Defendants of SB 1028 violates the Equal Protection Clause of the Fourteenth Amendment;

B.    Preliminarily and permanently enjoining Defendants, their officials, agents, employees, assigns and all persons acting in concert or participating with them from enforcing SB 1028 and any other law, policy or bylaw that would preclude Plaintiff from participation in any girls' sports team in Florida;

      C.      Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

      D.      Awarding Plaintiff nominal damages, as well costs, expenses and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

      E.      Granting such other and further relief as the Court deems just and proper.

DATED January 11, 2023

Respectfully submitted,

/s/ *Jason A. Ross*
Jason A. Ross
Fla. Bar No. 59466
Jason.Ross@arnoldporter.com
Arnold & Porter Kaye Scholer
LLP 601 Massachusetts Avenue
NW Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Kent A. Yalowitz
Admitted *Pro Hac Vice*
Arnold & Porter Kaye Scholer
LLP 250 W. 55th St.
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-9689
Kent.Yalowitz@arnoldporter.com

Sarah Warbelow
Jason Starr
Cynthia Weaver
Admitted *Pro Hac Vice*
Human Rights Campaign
Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762
Sarah.Warbelow@hrc.org
Jason.Starr@hrc.org
Cynthia.Weaver@hrc.org

*Counsel for D.N., by her next friends,*
*Jessica N., mother, and Gary N., father*