**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

D.N., by her next friends, JESSICA N.,
mother, and GARY N., father,

                    Plaintiff,

       v.

FLORIDA STATE BOARD OF EDUCATION, *et al.*,

                    Defendants.

**Case No. 21-61344-CIV-ALTMAN/Hunt**

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT**

## I.      Introduction

This case is about D.N., a teenage athlete, whose friends and classmates have only ever recognized and treated her as a girl, and her desire to continue playing girls' sports with her team-mates.  This case is not, as Defendants misleadingly claim, an attempt to subvert the fairness of girls' or women's sports or deny anyone the opportunity to play on sex-segregated athletic teams.  Indeed, it is **Defendants'** position that would deny D.N. that opportunity, and, in spite of their protests to the contrary, the context of this litigation and the legislative process that led to SB 1028 indicate that a plausible explanation for Defendants' policies is that they are borne out of animus and intended solely to treat transgender girls differently from their non-transgender peers.

The First Amended Complaint (ECF No. 140) ("F.A.C.") alleges that D.N. is a girl and that she is being treated differently from other girls on the basis of her gender identity.  This as-sertion is based on science and evidence.  To argue that the factual allegations about D.N.'s identity can be ignored and to categorically exclude her from school sports based on her status, as Defend-ants do, perpetuates animus.  To deny D.N. her day in court would allow Defendants to perpetrate animus and would amount to a grave miscarriage of justice.

In their renewed Motion to Dismiss (ECF No. 153) ("Opening Br."), Defendants break no new ground in their arguments.  As they have for over two years, they rely on nothing more than rank stereotyping and tired tropes about transgender people.  Defendants continue to recycle the-ories that are based on bias and animus, not science.  Just as before, their arguments are better suited for trial than for a motion to dismiss.  The issues Defendants raise—such as theories on physiological differences between boys and girls and the impact of hormones on athletic perform-ance—are issues of fact that cannot be resolved at the pleading stage, at which Plaintiff need only state a **plausible** case, which she has done.  That the Defendants can only muster the same repetitive arguments they have been repeating without scientific or empirical basis for years only underscores how their justification for passing SB 1028 is mere pretext to cloak the underlying extent to which their actions have been driven by animus against transgender girls, as adequately alleged in the F.A.C.

## II.     Legal Standard

At the motion to dismiss stage under Fed. R. Civ. P. 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  At the motion to dismiss stage, the Court must further make all plausible inferences in plaintiff's favor based on the facts as alleged in the complaint.  *See, e.g., Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration*, 304 F.3d 1076, 1081 (11th Cir. 2002).  "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

At this juncture, the Court should give D.N. the opportunity to develop the factual record. *Rubin v. Rubin*, No. 21-82014-CIV-MARRA, 2022 WL 4771861, at **1–2 (S.D. Fla. Aug 2, 2022) (denying a motion to dismiss that turned on "a factual determination that is ill-suited to a motion to dismiss").  D.N. also should be given the opportunity to develop the factual record and relevant expert testimony needed to demonstrate that Defendants' core arguments are incorrect and pretextual.  Because D.N. has met her burden of pleading facts that ***plausibly*** allege discriminatory animus, the Court should deny Defendants' Motion to Dismiss and allow D.N. to develop evidence to resolve disputes as to material facts.

## III.   D.N. Has Pled Facts Sufficient to Establish a Plausible Inference of Discriminatory Animus

Assessing a claim for discriminatory animus does not involve a bright-line legal test.  Instead, a court must consider and weigh multiple factors.  A "non-exhaustive" list of relevant factors is: "(1) the impact of the challenged law, (2) the historical background, (3) the specific sequence of events leading up to its passage, (4) procedural and substantive departures, (5) the contemporary statements and actions of key legislators . . .  (6) the foreseeability of the disparate impact, (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977)); *see also Arlington Heights*, 429 U.S. at 268 ("[t]he foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry").

No one factor is dispositive.  Instead, the test "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at

266. As the Fourth Circuit put it, a court must not examine "each piece of evidence in a vacuum, rather than engaging in the totality of the circumstances analysis required by *Arlington Heights*." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016). Importantly, it is also not required that a challenged law be motivated solely by discriminatory animus for it to be unlawful, for "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern[.]" *Arlington Heights*, 429 U.S. at 265. "When there is a proof that a discriminatory purpose has been *a* motivating factor in the decision, . . . judicial deference is no longer justified." *Id.* at 265–66 (emphasis added); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277 (1979) ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not.").

A.     <u>Presumption of Legislative Good Faith</u>

First, Defendants argue that "[e]specially against the legislative presumption of good faith, D.N.'s conclusory allegations are not entitled to be accepted as true, and the Amended Complaint's claim for relief does not meet *Iqbal*'s standard of plausibility." Opening Br. at 7. It is true that, in cases involving racial gerrymandering challenges to redistricting plans, state legislatures are entitled to a presumption of good faith. *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (explaining that "in assessing the sufficiency of a challenge to a districting plan . . . the good faith of the state legislature must be presumed"). But this presumption is not absolute and can be overcome as it is merely a burden-shifting framework. As the Supreme Court explained, "[w]henever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Id.* at 603. The Eleventh Circuit's opinion in *League of Women Voters of Florida, Inc.*, 32 F.4th 1363, 1373 (11th Cir. 2022), reiterates this general rule and adds that "statement[s] by a single legislator [are] not fairly read to demonstrate discriminatory intent by the state legislature." But D.N. plausibly alleges discriminatory statements made by ***multiple*** legislators in both their public and private capacities. Thus, the Court should move to "[t]he ultimate question," which is "whether a discriminatory intent has been [alleged] in a given case." *See Abbott*, 585 U.S. at 603.

B.     <u>*Arlington Heights* Factors</u>

D.N. has plausibly alleged multiple facts under the non-exhaustive *Arlington Heights* factors demonstrating that it is plausible that discriminatory animus was a motivation for enacting SB 1028. *See Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1296 (N.D. Fla. 2021) (noting

"[p]laintiffs have done enough at the pleading stage" and denying defendant's motion to dismiss where plaintiff presented evidence across multiple *Arlington Heights* factors "[g]iven that the question is whether this Court can infer a discriminatory purpose given the totality of the circumstances, and that no one factor is dispositive."). No more is required at the motion to dismiss stage.

Defendants examine each fact put forth by D.N. in isolation, arguing that standing alone each fails to establish discriminatory animus on its own, and then discard each in turn. Defendants then point to this supposed lack of evidence and claim D.N. has failed to plausibly allege discriminatory animus. But that is neither the correct standard nor the correct analytical framework. At this motion to dismiss stage, D.N. need not prove that discriminatory animus existed, but merely show a plausible inference of such animus can be drawn. Nor may each fact or set of facts be assessed and disposed of individually. All facts alleged in the First Amended Complaint must be considered together in totality.

Whether some facts, or some factors, are weaker than others is not dispositive. Taken together, the facts alleged by D.N. in her First Amended Complaint support a plausible inference that SB 1028 was motivated by discriminatory animus.

### a. The Contemporary Statements and Actions of Key Legislators

Contemporary statements of key legislators are relevant because they form part of the legislative history. *See Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 835 (11th Cir. 2020) (characterizing evidence as "legislative or administrative history' in the form of contemporary statements by the decisionmakers"); *see also Arlington Heights*, 429 U.S. at 268 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision making body"). However, it is also true that the "discriminatory intent may be found to exist even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials." *Williams v. City of Dothan, Ala.*, 745 F.2d 1406, 1414 (11th Cir. 1984).

In *Jacksonville Branch of NAACP v. City of Jacksonville*, plaintiff residents sued the city claiming that council district boundaries were racially gerrymandered and motivated by discriminatory intent. 635 F. Supp. 3d 1229 (M.D. Fla. 2022). The court examined the statements of a key council member, but also the extent to which her comments were echoed and applauded by other council members. *See City of Jacksonville*, 635 F. Supp 1229 at 1293 ("Moreover, nothing in the record suggests that Priestly Jackson was a rogue legislator in the redistricting process. To the

extent the Councilmembers spoke at all about the Enacted Plan before the final vote, they did so to compliment Priestly Jackson on her leadership."). Because the key council member's statements were echoed by others who also supported the district boundaries, they were "important evidence relevant to the question of legislative intent" and not merely her own private opinions. *Id*. Plaintiff has similarly presented evidence of an echo-chamber of similar comments among legislators supportive of SB 1028, that support being evidence of legislative intent. *See* F.A.C. at ¶¶ 53–63.

Here, Defendants argue that D.N. has not provided the direct, contemporaneous statements of key legislators necessary to show animus. Instead, Defendants cast D.N.'s First Amended Complaint as relying on non-contemporaneous statements by non-legislative sponsors of SB 1028. That is incorrect. In her First Amended Complaint, D.N. provided multiple contemporary statements from key legislative sponsors of SB 1028 and its predecessor bills from the same legislative session. *See* F.A.C. at ¶¶ 53–63. These contemporary statements easily support at least a plausible inference that SB 1028 was motivated by discriminatory animus. Additional statements about these bills from their legislative sponsors and proponents elucidate and reinforce the discriminatory nature of these comments.

### i. Statements By Key Legislative Sponsors

Specific statements by the primary legislative sponsors of SB 1028 support a plausible inference of animus. In the House, this was Representative Kaylee Tuck who sponsored HB 1475, "Sex-specific Student Athletic Teams or Sports". F.A.C. at ¶ 51. In the Senate, this was Senator Kelli Stargel, Chairwoman of the Senate Appropriations Committee, who introduced and filed SB 2012, "Promoting Equality of Athletic Opportunity," the precursor to SB 1028 in the Senate. F.A.C. at ¶ 52.

"On March 17, 2021, in a House Secondary Education and Career Development Subcommittee hearing, Rep. Tuck said HB 1475 would allow girls to '[compete] in sports without fear that they will have to compete against biological males.'" F.A.C. at ¶ 55. This statement reflects a pretextual reason for passing SB 1028; that transgender girls are significantly different in relevant ways from non-transgender girls.

First, the terms "biological boy" and "biological girl" have now become politically loaded terms divorced from any original scientific meaning they once had. *See* Katrina Karkazis, *The misuses of "biological sex"*, 394 LANCET 1898, 1898–99 (Nov. 23, 2019); *see also* Greta R. Bauer,

*Sex and Gender Multidimensionality in Epidemiologic Research*, 192 (1) AM. J. OF EPIDEMIOLOGY 122, 122–132 (Oct. 4, 2022). As currently used in political rhetoric, these terms convey the underlying assumption that gender identity is not real, and therefore that transgender girls are not real. The FAC plausibly alleges that these terms, and their underlying assumptions, are factually incorrect. *See* F.A.C. at ¶¶ 16–22, 42, 59, 63. Rather, they are designed to create a universally applicable categorization of a person's unified sex and gender as either male or female in order to exclude certain people. *See id.* This universal binary category simply does not exist in the real world, the FAC alleges, and its creation and use for the purpose of enacting laws restricting the rights of transgender people is indicative of the discriminatory intent with which SB 1028 was passed. *See* F.A.C. at ¶¶ 42, 59, 63. At minimum, the underlying factual assumptions that animated SB 1028 are alleged to be false. *See* F.A.C. at ¶¶ 16–22, 53–54, 59, 63, 70.

Second, Rep. Tuck's use of the word "fear" (F.A.C. at ¶ 55) echoes and reinforces statements by other legislative proponents of SB 1028 that non-transgender girls would be endangered by having to play sports with transgender girls. But there is no evidence in the legislative record supporting this supposed danger, and in fact this narrative is based on the idea that "our girls" would be competing against the physical equivalent of adult males. *See* F.A.C. at ¶¶ 53–56. This statement advocates for SB 1028 on the basis of a factually inaccurate claim, using language appealing to stereotype-driven fear. It is evidence of the discriminatory intent with which SB 1028 was enacted.

"On March 23, 2021, in a Senate Committee Hearing on Education, Sen. Stargel admitted that she '[had] not received any complaints' about transgender athletes, but she still 'believe[d]' that there is a problem that needs to be settled with this bill.'" F.A.C. at ¶ 56. Her belief that there is a problem absent any evidence that it was impacting athletic competition supports an inference of a pre-existing bias or stereotype. The stereotype here is that the physical characteristics of all transgender girls necessarily make them stronger than, or even a danger to all, non-transgender girls. As illustrated by multiple comments from legislative proponents during the 2021 session, stereotype-fueled fears and beliefs about the physiology of transgender girls served as the basis for enacting SB 1028. Thus, "[o]n April 28, 2021, in a session of the Florida Senate, Sen. Stargel revealed her inner thoughts and bias against gay and transgender people, stating that she believes being gay or transgender is a choice: 'And I embrace a child who would like to be trans – that's their choice. If they are a LGB- LGB…gay – they have that choice.'" F.A.C. at ¶ 62. At the very

end of the floor debate, likely under advisement, Sen. Stargel apologized for this comment.  Yet her slip—inaccurately referring to gender identity as a "choice" and expressly separating her feelings on lesbian, gay, and bisexual people from her feelings on transgender people—revealed an example of the discriminatory beliefs which underlie SB 1028.  Her later apology does nothing to sanitize the import of her beliefs to the bias underlying SB 1028.

The idea that being gay or transgender is a choice has been used for decades (and indeed, for centuries before the modern era) to justify discrimination, shunning, and worse against the social exclusion of gay and transgender people.  It is also entirely false as repeatedly demonstrated by peer-reviewed scientific studies, including gold-standard monozygotic and dizygotic twin studies.  *See, e.g.*, Georgios Karamanis et al., *Gender dysphoria in twins: a register-based population study*, 12 Sci. Rep. 13439 (Aug. 4, 2022); Gunter Heylens et al., *Gender identity disorder in twins: a review of the case report literature*, 9 J. Sex Med. 751, 751–57 (Mar. 1, 2012).  The false and harmful belief that a transgender girl is only choosing to identify as a girl in order to gain an advantage in sports is a fundamentally false narrative among those seeking to restrict transgender girls' access to school sports.  Its invocation by Sen. Stargel, one of the two most important legislative proponents of SB 1028, is a clear indication that the law was motivated by discriminatory animus.

### ii. Statements By Other Legislative Proponents

In addition to the above statements by the primary legislative sponsors of SB 1028, D.N. has also provided statements by other legislative proponents which reinforce the existence of a plausible inference that SB 1028 was motivated by discriminatory animus.

"On March 23, 2021, in a Senate Committee of Education hearing, Sen. Doug Broxson said the thought that his 'four foot eleven . . . less than 100 pound' granddaughter would '[be] struck by a six foot five or six foot six male terrifies [him].'"[1]  F.A.C. at ¶ 57.  Like Rep. Tuck's statement citing girls' "fear" as a reason for SB 1028, Sen. Broxson's statement is based on a discriminatory stereotype about the physical characteristics of transgender girls.  A young, teenage transgender girl is simply not going to be anywhere close to "six foot five or six foot six" in height.

---

[1] Proponents of SB 1028 repeatedly use participation in contact sports, where there is risk of physical collisions and contact, as their scenarios when describing why non-transgender girls need to be protected from playing sports with transgender girls.  This is yet another example of a broad overgeneralization intended to invoke fear of injury in contact sports as a universal concern.  There are plenty of sports in which there is no risk of physical contact.  Instead, the necessary skills and demands of sports vary.

The vast majority of adult men are at least several inches shorter than this.[2]  That such fear, based in a discriminatory stereotype about transgender girls being physically similar to significantly larger than average imposing men who are apparently of NBA player stature, would be laughable if not for the real harm it causes when used as the motivation for enacting legislation.  This is especially so when that legislation restricts the opportunities of a class of people because of the discriminatory stereotype.

"On March 31, 2021, in a Senate Committee on Health Policy hearing, Sen. Dennis Baxley voiced his support because 'young women [] are in serious physical danger of being harmed . . . which could cost someone their life. . . . I have a lot of granddaughters.  I do not want to see some big male who thinks he's a woman or is convinced he's a woman, knocking them down on the ground  . . . We cannot just let these social winds blow us into corners that are dangerous for people's lives.'"  F.A.C. at ¶ 58.  The suggestion that gender identity is merely a product of "social winds" rather than based in biology is a biased statement that implicitly denies the existence of transgender persons.  Just like the above statement by Sen. Broxson, this statement by Sen. Baxley is based on a discriminatory stereotype about the physical characteristics of transgender girls and provides additional context to Rep. Tuck's statement.  It certainly does not apply to Plaintiff:



[Photo of D.N.]

Sen. Baxley's statement provides further evidence of motivation by discriminatory stereo-types by acknowledging a belief that non-transgender girls' lives are in danger from transgender

---

[2] According to the CDC, the average adult male height in the United States is 69 inches, or 5'9".  Centers for Disease Control and Prevention, National Center for Health Statistics, "Body Measurements", https://www.cdc.gov/nchs/fastats/body-measurements.htm (last visited March 28, 2024).

girls.  Again, we see a false belief that teenaged transgender girls are physically "big males" who pose a physical danger to non-transgender girls.  This statement also reinforces the discriminatory statement of Sen. Stargel that being transgender is "a choice."  The view that a transgender girl is a man who "thinks he's a woman" dehumanizes a transgender girl's whole being and reinforces the harmful belief that it is a "choice" and not a real, healthy and natural part of human variation. Here, fear based on a discriminatory stereotype is used to justify legislation that bans transgender girls from playing on girls' sports teams.

"On March 31, 2021, in a Senate Committee on Health Policy hearing, Sen. Baxley said he was concerned about 'a male body who believes they are a woman—or are posing as a woman—I don't know how you actually discern those two. . . . I can stand out here in the garage all day convinced that I am an automobile, but it does not make me an automobile.'"  F.A.C. at ¶ 61.  Even worse than Sen. Stargel's statement, not only is the belief that being transgender is a symptom of delusional thinking extremely harmful and rooted in deep discriminatory stereotypes, but here, Sen. Baxley compared transgender girls to an inanimate object.  Its use as a justification for passing SB 1028 is strong evidence of discriminatory animus.

"On March 17, 2021, in the House Secondary Education and Career Development Sub-committee hearing, Rep. Jason Shoaf said he was concerned about boys deciding to be transgender in order to have an advantage in sports.  'If my son decided tomorrow that he is now a girl, he could use his natural biological advantages to take opportunities away from biological girls.'"  F.A.C. at ¶ 60.  This statement is yet another example of a belief that being transgender is a choice or a delusion.  Like the above statement by Sen. Baxley, Rep. Shoaf's statement reinforces Sen. Stargel's statement.  The use of this discriminatory stereotype as a stated reason for supporting SB 1028 shows the discriminatory animus at play in the law's enactment.

As seen repeatedly in the above statements, the legislative proponents of SB 1028 ascribe to impermissible gender stereotyping that is rooted in discrimination.  Where a body "generally relied very heavily on such [statements] in making its decision" and "some of the [] comments were the product of stereotyping" it is "[c]ertainly a plausible—and, one might say, inevitable—conclusion" that the body "t[ook] into account all of the [] comments, including the comments that were motivated by stereotypical notions about women's proper deportment."  *See Price Water-house v. Hopkins*, 490 U.S. 228, 256 (1989).

Here, this is true of the views of key legislators all around—of transgender girls, but also of non-transgender girls and boys.  Their statements are replete with the trope that girls are universally weaker and more vulnerable than boys, who are big and strong.  The proponents of SB 1028 use these stereotypes to deepen the misunderstanding and fear many people have regarding transgender youth, specifically transgender girls.  They inform a hypothetical scenario for which there is no evidence to support: that a non-transgender boy would choose to identify as a girl to play on a girls' team in order to win.  The scenario itself belies its discriminatory foundation as it presupposes that all boys have a propensity for playing sports, should be of a specific physical stature, and are better at all sports than all girls.   The law's classification that is based on stereotyping towards transgender girls cannot be both important and substantially related to protecting rights of women and girls.  The State's justification for SB 1028 is but mere pretext for targeting and singling out transgender girls.

D.N.'s First Amended Complaint provides multiple examples of statements from SB 1028's key legislative sponsors and its other legislative proponents based in discriminatory stereotypes which support, at minimum, a plausible inference that SB 1028 was motivated by discriminatory animus.  Taken together these statements only mutually reinforce each another and make clear the discriminatory stereotypes they are based on.  Taken together with other allegations in D.N.'s First Amended Complaint, an inference that SB 1028 was motivated by discriminatory animus is clearly at least plausible, which is all that is required of D.N. at this stage.

b.  The Recent Historical Background

The general historical background in a state, and the specific history related to SB 1028 in particular, are important pieces of evidence when assessing discriminatory animus.  *See Arlington Heights*, 429 U.S. at 267 (stating that "[t]he historical background of the decision" and "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purpose").  Unlike Defendants' characterization of the presumption of legislative good faith in *League of Women Voters*, here Plaintiff is not relying on the "intentions of previous generations to taint [Florida]'s legislative action forevermore on certain topics." 66 F.4th 905, 923 (11th Cir. 2023).  Rather, in addition to the multiple contemporary statements by key legislative sponsors and proponents of SB 1028 detailed above, D.N. has alleged significant facts from ***recent history*** which support the discriminatory animus inferred from the legislative statements, and has linked this history directly to at least one co-sponsor of SB 1028.

10

First, there is a significant recent history of efforts to restrict the rights and opportunities of transgender people, including transgender girls. D.N. pointed to multiple recent bills from other states beginning in 2016 to demonstrate this accelerating trend. *See* F.A.C. at ¶ 38. As D.N. notes, these bills were fueled and coordinated, at least in part, by networks of anti-transgender activists. *See* F.A.C. at ¶¶ 39–40. Crucially, D.N. presented evidence that "[b]y at least the 2020 [Florida] legislative session" these groups were active in Florida, having ties with at least one co-sponsor of one of SB 1028's predecessor bills." F.A.C. at ¶ 41. Indeed, it is unlikely this was the only such contact, and D.N. expects additional evidence to be uncovered through third-party discovery. Because of the direct ties these activist groups had to key legislators involved in SB 1028's passage, this history is relevant to showing a plausible inference of discriminatory intent through the pattern and practices they used.

The existence of a pattern of discriminatory practices is made clear by the continued trend of the Florida legislature passing additional restrictions on the rights and opportunities of transgender people, including transgender girls, following SB 1028. *See* F.A.C. at ¶ 47. Taken together, the recent historical context around SB 1028 presents a clear pattern and practice of key Florida legislators engaging in an effort to restrict the freedoms and rights of transgender girls.

      c.   The Impact of the Challenged Law

Evidence of the disparate and discriminatory impact of the challenged law is also important when assessing whether it was motivated by illegal discriminatory evidence. *See Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern . . . emerges from the effect of the state action"); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) (disparate impact "may for all practical purposes demonstrate unconstitutionality"). Indeed, if the size and type of the disparity is particularly significant it is a strong indicator that the challenged law is based on discriminatory intent. In *Baker v. City of Kissimmee* 645 F. Supp. 571, 579–82 (M.D. Fla. 1986), black residents sued the city over policies which resulted in street paving and maintenance being significantly disproportionately focused in a majority white neighborhood. The court found that the "overwhelming disparities in the two contested [municipal] services" strongly supported a finding of discriminatory intent." *Id*. at 586.

Like in *Baker*, the disparate impact of SB 1028 is so overwhelming that it presents strong evidence of discriminatory intent. As D.N. has plainly pled, the ***only*** impact is on transgender girls. First, D.N. has pointed to the impact of the direct and natural consequences of SB 1028—to

remove transgender girls from their schools' girls' sports teams.  Transgender girls who try to play sports will "face the risk that their participation will be subject to legal challenge."  F.A.C. at ¶ 73. This would result in lengthy legal battles disclosing private medical and academic records, and involuntarily outing the transgender girl.  *See id*.  Any transgender girl would be forced to defend her own accomplishments from any allegedly "deprived" or "indirect[ly] harm[ed]" non-transgender student.  F.A.C. at ¶ 74.

D.N. provided further evidence of what would happen to her or any other transgender girl in her situation.  Any transgender girls who wish to continue to play school sports would be forced "to be on the boys' team and use the boys' locker room," even as she "is developing as a girl." F.A.C. at ¶ 76.  This would expose transgender girls to the same risks that the Florida legislature claims to be concerned about and sought to protect non-transgender girls from.  If there are any safety concerns at issue here, they should logically focus on having a small framed girl, going through female puberty, in a boys' locker room surrounded by boys who are going through male puberty.  But this is of no concern to SB 1028 and its legislative proponents.  Moreover, playing on a boys' sports team would force disclosure of a girl's transgender identity, and likely result in her social ostracization from her high school peers.  *Id*.  This would be an incredible invasion of privacy and would be psychologically scarring.  It should be obvious how distressing and harmful these experiences would be to a child, and an expert witness would be able to testify in detail as to the impact of these harms. The sponsors' utter lack of acknowledgment of this type of harm to a transgender girl reflects the worst kind of animus—the dehumanization of individuals who would be directly and adversely affected by the change in law.

The risks imposed by playing sports on a boys' team will, in purpose and in effect, deprive transgender girls of "the benefits of being part of the team environment" and the attendant emotional and psychological support crucial for a developing child.  *See* F.A.C. at ¶ 77.  This ostracization and loss of social consortium would send a strong message to every transgender girl that there is something wrong with them.  By targeting transgender girls, SB 1028 already "sends a message that they should be isolated instead of embraced."  F.A.C. at ¶ 79.  There has been a notable increase in hate crimes against transgender people, including transgender girls and youth,

following the enactment of SB 1028 and other laws targeting transgender youth.[3]  The psycholog-
ical harms transgender girls experience can have very serious and permanent consequences.

This is not just theoretical.  D.N. has already experienced these harms.  "On December 12,
2023, the Florida High School Athletic Association banned D.N. from participation in sports for
11 months" and she will be unable to play on a girls' sports team at school.  F.A.C. at ¶ 100.  D.N.
was "outed" as a result of an enforcement action at her school and has not returned in person since
November 27, 2023, for fear of her safety and the stigma she would be subject to.  F.A.C. at ¶¶
101–02.  D.N.'s experience shows that transgender girls, and transgender girls alone, in fact suffer
serious negative consequences as a result of SB 1028.  This impact demonstrates that it is plausible
SB 1028 was enacted as a result of discriminatory animus.

### d.  Foreseeability And Knowledge of that Impact

The foreseeability and knowledge of the disparate discriminatory impact of a challenged
law is another important factor in determining that it was motivated by discriminatory animus.
Indeed, while disparate impact alone is not enough, "actions having foreseeable and anticipated
disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." *Columbus
Bd. of Ed. v. Penick*, 443 US 449, 464 (1979).  "[A]dherence to a challenged action with full
knowledge of the predictable effects is one factor, among others, which may be considered in
determining purpose." *Baker*, 645 F. Supp at 587.

The F.A.C. alleges that the legislative sponsors and proponents of SB 1028 foresaw (and
intended) the disparate impact on transgender girls.  The contemporary comments of key legisla-
tors highlighted by D.N. falsely characterize transgender girls as imposing, full-grown adult men
and shows there was a singular obsessive concern with transgender girls.  "By design and on its
face, the only group of people whose sports participation was altered by SB 1028 are transgender
girls and women." F.A.C. at ¶ 80.  The text of SB 1028 singles out transgender girls while allowing
"a boy who is transgender to play on the girls' sports teams even if the boy had received mascu-
linizing hormone therapy as part of necessary gender transition medical care."  F.A.C. at ¶ 75.
"Only transgender girls will be forced off their current teams." F.A.C. at ¶ 80.

---

[3] *See, e.g.* The Washington Post, In States with laws targeting LGBTQ issues, school hate crimes quadrupled
https://www.washingtonpost.com/education/2024/03/12/school-lgbtq-hate-crimes-incidents/;  The Trevor Project,
Perceived Life Expectancy and Life Purpose in LGBTQ+ Young People https://www.thetrevorproject.org/research-
briefs/perceived-life-expectancy-and-life-purpose-in-lgbtq-young-people/; see also F.A.C. at ¶49.

In addition to the contemporary comments of key legislators, comments by other legislative proponents at other times demonstrate that the targeting of transgender people has been and continues to be a longstanding goal of theirs.  As D.N. notes in her Complaint, SB 1028 co-sponsor Rep. Randy Fine has called for "erasing" LGBTQ+ communities and equated transgender supporters with child sex abusers.  F.A.C. at ¶¶ 82–83.  Similarly, SB 1028 proponent Rep. Webster Barnaby literally denied that supporters of transgender rights were human, calling them "demons and imps" and "mutants from another planet."  F.A.C. at ¶ 84.  With members of the Florida legislature, who are co-sponsors and proponents of SB 1028, literally denying the humanity of and calling for the erasure of transgender people, it is almost impossible to deny that their motivation for enacting SB 1028 was rooted in discriminatory animus.  At the very least, it is certainly plausible, which is all D.N. need demonstrate at this motion to dismiss stage.

e. The Availability of Less Discriminatory Alternatives

The availability of less discriminatory alternatives is not in dispute, because before the law took effect, Defendants ***actually used*** a less discriminatory alternative.  Until SB 1028 came into effect, the FHSAA had a specific and scientifically grounded procedure to determine whether an individual transgender girl could play on a girls' team.  *See Bylaws of the Florida High School Athletic Association, Inc.*, 2019–20 Edition, at 72–73 (2019); *see also Bylaws of the Florida High School Athletic Association, Inc., 2021-2022 Edition*, at 72–73 (2021).[4]  Further, the NCAA has continued to maintain a less restrictive, substantially less discriminatory policy for the participation of transgender athletes.  That policy, which continues to be refined, maintained, and updated, ***also*** provides for individualized determinations of eligibility based on physiological testing,[5]  The existence, use, and success of these policies further undermines Defendants' arguments that the rules promulgated pursuant to SB 1028 bear a substantial relationship, or even a rational connection, to the government interests at stake here.[6]  Rather than attempting to carry the burden of demonstrating a link between the law and policies at issue and the governmental interest at stake,

---

[4] The FHSAA bylaws for the 2019-2020 school year are archived and available at https://web.archive.org/web/20210615000000*/http://fhsaa.site/sites/default/files/1920_handbook_website_116.pdf . The FHSAA 2021-2022 bylaws are available at: http://fhsaa.site/sites/default/files/1920_handbook_website_116.pdf
[5] *See* Dr. Pat Griffin & Helen Carroll, NCAA Inclusion of Transgender Student-Athletes, at 13 (August 2011) (https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf); *see also* "Transgender Student-Athlete Participation Policy," NCAA SPORTS SCIENCE INSTITUTE, https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (last updated Apr. 17, 2023).
[6] For an analogy in the free speech context, see *Messina v. City of Fort Lauderdale*, 546 F. Supp.3d 1227, 1250 (S.D. Fla. 2021) (taking issue with the defendant city's "lack of *any* evidence to justify the law," and adding that "the City must point to some evidence … that its Ordinance was justified by some significant government interest.")

Defendants merely recite the standard and assert that they have met it, conveniently ignoring the novelty of their "solution," the longstanding alternatives (including their own), and the key sponsors' admission that the law was, in effect, a solution in search of a problem that was never found. At the very least, the existence of the prior FHSAA policy and the NCAA's continued use of individualized assessments is a fact to be weighed by the finder of fact with regard to animus.

        f.   <u>The Text of SB 1028 Supports An Inference Of Discriminatory Animus</u>

Because the text of the law itself does not mention the word "transgender" at all, its proponents argue, it cannot be said to single out transgender girls. However, the absence of the word "transgender" is not dispositive. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 64 (2001) ("neutral terms can mask discrimination that is unlawful"). The text of SB 1028—both what it includes and what it does not include—supports an inference of discriminatory animus.

First, SB 1028 uses the recently redefined terms "biological boy" and "biological girl" throughout. As noted above, these terms have become political rhetoric and have lost their original scientific meaning. *See* Karkazis, *The misuses of "biological sex"; see also* Bauer, *Sex and Gender Multidimensionality in Epidemiologic Research*; F.A.C. at ¶¶ 16–22. Instead, they are political phrases meant to advance a factually inaccurate agenda: that sex and gender are always a single, unified characteristic for all people, everywhere. *See id*; *see* also F.A.C. at ¶¶ 42, 59, 63. In effect, the terms deny the existence of transgender people. That SB 1028's text includes these terms, and that the law's legislative sponsors and proponents used these terms prolifically when speaking about the bill, reflects animus: a desire to erase transgender identities or, at a minimum, denigrate and otherwise codify the discriminatory stereotypes underlying these phrases into law through SB 1028. Indeed, the phrase "biological boy" as used in the statute and by legislators is code for "transgender girl."

Second, SB 1028 bases assignment to a girls' sports team on the birth certificate that was submitted at or near the time of birth. Assignment to a girls' sports team is not based on physical ability or any other contemporary, relevant, or individualized factor. Tellingly, assignment is not allowed where a transgender girl has an amended birth certificate legally recognizing her as a girl. SB 1028 is specifically designed to prevent a transgender girl from presenting her amended birth certificate reflecting her current, legally recognized gender identity. There would be no logical reason to require production of an outdated birth certificate issued at or close to the time of birth

if the state did not intend to exclude transgender girls, and only transgender girls, from participating on the sports team aligned with their gender identity.

Defendants may claim that use of the birth certificate submitted at or near the time of birth is an attempt to find the least invasive way to ensure that transgender girls aren't allowed to play on girls' sports team.  However, such an inquiry is in fact among the most inaccurate, as it limits the determinants of sex or gender identity to a single observation by one medical professional at the time of birth.  Amended birth certificates reflect any evolution in that identity, and do not require any intrusive questioning by the government.  Further, all widely accepted tests for transgender girls and women seeking to play sports—namely testing for levels of testosterone and other hormones—are minimally invasive, and require only the drawing and analysis of blood.  To the contrary, Defendants' ostensible solution has *already* opened girls and women, both transgender and not, to invasive and humiliating questioning by peers, school officials, and parents alike.[7]  The use of "biological boy/girl" (instead of the established and accepted phrases transgender and non-transgender girl) and the birth certificate requirement are transparent attempts to discriminate against transgender girls, without having to explicitly write it into statute.

## IV.   Expert Testimony Is Required to Decide This Case

This case presents significant, disputed factual questions that can only be resolved by a finder of fact after hearing expert testimony.  Defendants' Opening Brief is replete with references to phrases such as "biological males" and "biological females."  And, in advancing their chosen narrative, Defendants do not bury the lede — they exclaim, front and center, that "biological males are not similarly situated to biological females—and *transgender girls are biological males*." Opening Br. at 2 (emphasis added).  Defendants' reductive approach is not only factually incorrect, but also charged with political rhetoric. As used throughout their Opening Brief, Defendants' use of the exclusionary phrases "biological males" and "biological females" collapses any recognized distinction between sex and gender and instead parrots unfounded fears concerning a transgender high school student's participation in school sports.

This Court is not the first to confront a challenge barring a transgender student's participation in school sports, and in each case, other courts have been guided by expert testimony. In *Hecox v. Little*, 479 F.Supp.3d 930, 982 (D. Idaho 2020), *aff'd* 79 F.4th 1009 (9th Cir. 2023), Chief Judge

---

[7] *See, e.g.*, Kim Bellware, "School Board Member Who Questioned Teen's Gender Faces Calls to Resign," WASH. POST, Feb. 11, 2024 (https://www.washingtonpost.com/nation/2024/02/11/utah-transgender-error-natalie-cline/).

Nye held that the finder of fact "must hear testimony from the experts at trial and weigh both their credibility and the extent of the scientific evidence" because "the incredibly small percentage of transgender women athletes in general, coupled with the significant dispute regarding whether such athletes actually have physiological advantages over [non-transgender] women when they have undergone hormone suppression in particular, suggest the Act's categorical exclusion of transgender women athletes has no relationship to ensuring equality and opportunities for female athletes in Idaho." *Id.* And in *Doe v. Horne*, 2023 WL 4661831, at **10–14 (D. Ariz. July 20, 2023), Judge Zipps evaluated competing expert declarations and found that "transgender girls, who have not experienced male puberty, play like girls." *Id.* at *13. Judge Zipps added: "There is no logical connection between prohibiting them from playing girls' sports teams and the goals of preventing unfair competition in girls' sports or protecting girls from being physically injured by boys." *Id.*

Like the courts in Idaho and Arizona, this Court should not take Defendants' word at face value and accept their number of unfounded representations "that transgender girls are biological males" and "[b]ecause transgender girls are biological males, and because biological males and biological females are not similarly situated for purposes of athletic competition, D.N. has failed to plead an equal protection claim." Opening Br. at 2, 5. As in *Hecox* and *Doe*, the Court should permit the parties to present admissible evidence to the finder of fact, which will determine whether Defendants' assertions are baseless.

## V.     The School Board and Superintendent Licata Should Not Be Dismissed

Defendants' arguments for the dismissal of the Broward County School Board ("Broward County Board") and its superintendent, Peter Licata, are premature, and are ill suited for a motion to dismiss, where the complaint's factual allegations are assumed to be true. While it is true that the actors who deliberated over and enacted SB 1028 were state-level entities and functionaries, that does not end the inquiry. It was only through the actions of the Broward County Board that Plaintiff was denied her constitutional rights, when *that* defendant made the decision that set in motion the chain of events leading to Plaintiff's removal from her team. That is to say, the actions of the Broward School Board and Superintendent Licata were a substantial contributing factor in the Plaintiff's actual injury. This is especially true where the detailed facts have not been revealed by Defendants—but will be revealed by discovery. *See, e.g.*, *Evangelou v. Dist. of Columbia*, 901 F. Supp.2d 159, 170 (D.D.C. 2012) (holding that plaintiff may allege "upon information and belief

where the facts are peculiarly within the possession and control of the defendant") (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *accord United States v. Zak*, 481 F. Supp.3d 1305, 1311 (N.D. Ga. 2020). Moreover, to the extent that Defendants try to argue for vicarious liability here, they have it backwards: Plaintiff does not seek to hold the Broward School Board and Superintendent Licata liable for the rogue actions of their employees, but rather for *their own official* actions. Thus, Defendants' citations to vicarious liability cases are altogether inapposite. *See Giordano v. Sch. Board of Lee Cty*, No. 2:19-cv-439-FtM-99NPM, 2020 WL 32957 (M.D. Fla. Jan. 2, 2020) (dismissing defendant school board where the underlying allegations were against an employee).

## VI.   FHSAA should not be dismissed

Defendants contend that Plaintiff's case against the FHSAA should be dismissed for her alleged failure to exhaust administrative remedies. But that argument is predicated on an incomplete and inadequate statement of the law. Further, if Defendants were to succeed on this argument, it would permit the State to entrap litigants in an endless loop of doomed lawsuits, so long as the challenged law sufficiently constrained administrative action.[8]

Defendants are correct that exhaustion doctrine applies to voluntary associations in addition to state agencies. *See Fla. High Sch. Athletic Ass'n v. Melbourne Cent. Cath. High Sch.*, 867 So.2d 1281, 1287–88 (Fla. 5th DCA 2004) (hereinafter "*Melbourne Cent. Cath. High Sch.*"). Where Defendants miss the mark, however, is in misapplying subsequent language stating that plaintiffs need not exhaust administrative remedies if doing so "would be a useless undertaking, would be meaningless[,] … internal remedies … are inadequate or nonexistent, or where resort to them would be futile." *Id.* at 1288–89 (citing 6 Am.Jur.2d Associations and Clubs §§ 25a, 30). The circumstances here, contrary to Defendants' breezy assertions, merit an exception to the doctrine. In *Sirpal v. Univ. of Miami*, this Court found an exception to exhaustion doctrine, and thereby asserted subject matter jurisdiction, where the defendant University "wholly failed to address what constitutes an available administrative remedy and whether [plaintiff's] allegations meet the standard." 684 F. Supp. 2d 1349, 1360 (S.D. Fla. 2010). In that case, Plaintiff alleged that the University conducted only a "sham" investigation, "suggest[ing] that further resort to internal

---

[8] Defendants also claim that D.N. lacks standing to challenge actions of the FHSAA, stating that "participat[ion] in interscholastic activities, standing alone, is not a constitutionally protected right." Opening Br. at 17. Defendants entirely miss the point. D.N. is not seeking to validate a purported right to play sports, but rather her right not to experience discrimination on the basis of her transgender status. *Bostock v. Clayton Cty*, 590 U.S. 644 (2020).

remedies would be a useless undertaking." *Id*.  Further, Florida state courts have held that "exhaustion of administrative remedies is not required where non are adequate or available to provide the requested relief." *Winick v. Dep't of Children and Fam. Svcs*., 161 So.3d 464, 469 (Fla. 2nd DCA 2014) (citing *Coastal Recovery Ctrs., Inc. v. Matthews*, 696 So.2d 1364 (Fla. 2nd DCA 1997)).

Here, as in *Sirpal* and *Winick*, it is clear that there is no adequate administrative remedy available to Plaintiff.  Quite simply, the FHSAA is ***bound by statute*** not to permit Plaintiff to play on school sports teams with other girls by the plain text of SB 1028.  Even if, as Defendants apparently desire, Plaintiff had attempted to appeal her case though the FHSAA bureaucracy, there is simply no imaginable way that she would have found the relief she sought.  However, Defendants have not even identified what they consider to be an available, let alone adequate, administrative remedy to address D.N.'s grievances, and none exists under the specific policy at issue here, namely the state's blanket proscription on trans girls playing girls' sports.  If, on the other hand, an adequate or plausible remedy ***does*** exist within the confines of the FHSAA's administrative jurisdiction, as Defendants baldly assert, the Court should be made aware of them before dismissing D.N.'s case under the exhaustion doctrine, underscoring yet again the need for discovery in this case and the prematurity of Defendants' motion.  Under SB 1028, however, the game is quite simply rigged against D.N.  It is clear that attempting to exhaust administrative remedies would be a fruitless endeavor, providing inadequate or nonexistent remedy to Plaintiff, and thus the exhaustion doctrine does not apply here.  D.N. need not exhaust any and all administrative remedies—which remain unspecified—before seeking relief from this Court.  Were this Court to decide otherwise, it would effectively codify an administrative Catch-22, whereby the State could limit administrative remedies through plain statutory language, and force would-be litigants to go through laborious and meaningless administrative procedure or risk immediate dismissal in the court of law.  Both logically and as a matter of policy, that simply cannot be.

## VII.   Hearing Requested

D.N. respectfully requests an oral hearing on Defendants' Motion to Dismiss.  D.N. requests 30 minutes for oral argument or such time as the Court will allow.

## VIII.   Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED: March 29, 2024

Respectfully submitted,

Kent A. Yalowitz*
Arnold & Porter Kaye Scholer LLP
250 W. 55th St.
New York, N.Y. 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-9689
Kent.Yalowitz@arnoldporter.com

*/s/ Jason A. Ross*
Jason A. Ross
Fla. Bar No. 59466
Jason.Ross@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Kaitlin Robinson*
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Ctr.
10th Floor
San Francisco, CA. 94111
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
Kaitlin.Robinson@arnoldporter.com

Jason Starr*
Cynthia Cheng-Wun Weaver*
Sarah Warbelow*
Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762
Facsimile: (202) 628-0517

Jason.Starr@hrc.org
Cynthia.Weaver@hrc.org
Sarah.Warbelow@hrc.org

* Admitted *pro hac vice*

*Counsel for D.N., by her next friends,*
*Jessica N., mother, and Gary N., father*

20

## CERTIFICATE OF SERVICE

I hereby certify that, on March 29, 2024, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, which will serve a copy on all counsel of record.

*/s/ Jason A. Ross*
Jason A. Ross
Fla. Bar No. 59466
Jason.Ross@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
