**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-61344-CIV-ALTMAN/Hunt**

D.N., by her next friends, JESSICA N., mother,
and GARY N., father,

    Plaintiff,

v.

FLORIDA STATE BOARD OF EDUCATION,
*et al.*,

    Defendants.
_____/

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT**

    Defendants, the Florida State Board of Education, Commissioner Diaz, the Broward County School Board, Superintendent Licata, and the Florida High School Athletic Association, respectfully reply in support of their Motion to Dismiss D.N.'s Amended Complaint (ECF No. 153) with prejudice.[1]

**INTRODUCTION**

    No matter what Plaintiff says, biological differences between the sexes are real. There is nothing sinister about recognizing this plain fact of everyday life. Yet Plaintiff's venomous response discards this fact—and savages the motives of anyone who acknowledges it—as unvarnished bigotry. Stripped of its rhetoric, the central argument in Plaintiff's response is simple: biological girls and biological boys are physiologically indistinguishable, and therefore any law premised on biological differences between the sexes is necessarily motivated by animus. This Court already disposed of this argument in its first Order Granting Motion to Dismiss, concluding that physiological differences in fact exist between biological males and biological females—and that, in this context, those differences matter. ECF No. 137 at 14–15, 17–19. Plaintiff's response does not raise any new arguments that this Court has not already rejected.

---

[1] All Defendants join in Parts I and II below. The SBBC and Superintendent Licata advance the arguments in Parts III and IV.A., while the FHSAA advances the arguments in Part IV.

This Court granted Plaintiff leave to amend the Complaint on the narrow issue of legislative animus. *Id.* at 37. It did not invite Plaintiff to relitigate the commonsense truth that biological boys and biological girls are different. Every allegation of animus in Plaintiff's Amended Complaint—and every argument in Plaintiff's response—simply seeks to relitigate a premise this Court has already accepted, by repeating arguments this Court has already rejected. Plaintiff offers this Court no reason to depart from its previous Order. This Court should therefore dismiss Plaintiff's Amended Complaint with prejudice.

## LEGAL ARGUMENT

### I. Plaintiff's *Arlington Heights* analysis does not establish a plausible inference of animus against transgender girls.

Plaintiff opens with a theme that appears throughout the response: that Defendants' arguments rely on "rank stereotyping and tired tropes about transgender people." ECF No. 159 at 2. The immutable, incontrovertible fact that transgender girls are biological boys is neither a stereotype nor a trope. Nor is the fact that biological males and females are physiologically different. Plaintiff's analysis under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), fails from the start because Plaintiff not only rejects these basic realities, but casts them as *per se* discriminatory with no facts to explain how or why. Even at the dismissal stage, it is a complaint's *well-pleaded factual allegations* that must give rise to a plausible inference of animus, not the unsupported conclusion that animus exists.

a. Statements by Legislators.

Plaintiff's analysis of statements by legislators does not address, but rather ignores, this Court's recognition of meaningful physiological differences between biological males and biological females. Plaintiff casts legislative statements that acknowledge these differences as discriminatory and pretextual on their face. ECF No. 159 at 6–10. But simply asserting that legislators' stated reasons for enacting SB 1038 are not their *real* reasons does not make it true, or even plausible. Plaintiff commands this Court to view legislators' statements about the biological differences between the sexes—the same biological differences that this Court has already recognized—as dog whistles for discriminatory animus, and does so on no better grounds than Plaintiff's own say-so. Plaintiff still has not alleged any *facts* showing that legislators' stated motivations were mere pretexts for discrimination, and therefore did not achieve the singular purpose for which this Court granted leave to amend: to plead facts showing legislative animus against transgender girls. ECF No. 137 at 37 ("We'll therefore give the Plaintiff *one more chance* to amend Count II of her Complaint (if she can) in a way that raises a 'plausible inference that an invidious discriminatory purpose was a motivating factor' in the passage of SB 1028." (emphasis in original)).

2

Defendants' Motion to Dismiss fully addresses the legislators' statements highlighted in Plaintiff's response, *see* ECF No. 153 at 8–10, so Defendants will not repeat those arguments here. To the extent Plaintiff identified even one or two statements that this Court believes could plausibly suggest animus by an individual legislator (which Plaintiff has not), Plaintiff still lacks sufficient facts to raise a plausible inference of animus that can be imputed to most of the Legislature's 160 members. Plaintiff's only real effort to refute this point is a citation to a few sentences from a 70-page decision in *Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229 (M.D. Fla. 2022). *See* ECF No. 159 at 5–6. But *City of Jacksonville*—which involved allegations of race-based gerrymandering in the redrawing of city-council district boundaries—is distinguishable. First, the statement at issue there was explicitly race-based: a city councilmember announced an express desire to achieve racial outcomes resulting from redistricting and to maintain a specific racial makeup of certain districts as a "fundamental" issue—an issue that motivated the councilmember to chair the committee that presented the City's proposed maps to the public and to the council. *Id.* at 1292–94. The court relied in part on these comments—and multiple other *Arlington Heights* factors—to conclude that race was a motivating factor in the City's drawing of district boundaries.

Of course, no such explicit statements exist in this case. In supporting SB 1028, none of Florida's 160 lawmakers[2] expressed a desire to single out transgender girls for discriminatory treatment. Moreover, the court in *City of Jacksonville* did not depart from the settled rule that statements of a single member are not attributable to an entire body absent some evidence supporting such extrapolation. 635 F. Supp. 3d at 1292–94. Instead, the court noted that the councilmember at issue, Priestly Jackson, sat on both the redistricting and rules committees, that the City's own expert characterized Jackson as "instrumental" to the map-drawing process, that other councilmembers publicly complimented Jackson's leadership, and that Jackson was the city council's sole mouthpiece in responding to public criticism of the proposed maps. *Id.* at 1293–94. Thus, Jackson's public commentary was "relevant to the question of legislative intent." *Id.* at 1293. Plaintiff alleges no such facts here. Plaintiff merely points to paragraphs 53 through 63 of the Amended Complaint, but these allegations reveal only that Florida's lawmakers consistently voiced concern over the equal opportunity of biological females to compete, and to compete safely, in interscholastic athletics, and that competition from biological males, regardless of transgender status, jeopardized those important interests.[3] These statements do nothing more than make Defendants' point.

---

[2] By contrast, 19 members sit on the Jacksonville city council.

[3] Plaintiff also sprinkles in more accusations about tropes and stereotypes, but those conclusory labels are not well-pleaded facts.

3

At bottom, Plaintiff contends that because several lawmakers dared to acknowledge the biological differences between males and females, the Legislature as a body feigned concern for the opportunities of biological females, including their granddaughters, ECF No. 140 ¶¶ 57–58, while acting with animus to target transgender girls. Meanwhile, the same lawmakers whom Plaintiff accuses of animus authorized co-ed teams and permitted transgender boys to compete on boys' teams. Fla. Stat. § 1006.205(3)(a), (b). This argument requires no belabored analysis in light of the Court's previous ruling squarely rejecting it.

    b. Recent History.

Plaintiff's analysis of recent historical background does not refute or even address the large body of precedent that should dissuade this Court from looking to events occurring outside of Florida, or to unrelated bills enacted in Florida after SB 1028, when evaluating the historical background of SB 1028. These cases are cited in Defendants' Motion to Dismiss, *see* ECF No. 153 at 9–12, and stand unrebutted.

    c. Impact.

Far from showing a "clear pattern" of discriminatory impacts "that would be determinative" of discriminatory intent, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021), Plaintiff offers only hypotheticals to suggest the potential bad outcomes that could befall some unnamed persons, at some unknown time in the future, under circumstances that do not exist, *see* ECF No. 159 at 12–14. This does not establish that SB 1028 has or is likely to have a discriminatory impact at all, much less that the Legislature enacted SB 1028 because of this hypothesized discriminatory impact.

Plaintiff's impact analysis is flawed from the start because it begins from the demonstrably false premise that "the **only** impact [of SB 1028] is on transgender girls." *Id.* at 12 (emphasis in original). On its face, the classification that SB 1028 draws applies to all biological males, regardless of gender identity. This Court already decided as much. ECF No. 137 at 22 ("And, far from singling out transgender girls for special treatment, the law applies equally to the (almost) fifty percent of the population who are born as biological boys—and who *don't* transition."). The reason is obvious: the Legislature wanted biological females to be able to play sports without facing competition from biological males. Plaintiff still points to no facts showing that the Legislature enacted SB 1028 because of its impact on transgender girls, as opposed to the impact the law plainly contemplates: the exclusion of all biological boys from girls' sports.

    d. Availability of Less Discriminatory Alternatives.

Plaintiff does not address Defendants' argument that less discriminatory alternatives are "viable," and therefore relevant to the *Arlington Heights* analysis, only when they "achieve[] the same objectives" as the challenged law. ECF No. 153 at 13 (quoting *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 941 (11th Cir. 2023)). Instead, Plaintiff doubles-down on proposals that represent a policy

choice opposite to the one the Legislature made, and that fails to achieve at least one of the Legislature's aims: preserving opportunities for *biological* girls, who have been historically underrepresented in sports. *See* ECF No. 159 at 15–16. The Legislature's rejection of measures that do not advance its policy choice does not prove that the Legislature could have served the same ends through less discriminatory means.

e. Text of SB 1028.

Like the rest of Plaintiff's arguments, Plaintiff's argument surrounding SB 1028's text relitigates an issue this Court has already decided: that transgender girls are biological males, and biological males are physiologically different from biological females. With no factual allegations to support the argument that the text of SB 1028 discriminates against transgender girls, Plaintiff hyperbolically declares that any mention of sex—as opposed to gender identity—is facially discriminatory against transgender girls. *See*, ECF No. 159 at 16 ("[T]he terms [biological boy and biological girl] deny the existence of transgender people."); *id.* at 17 ("The use of 'biological boy/girl' . . . [is a] transparent attempt[] to discriminate against transgender girls, without having to explicitly write it into statutes."). But Plaintiff cannot eradicate the biological distinction between male and female, redefine "sex" to mean "gender identity," ban the terms "biological boy" and "biological girl" in favor of "accepted phrases," and leave no word in our vernacular (or at least no "accepted" word) to describe the biological classification between males and females. ECF No. 159 at 17. Simply saying that the Legislature's reliance on a well-known biological trait is pretextual does not make it true. Plaintiff's textual argument is based on a policy disagreement and speculation—not well-pleaded facts—and contradicts this Court's earlier conclusion. *See* ECF No. 137 at 22 ("[W]e disagree that the statute comes anywhere close to the sort of caste-like system the Constitution forbids—a system in which transgender girls are legally demeaned and degraded *because of* their gender identity.").

The *Arlington Heights* factors weigh decidedly against any plausible inference that animus towards transgender girls motivated the Legislature's enactment of SB 1028. Consistent with its prior ruling, this Court should dismiss—this time, with prejudice.

**II.     Plaintiff's individual circumstances are irrelevant to the equal-protection analysis.**

Plaintiff incorrectly focuses on whether SB 1028's application to Plaintiff's circumstances furthers the law's aims, rather than whether the statutory classification at large further those aims. Only the latter inquiry matters in an equal-protection analysis. In furtherance of this error, Plaintiff argues that discovery is necessary because the parties' disputes are factual, and therefore this Court must consider evidence, including expert testimony, related to Plaintiff's circumstances and the impacts of hormone treatment on individual athletic performance before it can decide this case. This argument fails for three reasons: *first*, Plaintiff's individual circumstances are irrelevant; *second*, if Plaintiff makes the team and displaces a

5

biological female, then the State's interest is implicated, whether or not Plaintiff's hormone therapy has eliminated the physiological advantages of a biological male; and *third*, Plaintiff must plead facts giving rise to a plausible inference of discriminatory animus before discovery begins, not the other way around.

To start, the equal-protection inquiry focuses on whether a statutory classification furthers the government's interest—not whether the law's application to a particular individual separately furthers the government's interest in every single instance. The State need not prove, student by student, that the challenged law's application to each biological male is substantially related to an important governmental objective. The question is not whether *the statute's application to D.N.* promotes an important governmental objective, but whether the *statutory classification at large* promotes an important governmental objective.[4]

To illustrate, in *O'Connor v. Board of Education of School District 23*, 449 U.S. 1301 (1980) (Stevens, J., in chambers), Justice Stevens declined to vacate a stay of a preliminary injunction that ordered a school district to permit a female athlete to try out for the boys' team. Justice Stevens recognized that the requirement of sex-separated athletic teams was "arbitrary" as applied to the plaintiff, but concluded that its validity depended on its operation "in most of its normal applications"—not "in an individual case." *Id.* at 1306–07 & n.4. Justice Stevens concluded that there was "little question about the validity of the classification in most of its normal applications" and that, without the classification, "there would be substantial risk that boys would dominate the girls' program and deny them an equal opportunity to compete in interscholastic events." *Id.* at 1307. The Seventh Circuit agreed, *O'Connor v. Bd. of Educ. of Sch. Dist. No. 23*, 645 F.2d 578, 581 (7th Cir. 1981), and the district court on remand denied relief because the plaintiff sought to prove only "that the generalization does not apply to her," *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 545 F. Supp. 376, 381 (N.D. Ill. 1982); *see also Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 316 (1976) (upholding a mandatory retirement age for police that advances a legitimate interest, even though the State elected "not to determine fitness more precisely through individualized testing"); *Steffan v. Perry*, 41 F.3d 677, 686 (D.C. Cir. 1994) (en banc) ("Nearly any statute which classifies people may be irrational as applied in particular cases." (quoting *Beller v. Middendorf*, 632 F.2d 788, 808 n.20 (9th Cir. 1980))).

---

[4] As an example, citizens under the age of eighteen may not vote. Fla. Const. art. VI, § 2. This limitation is designed to exclude individuals who, as a class, lack sufficient judgment and knowledge to exercise the franchise. If Plaintiff were to prove that, at fifteen, *Plaintiff individually* has sufficient judgment and knowledge to vote—and that *Plaintiff's* exclusion from the franchise serves no legitimate objective—then an equal-protection challenge to the age limitation would still be rejected. Or if, despite being fifteen, Plaintiff were able to safely drive a car or own a firearm—and the State's refusal to issue Plaintiff a driver license or a concealed-carry license served no legitimate objective—then an equal-protection claim would still fail. Florida may rely on classifications that are well-founded in the main and need not conduct case-by-case assessments of the constitutional fitness of those classifications in individual cases.

6

Here too, the relationship between the broad classification and the State's objective determines the constitutional question—not the law's effect on one plaintiff, or even a small subclass of biological males who identify as female. *See, e.g., Lalli v. Lalli*, 439 U.S. 259, 272–73 (1978) (upholding statute even when it "operate[s] unfairly" as applied to plaintiffs because the equal-protection analysis looks at "the state interests [the law] is intended to promote" rather than its "fairness" applied to individual plaintiffs, and noting that "inequitable results" are inherent in most classifications); *Califano v. Jobst*, 434 U.S. 47, 55–56 (1977) (upholding statute's application to plaintiff because a "broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples").

The en-banc Eleventh Circuit applied this reasoning in *Jones v. Governor of Florida*, 975 F.3d 1016, 1036–37 (11th Cir. 2020) (en banc), which reviewed a three-judge panel's decision in *Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020). The three-judge panel affirmed the invalidation of a state law that required felons to pay all fines before their right to vote could be restored. The panel recognized that the State had an interest in the collection of revenues but concluded that the statute's application to the individual plaintiffs—who were indigent and unable to pay their fines—did not serve the State's interest. 950 F.3d at 811. The en-banc court rejected the panel's reasoning, concluding that the statute applied to the plaintiffs even if its application to them did not advance the State's interest. 975 F.3d at 1036–37.

The Eleventh Circuit confirmed this principle again in *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791, 800 n.3 (11th Cir. 2022), noting that the plaintiff's characterization of an equal-protection claim as an "as-applied" challenge did not "speak to the substantive rule of law necessary to establish a constitutional violation," and that the plaintiff's "attempt to cabin the lawsuit to [the plaintiff's] particular circumstances" was improper because the relief sought would apply far more broadly. It is therefore irrelevant to this Court's analysis whether SB 1028's application to Plaintiff's individual circumstances achieves one of its stated goals. *Cf. Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70 (2001) ("None of our gender-based classification equal protection cases [has] required that the [policy] under consideration must be capable of achieving its ultimate objective in every instance.").[5] Certainly, the Equal Protection Clause does not require this Court to administer a physical-fitness examination or assess the hormone levels in a plaintiff's bloodstream to determine whether a state's interest is legitimate.

---

[5] Plaintiff's analysis is also irreconcilable with courts' recognition that, in the context of sex-based classifications, intermediate scrutiny does not require a perfect fit in every case. *Nguyen*, 533 U.S. at 70; *Adams*, 57 F.4th at 801 ("But the Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex.").

Next, even if individual circumstances were relevant, SB 1028's application to Plaintiff would serve the State's interest. The State sought to protect and preserve the athletic opportunities of biological females, who have historically been underrepresented in athletic competition. If Plaintiff—a biological male—makes the team and displaces a biological female, then the State's interest will have been defeated, even if Plaintiff, though biologically male, does not retain physiological advantages over most biological females. SB 1028's application to Plaintiff would have preserved the opportunity of a biological female to play sports—an opportunity that, without SB 1028, would have been conferred on a biological male.

Finally, this Court should not be swayed by Plaintiff's pleas for discovery. Discovery is not a life raft designed to save an insufficiently-pleaded complaint. The response argues, for example, that Plaintiff "should be given the opportunity to develop the factual record and relevant expert testimony needed to demonstrate that Defendants' core arguments are incorrect and pretextual." ECF No. 159 at 3. This conclusory statement speeds past Plaintiff's preliminary obligation to articulate a well-pleaded complaint before "unlock[ing] the doors of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This Court's analysis at the dismissal stage looks at the facts actually pleaded—not what a plaintiff hopes to establish during discovery. If Plaintiff cannot allege facts showing pretext *now*, then Plaintiff has not stated a claim.

### III. Both the School Board of Broward County and the Superintendent of Broward County Public Schools should be dismissed with prejudice.

Plaintiff's response suffers from the same deficiencies as the Amended Complaint as it relates to both the SBBC and to Licata—the response, just like the Amended Complaint, is devoid of any factual allegations related to any actions that the SBBC and/or Licata took to deprive Plaintiff of her rights. Like the Amended Complaint, most of the response focuses on the actions of the Legislature and statements of legislative sponsors or proponents—not the actions or statements of the SBBC or Licata.

In an effort to save her unsupported claims against the SBBC and Licata, Plaintiff claims that it was the actions of the SBBC that set into motion Plaintiff's alleged removal from the team. Plaintiff cites no factual allegation in the Amended Complaint to support this position. Moreover, Plaintiff makes this argument while simultaneously conceding that the "actors" were "state-level entities and functionaries." ECF No. 159 at 17. These inconsistent positions cannot be reconciled.

Plaintiff claims that the SBBC and Licata's arguments are ill-suited for a motion to dismiss because the Court has to take the Amended Complaint's allegation as true. *Id.* However, fatal to Plaintiff's claims is the lack of any factual allegations in the Amended Complaint related to the SBBC and/or Licata as it relates to Plaintiff's removal from the team. Indeed, Plaintiff affirmatively alleges that it was the FHSAA that banned her from the team. *See* ECF No. 140 ¶ 100. There are no allegations of

8

deprivation on the part of Licata, and the only allegation in the Amended Complaint that relates to the SBBC is Plaintiff's allegation that the SBBC followed the law as it was obligated to do.

Plaintiff concludes by admitting that she has no facts to support that the SBBC and/or Licata deprived Plaintiff of any rights and that these facts will be revealed in discovery. Maybe that will be the case; it is doubtful as it relates to the SBBC and/or Licata, but, nonetheless, as set forth above, Plaintiff's burden is to state a claim in the Amended Complaint. Plaintiff cannot sue the SBBC and Licata and hope to find a basis for her claims against these defendants in discovery. Because Plaintiff has consistently demonstrated that she has no factual allegations to support her claims against the SBBC and Licata, the Amended Complaint must be dismissed with prejudice as to these Defendants.

It appears from Plaintiff's response that Plaintiff misunderstood the SBBC and Licata's vicarious liability argument. The SBBC and Licata's argument was that the Plaintiff cannot impute the actions or statements of the Legislature to the SBBC and Licata and hold the SBBC and Licata liable for a deprivation of rights based on actions or statements that the Legislature made. The SBBC and Licata are not part of the Legislature. Here again, Plaintiff states that she is holding the SBBC and Licata liable for their own actions, but fails to cite any factual allegations to shed light on what those actions were.

Finally, Plaintiff ignores entirely Licata's argument that he is a redundant defendant. It is not addressed anywhere in the response. That is likely because there is no conceivable basis for maintaining an action against both the SBBC and its superintendent. These entities are one and the same, and they do not exist or operate independent of one another. As a result, and for the reasons set forth in the Motion to Dismiss, ECF No. 153, Licata should be dismissed with prejudice.

## IV. FHSAA should be dismissed.

### A. D.N. Lacks Standing.[6]

D.N. contends she has standing to bring her claims against FHSAA because she is not seeking to validate a purported right to play sports, but rather her right not to experience discrimination on the basis of her transgender status. However, D.N. is specifically seeking the right to play on a girls' sports team in Florida. D.N. claims that FHSAA's enforcement of SB 1028 has resulted in her being banned from playing on her sports team, and she seeks an injunction enjoining all Defendants "from enforcing SB 1028 or any other law, policy or bylaw that would preclude Plaintiff from participation in any girls' sports teams in Florida." ECF No. 140 ¶ 3, Prayer for Relief ¶ B. D.N.'s alleged damages in this matter

---

[6] The SBBC and Licata join in this argument as it relates to these defendants and reasserts these arguments as to the SBBC and Licata.

are her being banned from playing on the sports team of her choosing, and she seeks the Court to prohibit her from being precluded from playing on any girls' sports team. Because the remedy she seeks is the opportunity to participate in interscholastic athletic activities, and such opportunity, standing alone, is not a constitutionally protected right or privilege, D.N. does not have standing to assert her claims against the FHSAA.

### B.  D.N. Fails to Allege Facts Showing FHSAA Violated 42 U.S.C. § 1983.

In her Opposition, D.N. fails to address how FHSAA has caused the alleged constitutional violation at issue. D.N. continues to point to comments and conduct of the Legislature, sponsors and supporters of the bill, which D.N. contends show a plausible inference that SB 1028 was motivated by discriminatory animus. However, D.N. does not allege any facts showing discriminatory conduct by FHSAA. Because D.N. does not identify any specific discriminatory conduct by FHSAA, she is merely attempting to hold FHSAA vicariously liable under Section 1983, which is not permissible. As such, FHSAA should be dismissed from this action.

### C.  D.N. Fails to Allege Facts Demonstrating Exhaustion of Administrative Remedies.

Plaintiff acknowledges that she failed to exhaust administrative remedies. While Plaintiff argues that doing so would be a useless undertaking, meaningless or futile, Plaintiff fails to allege any facts in her Amended Complaint supporting this position. Therefore, Plaintiff's claims against FHSAA should be dismissed.

**WHEREFORE**, Defendants respectfully request that the Court dismiss Plaintiff's Amended Complaint with prejudice.

Dated April 15, 2024.                                   Respectfully submitted,

/s/ *Anastasia Protopapadakis*                          /s/ *Andy Bardos*
Anastasia Protopapadakis (FBN 051426)                   Andy Bardos (FBN 822671)
anastasia.protopapadakis@gray-robinson.com              andy.bardos@gray-robinson.com
GRAYROBINSON, P.A.                                      Ashley H. Lukis (FBN 106391)
333 S.E. 3rd Avenue, Suite 3200                         ashley.lukis@gray-robinson.com
Miami, Florida 33131                                    GRAYROBINSON, P.A.
Telephone: 305-416-6880                                 301 South Bronough Street, Suite 600
*Attorneys for Defendants, Broward County*              Tallahassee, Florida 32301
*School Board and Superintendent Licata*                Telephone: 850-577-9090
                                                        *Attorneys for Defendants, Florida State Board of*
                                                        *Education and Commissioner Diaz*

| | |
|---|---|
| /s/ *Henry C. Whitaker* | /s/ *Jessica DeBono Anderson* |
| Ashley Moody | JESSICA DEBONO ANDERSON |
| *Attorney General* | Fla. Bar No.: 58503 |
| Henry C. Whitaker (FBN 1031175) | BARRY A. POSTMAN |
| *Solicitor General* | Fla. Bar No: 991856 |
| Office of the Attorney General | Cole, Scott & Kissane, P.A. |
| PL-01, The Capitol | Tower Place, Suite 400 |
| Tallahassee, Florida 32399-1050 | 1900 Summit Tower Boulevard |
| *Attorneys for Defendants, Florida State Board of Education and Commissioner Diaz* | Orlando, Florida 32810 |
| | Primary Email: |
| | Barry.Postman@csklegal.com |
| | Secondary Email: |
| | Jessica.Anderson@csklegal.com |
| | Secondary Email: |
| | Cynthia.Acuna-Nelson@csklegal.com |
| | Telephone: (321) 972-0037 |
| | Facsimile: (321) 972-0099 |
| | *Attorneys for Defendant, Florida High School Athletic Association* |