# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-cv-61344-ALTMAN/Hunt

**D.N.**, *by her next friends*, **JESSICA N.**,
*mother*, and **GARY N.**, *father*,

      *Plaintiff*,

*v.*

**GOVERNOR RONALD DESANTIS**,
*in his official capacity as Governor of*
*Florida, et al.*,

      *Defendants*.

_____/

## <u>ORDER GRANTING MOTION TO DISMISS</u>

In 2021, the Florida Legislature passed (and Governor Ron DeSantis signed into law) SB 1028—the "Fairness in Women's Sports Act," Fla. Stat. § 1006.205. *See* Amended Complaint [ECF No. 140] ¶¶ 64–66. Our Plaintiff, D.N., is a biological male who identifies as a girl and now believes that SB 1028 unlawfully discriminates against transgender females by limiting their participation in school-sponsored sports teams. *See id.* ¶ 4 ("SB 1028, ironically titled the 'Fairness in Women's Sports Act,' is one of many state laws passed in recent years, both in Florida and across the country, that single out and target transgender people."). D.N.'s original Complaint, which was filed on June 29, 2021, "assert[ed] three claims for relief: Violation of Title IX (Count I); Deprivation of Equal Protection (Count II); and Violation of Due Process Right to Privacy (Count III)." *D.N. v. DeSantis*, 701 F. Supp. 3d 1244, 1248–49 (S.D. Fla. 2023) (Altman, J.). The Defendants moved to dismiss D.N.'s Complaint, *see* Renewed Motion to Dismiss [ECF No. 108], relying principally on the Eleventh Circuit's decision in *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc).

We *mainly* agreed with the Defendants and dismissed most of D.N.'s original Complaint *with* prejudice. *See D.N.*, 701 F. Supp. 3d at 1272 ("Count I of the Complaint is DISMISSED . . . . Count III of the Complaint is DISMISSED with prejudice and without leave to amend."). Still, we found that *Adams* had left open one question—whether SB 1028 violated Title IX because D.N., "as a biological male, [is] being treated differently (and worse) than biological females." *Id.* at 1265. We also allowed D.N. to amend the Equal Protection claim to show "'that an invidious discriminatory purpose was a motivating factor' in the passage of SB 1028." *Id.* at 1271 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020)). We therefore granted D.N. leave to amend: (1) the Title IX claim "to advance the only potential claim *Adams* left unaddressed—*viz.*, whether Title IX prohibits the State from treating D.N., as a biological male, differently than biological females"; and (2) the Equal Protection claim to include more details "on the issue of discriminatory animus." *Id.* at 1272.

D.N. filed a one-count Amended Complaint on January 11, 2024. *See* Amended Complaint [ECF No. 140]. In that second complaint, D.N. chose *not* to renew the Title IX challenge and focused instead solely on beefing up the Equal Protection claim. *See id.* ¶¶ 103–11. The Defendants have now responded with a Renewed Motion to Dismiss (the "Motion") [ECF No. 153], which has been fully briefed, *see* Opposition to Defendants' Motion to Dismiss Amended Complaint ("Response") [ECF No. 159]; Defendants' Reply in Support of Motion to Dismiss ("Reply") [ECF No. 160]. After careful review, we **GRANT** the Defendants' Motion and **DISMISS** this case.

### THE FACTS

D.N. is a sixteen-year-old Broward County high school student who has "identified and lived as a girl[.]" Amended Complaint ¶ 23. D.N. "was diagnosed with gender dysphoria" at seven years old, began "taking hormone blockers at the recommendation of her endocrinologist to stop her body's production of testosterone and prevent the onset of endogenous male puberty" at age eleven, uses female pronouns, and "legally changed her gender marker to female on her birth records and obtained

a legal name change to a name that reflects her female gender identity." *Id.* ¶¶ 23–26. Sports have played "an integral role" in D.N.'s life. *Id.* ¶ 27. D.N. "joined a girls' soccer team" at age seven and has played basketball and softball "both in school and during the summer." *Id.* ¶¶ 24, 27. In high school, D.N. joined the girls' volleyball team. *Id.* ¶ 30. At that time, Broward County Public Schools followed "a specific non-discrimination policy regarding gender identity," which guaranteed "equal treatment and opportunity for transgender students at school." *Id.* ¶ 33.

On July 1, 2021, the State of Florida enacted SB 1028. *See id.* ¶ 66 ("Governor Ron DeSantis chose to sign [SB 1028] . . . on June 1, 2021[.] . . . The law became effective on July 1, 2021."). According to D.N., SB 1028 "targets and prohibits transgender girls from participating, at any public secondary school or public postsecondary institution, in any school-sponsored girls' sports. It mandates that interscholastic, intercollegiate, intramural, or club athletics teams or sports that are sponsored by a public school must be 'expressly designated' as male (men or boys) or female (women or girls) based on the 'biological sex at birth of team members.' It also provides for coed or mixed teams, which can include both males and females." *Id.* ¶ 67; *see also* FLA. STAT. § 1006.205(3)(a) ("Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public secondary school or public postsecondary institution must be expressly designated as one of the following based on the biological sex at birth of team members: males, men, or boys; females, women, or girls; or coed or mixed, including both males and females."). SB 1028 also provides "private rights of action for any student who is deprived of an athletic opportunity or suffers 'direct or indirect harms' as a result of a violation of the statute." Amended Complaint ¶ 71; *see also* FLA. STAT. § 1006.205(4)(a) ("Any student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of this section shall have a private cause of action for injunctive relief, damages, and any other relief available under law against the school or public postsecondary institution.").

The passage of SB 1028 "forced" Broward County Public Schools "to backtrack and violate their own non-discrimination policy by banning D.N. from playing girls' sports at school." *Id.* ¶ 34. D.N.'s mother, Jessica, "was informed that she was under investigation . . . for an alleged violation of SB 1028" on November 27, 2023. *Id.* ¶ 95. That inquest resulted in D.N. being "banned . . . from participating in sports for 11 months." *Id.* ¶ 100. The investigation caused D.N. to "experience[ ] extreme distress" in "a hostile and emotionally charged political environment." *Id.* ¶ 101.[1] "As a result of the enforcement of SB 1028 and the forced outing that resulted, D.N. has not attended school in person since November 27, 2023. She fears she will not be safe at school." *Id.* ¶ 102. D.N. wants to "return to her current school and resume her academic and student leadership pursuits" but "fears that the stigma resulting from the enforcement of SB 1028 has taken away that option for her." *Ibid.*

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a

---

[1] These alleged acts against D.N.'s mother by Broward County Public Schools officials is the subject of another case pending before us. *See generally* Complaint, *Norton v. Broward Cnty. Sch. Bd.*, No. 24-cv-61874 (S.D. Fla. Oct. 8, 2024) (Altman, J.), ECF No. 1.

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

**ANALYSIS**

D.N. alleges that (1) "SB 1028 was designed to only impact transgender girls by forcing them to play sports on teams that do not align with their gender identity"; (2) "[n]o other class of people is so impacted by [SB 1028]"; (3) "SB 1028 was passed with invidious discrimination as a motivating factor, as demonstrated by statements made by the bill's sponsors and supporters"; and (4) "SB 1028 is part of a pattern and practice in recent history of anti-LGBTQ legislators targeting transgender girls, a vulnerable minority class, with laws designed to erase their identity, remove their rights, and deny them the ability to live with dignity in Florida." Amended Complaint ¶¶ 107–09.

In their Motion to Dismiss, the Defendants advance four arguments. *First*, they say that D.N. fails to state an Equal Protection claim because "biological males are not similarly situated to biological females for purposes of athletics." Motion to Dismiss at 4. As the Defendants see it, "[f]or purposes of athletic participation, transgender girls—i.e., biological males—and biological females are not 'in all relevant respects alike' and are therefore not similarly situated." *Ibid. Second*, they contend that D.N.'s "allegations of discriminatory animus" offer only "sweeping conclusions, labels, and rancor without corroborating, well-pleaded facts or a nexus to the challenged law's passage." *Id.* at 5. *Third*, they argue that the factors laid out by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), "weigh firmly against a plausible inference of discriminatory animus here." *Id.* at 8. *Fourth*, they ask us to reaffirm our earlier conclusion that SB

1028 "satisfies intermediate scrutiny." *Id.* at 15 (citing *D.N.*, 701 F. Supp. 3d at 1259).[2] Because the *Arlington Heights* factors don't support a finding of discriminatory animus, we dismiss the Amended Complaint *without* addressing the Defendants' other arguments.

## I.    Our Prior Dismissal Order

We started our first dismissal order by finding that intermediate scrutiny applied to our assessment of SB 1028's constitutionality because the law "explicitly classifies students on the basis of biological sex." *D.N.*, 701 F. Supp. 3d at 1253.[3] For this view, we relied on *Adams*, where the Eleventh Circuit held that a regulation separating "bathrooms based on biological sex" (which likewise affected transgender students) was subject to intermediate scrutiny *because* it "explicitly classif[ed] . . . on the basis of biological sex." *Id.* at 1253 (quoting *Adams*, 57 F.4th at 798, 803). To satisfy intermediate scrutiny, we explained, "the government 'must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Ibid.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Applying that test, we found that Florida had identified a "well-established" and "important" governmental interest in "promoting women's equality in athletics." *Id.* at 1254. We also concluded that SB 1028 furthers this important governmental interest because it was designed to

---

[2] The Defendants also argue that the School Board of Broward County, the Superintendent of Broward County Public Schools, and the FHSAA should be dismissed for reasons unrelated to D.N.'s inability to plead discriminatory animus. *See, e.g.*, Motion to Dismiss at 16 ("D.N. seeks to hold the SBBC and Licata liable under Section 1983 by way of the SBBC's enforcement of SB 1028, which is required by state law, which is tantamount to a claim of vicarious liability and not permissible under Section 1983."); *id.* at 18 ("Because D.N.'s claims against FHSAA simply involve the opportunity to participate in interscholastic athletic activities, which is not a constitutionally protected right or privilege, D.N. lacks standing."). Since D.N. fails to state a viable Equal Protection claim against *any* of the Defendants, we needn't (and won't) address these defendant-specific arguments here.

[3] SB 1028 does this by requiring public secondary schools and postsecondary schools: (1) to "expressly designate[ ]" their athletic teams as being for "males," "females," or "coed or mixed"; and (2) to prevent "students of the male sex" from participating in "[a]thletic teams or sports designated for females, women, or girls[.]" FLA. STAT. § 1006.205(3).

"giv[e] female athletes an opportunity 'to demonstrate their strength, skills, and athletic abilities,' §
1006.205(2)(a)—without having to compete with biological men." *Id.* at 1256.

As here, D.N. claimed in the original Complaint that "the statute is tacitly motivated by
discriminatory animus and that its *real* purpose is to categorically exclude transgender girls from school
sports." *Id.* at 1255 (cleaned up) (citing Response to Original Motion to Dismiss [ECF No. 123] at 15
n.11, 17). To prove this animus, D.N. relied on (1) the Florida Legislature's decision to "reject[ ] a
competing bill to SB 1028 that would have permitted transgender girls to join girls' teams under the
standard adopted by the International Olympic Committee" and (2) statements made by Florida
Senator Kelli Stargel and Florida Governor Ron DeSantis. *Ibid.* (cleaned up). In our view, however,
these allegations of discriminatory animus did not "raise a plausible inference that an invidious
discriminatory purpose was a motivating factor" in the passage of SB 1028. *Id.* at 1256. Although D.N.
may have disagreed with Governor DeSantis and Senator Stargel's remarks "that keeping transgender
girls off of girls' sports teams serves the government's important interest in promoting women's
athletics," mere disagreement with these speakers, we explained, wasn't enough to make out a plausible
case of discriminatory animus. *Id.* at 1256–57.

Finally, we held that SB 1028 was "substantially related to the achievement" of the State's
important governmental objective—*viz.*, "protecting and promoting athletic opportunities for girls."
*Id.* at 1257. Applying the Eleventh Circuit's holding in *Adams*, we noted that "the biological differences
between males and females" sometimes compels unequal treatment. *Id.* at 1258 (quoting *Adams*, 57
F.4th at 809); *see also id.* at 1257 ("On the one hand, the Supreme Court has held that intermediate
scrutiny 'does not make sex a proscribed classification' because 'physical differences between men and
women are enduring.'" (cleaned up) (quoting *Virginia*, 518 U.S. at 533)). With this understanding in
mind, we noted that "SB 1028's gender-based classifications are rooted in real differences between the
sexes—*not* stereotypes." *Id.* at 1258. The law, after all, simply "adopt[ed] the uncontroversial

proposition that most men and women *do* have different (and innate) physical attributes." *Ibid.* And, we continued, SB 1028 didn't "rely on impermissible stereotypes about transgender girls" merely because "the separation of sports teams into girls' teams, boys' teams, and co-ed teams" had an arguable "disparate impact" on transgender girls. *Id.* at 1259. At the same time, we gave D.N. "*one more chance* to amend [her Equal Protection claim] (if she can) in a way that raises a 'plausible inference that an invidious discriminatory purpose was a motivating factor' in the passage of SB 1028." *Id.* at 1271 (quoting *Dep't of Homeland Sec.*, 591 U.S. at 34).

## II.   D.N.'s Allegations and the *Arlington Heights* Factors

As we've said, D.N. has now submitted that Amended Complaint, alleging that SB 1028 "is part of a pattern of discriminatory laws targeting transgender people, especially girls." Amended Complaint ¶ 44; *see also id.* ¶ 54 ("[U]nlawful discriminatory animus towards transgender girls was the true motivation for SB 1028 and other bills like it."). To support this proposition, D.N. points to statements made (and actions taken) by the law's supporters. *First*, D.N. says that "[s]ponsors and supporters of SB 1028" were part of "[anti-trans] networks and efforts," and she insists that these sponsors and supporters relied on "legislative witnesses" to further their goals of "pass[ing] anti-trans laws[.]" *Id.* ¶ 41. *Second*, D.N. points to several other bills passed by the Florida Legislature— specifically, HB 1557, HB 7, HB 1069, SB 254, HB 1521, SB 266, SB 1580, HB 599, and HB 1233— as proof that the Florida Legislature is engaged in a "pattern of [enacting] discriminatory laws [that] target transgender people and girls[.]" *Id.* ¶¶ 45–48. *Third*, D.N. relies on statements certain Florida legislators made while debating the bill—statements that, she says, were little more than "fearmongering fantasies, rooted in discriminatory tropes . . . . motivated by fear of transgender people based on stereotypes about transgender people." *Id.* ¶¶ 54, 59. *Fourth*, D.N. claims that the discriminatory impact of SB 1028 reveals the Florida Legislature's discriminatory animus, since the law "would allow a boy who is transgender to play on the girls' sports teams" while simultaneously

forbidding transgender girls "from participating on girls' sports teams[.]" *Id.* ¶ 75. *Fifth*, D.N. cites other "[c]omments by sponsors and supporters of SB 1028 and its predecessor bills," which demonstrate their "discriminatory motivations in public." *Id.* ¶ 81. *Sixth*, D.N. identifies other "less discriminatory alternatives" the Florida Legislature *could* have (but did not) adopt—such as the Florida High School Athletic Association's ("FHSAA") former "Gender Identity Participation" policy and the National Collegiate Athletics Association's ("NCAA") "Transgender Student-Athlete Participation Policy"—as evidence that SB 1028 was designed, *not* "to protect fairness in women's sports," *but* to discriminate against transgender athletes. *Id.* ¶ 85.

To establish a violation of the Equal Protection Clause, the Plaintiff must show that a legislative act "had a discriminatory purpose and effect." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188–89 (11th Cir. 1999). The Eleventh Circuit recognizes "three broad categories" of equal-protection claims—that is to say, three different ways for an aggrieved plaintiff to show discriminatory purpose and effect. *E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987); *see also Red Door Asian Bistro v. City of Ft. Lauderdale*, 2023 WL 5606088, at *7 (11th Cir. Aug. 30, 2023) ("The Equal Protection Clause protects against race discrimination on the face of a statute, in the enactment of a statute, and in the application of a facially neutral statute."). One category—not relevant here—is triggered when the "defendants are unequally administering a facially neutral statute." *E&T Realty*, 830 F.2d at 1112 n.5. The second category kicks in when "a statute discriminates on its face." *Ibid.* That's the type of claim the Eleventh Circuit confronted in *Adams*, and it's the kind of claim we considered (and rejected) in our prior Order. *See Adams*, 57 F.4th at 808 ("[T]he bathroom policy facially classifies based on biological sex[.]"); *D.N.*, 701 F. Supp. 3d at 1253 ("SB 1028 explicitly classifies students on the basis of biological sex[.]"). The final category—and the sole remaining way for D.N. to advance an equal-protection claim—applies when the "neutral application of a facially neutral statute has a disparate impact." *E&T Realty*, 830 F.2d at 1112 n.5. And "a facially neutral law

is unconstitutional under the Equal Protection Clause only if a discriminatory impact can be traced to a discriminatory purpose." *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000).

"[A] discriminatory purpose 'implies that the decisionmaker[ ]' . . . 'selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *Adams*, 57 F.4th at 810 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)). "To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec.*, 591 U.S. at 34 (citing *Arlington Heights*, 429 U.S. at 266). "Sometimes a clear pattern, unexplainable on grounds other than [discrimination], emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare." *Arlington Heights*, 429 U.S. at 266 (cleaned up). In most cases, then, the district court must conduct a "sensitive inquiry into . . . circumstantial and direct evidence of intent" to determine "whether invidious discriminatory purpose was a motivating factor" behind the allegedly unlawful act. *Ibid.*; *see also Jean v. Nelson*, 711 F.2d 1455, 1485 (11th Cir. 1983) ("The very nature of legislative and administrative action makes it difficult to ascertain the 'intent' of the acting body. For that reason, in *Arlington Heights* the Supreme Court provided some examples of 'circumstantial and direct evidence' that courts might properly consider in judging whether invidious discrimination permeated official action.").

To guide our analysis of a law's allegedly discriminatory purpose, the Supreme Court has outlined the following eight factors (known as the *Arlington Heights* factors) for us to consider: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators[;] (6) the foreseeability of the disparate impact; (7) knowledge of that impact,

and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) (citing *Jean*, 711 F.2d at 1486).[4] The eight *Arlington Heights* factors "are not exhaustive," *ibid.*, so we can look to "any other direct or circumstantial evidence relevant to intent." *Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 209 (8th Cir. 1982) (citing *Arlington Heights*, 429 U.S. at 266–68); *see also His House Recovery Residence v. Cobb Cnty., Ga.*, 806 F. App'x 780, 784 n.3 (11th Cir. 2020) ("The considerations the Supreme Court offered [in *Arlington Heights*] were not intended to be exhaustive. Instead, the Court listed merely some of the subjects of proper inquiry in determining whether racially discriminatory intent exists." (cleaned up)). D.N. bears the burden of showing that the *Arlington Heights* factors weigh in favor of a finding that the Florida Legislature enacted SB 1028 with a discriminatory purpose. *See Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State.").

But a finding of discriminatory purpose under the *Arlington Heights* factors will not end our inquiry. "To state a viable equal protection claim, [D.N.] must allege that [SB 1028] purposefully

---

[4] Although an analysis of the *Arlington Heights* factors sometimes requires "a fact intensive examination of the record," *Greater Birmingham Ministries*, 992 F.3d at 1322 n.33, courts can evaluate discriminatory purpose under *Arlington Heights* at the motion-to-dismiss stage, *see, e.g., Ala. State Conference of NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d 1333, 1341 (N.D. Ala. 2019) (Coogler, J.) ("Additionally, after reviewing Plaintiffs' Complaint as well as the factors set forth by the Supreme Court for finding intent in [*Arlington Heights*], the Court finds that Plaintiffs' allegations of discriminatory intent are sufficient. Thus, Pleasant Grove's motion to dismiss the Fourteenth Amendment claims against it is due to be denied."); *Mendoza v. Inch*, 2019 WL 1901811, at *6 (N.D. Fla. Feb. 20, 2019) (Stampelos, Mag. J.) ("Plaintiff's complaint alleges no facts which demonstrate a discriminatory intent or purpose. Because the claim is based on impact alone, the motions to dismiss Plaintiff's equal protection claim should be granted."), *report and recommendation adopted*, 2019 WL 1236056 (N.D. Fla. Mar. 17, 2019) (Hinkle, J.); *see also Common Cause Fla. v. DeSantis*, 2022 WL 19978293, at *7 (N.D. Fla. Nov. 8, 2022) (Winsor, J., concurring in part and dissenting in part) ("In my view, Plaintiffs have not alleged sufficient facts to plausibly allege a claim for racial discrimination. . . . Plaintiffs contend the newly drawn congressional districts violate their Fourteenth and Fifteenth Amendment rights. To succeed, they ultimately must prove that the Legislature acted with a racially discriminatory purpose." (citing *Arlington Heights*, 429 U.S. at 265)).

discriminates against [D.N.] because of [D.N.'s] membership in a particular class" *and* "that [SB 1028] fails under the appropriate level of scrutiny." *Fowler v. Stitt*, 104 F.4th 770, 783–84 (10th Cir. 2024) (cleaned up); *see also United States v. Samuels-Baldayaquez*, 2021 WL 5166488, at *3 (N.D. Ohio Nov. 5, 2021) ("Further, a finding of discriminatory intent combined with disparate impact does not automatically result in invalidation under *Arlington Heights*."). Since D.N. alleges that SB 1028 "was designed to only impact transgender girls," and that "[n]o other class of people is so impacted by this law," Amended Complaint ¶ 107, we subject the law only to rational-basis review because our Circuit *doesn't* recognize a person's gender identity as a quasi-suspect class.[5] *See Adams*, 57 F.4th at 803 n.5

---

[5]      In the original Complaint, D.N. alleged that SB 1028 discriminates *both* on the basis of sex *and* on the basis of transgender identity. *See* Complaint [ECF No. 1] ¶ 70 ("SB 1028 treats transgender girls and transgender women differently from both cisgender girls and women and transgender boys and men by precluding them from engaging in school-sponsored athletics based on *their sex and transgender status*." (emphasis added)). In our first dismissal order, we applied intermediate scrutiny to (and dismissed *with prejudice*) the former—D.N.'s claim that SB 1028 discriminates on the basis of sex—because the Supreme Court has been clear that sex-discrimination claims are subject to intermediate scrutiny. *See D.N.*, 701 F. Supp. 3d at 1258 ("As the Eleventh Circuit explained in *Adams*, 'the biological differences between males and females are the reasons intermediate scrutiny applies in sex-discrimination cases in the first place.'" (quoting *Adams*, 57 F.4th at 809)). At the same time, however, we dismissed *without prejudice* D.N.'s latter claim—that the law discriminates on the basis of transgender status—because D.N. failed to allege that the law had a discriminatory impact or that it was enacted with a discriminatory purpose. *See id.* at 1256–57 ("To plead animus, however, a plaintiff must raise a plausible inference that an invidious discriminatory purpose was a motivating factor in the relevant decision. And D.N. has failed to do that here. The law, after all, *doesn't* discriminate against transgender students. In addition to allowing transgender athletes of both sexes to play on coed (or mixed) teams, the law *explicitly* allows transgender boys to try out and play for boys' sports teams. If the law had intended to discriminate against transgender student-athletes, in other words, it's done a very poor job of it."). In doing so, we invited D.N. "to amend Count II of her Complaint (if she can) in a way that raises a 'plausible inference that an invidious discriminatory purpose was a motivating factor' in the passage of SB 1028." *Id.* at 1271 (quoting *Dep't of Homeland Sec.*, 591 U.S. at 34).

         In this Amended Complaint, D.N. has now dropped the claim that SB 1028 discriminates on the basis of sex—and asserts only that the law invidiously discriminates against transgender girls. *See generally* Amended Complaint. We therefore reaffirm our prior holding that, as it applies to biological boys, SB 1028 satisfies intermediate scrutiny. In this Order, then, we address only D.N.'s remaining claim that SB 1028 unlawfully discriminates against transgender girls. And, as to that claim, we apply rational-basis review because the Eleventh Circuit has *strongly* suggested that gender identity is *not* a suspect (or quasi-suspect) class—and, therefore, that discrimination claims based on a person's *gender identity* are not subject to heightened scrutiny. *See Adams*, 57 F.4th at 803 n.5 ("[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class."). Other circuit courts (it's true) disagree on this point. *See, e.g.*, *Hecox v. Little*, 104 F.4th 1061, 1078 (9th Cir. 2024) ("We have previously held that

("[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class."); *Doe v. Surgeon Gen.*, 2024 WL 4132455, at *3 (11th Cir. Aug. 26, 2024) ("What's more, even if the district court were correct in its animus decision, heightened scrutiny under the Equal Protection Clause does not apply to invidious discrimination based on a non-suspect class, and '[n]either the Supreme Court nor this court has recognized transgender status as a quasi-suspect class.'" (quoting *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023))); *see also Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1264 (11th Cir. 2024) (Pryor, C.J., concurring in the denial of reh'g en banc) ("More generally, transgender status is not a quasi-suspect classification in the first place.").

So, even if we determine that SB 1028 purposefully discriminates against biological boys who identify as (or transition to) transgender girls, the law will still satisfy the Equal Protection Clause if it is "rationally related to a legitimate government interest." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1220 (11th Cir. 2023) (cleaned up). This standard is "highly deferential to government action," though it isn't *completely* "toothless[.]" *Ibid.* (cleaned up). For instance, SB 1028 would be unconstitutional if its "relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). After all, the "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *accord Trump v. Hawaii*, 585 U.S. 667, 705 (2018) ("[A] common thread has been that the laws [struck down as illegitimate under rational-

---

heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a 'quasi-suspect class.'" (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019))); *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 570 (4th Cir. 2024) ("In this Circuit, a statute that plainly rests on distinctions based on transgender status is suspect."); *see also Tirrell v. Edelblut*, 2024 WL 4132435, at *9 (D.N.H. Sept. 10, 2024) (finding "that discrimination based on transgender status or homosexuality, by definition, entails discrimination based on sex"). But we here are "duty-bound to apply [Eleventh Circuit] precedent" until "the Supreme Court issues a decision that actually changes the law[.]" *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1284 (11th Cir. 2015).

basis review] lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" (quoting *Moreno*, 413 U.S. at 534)).

### III.    Applying the Factors

After careful review, we find that, even accepting all the Plaintiff's factual allegations as true, most of the *Arlington Heights* factors weigh strongly against a finding that "an invidious discriminatory purpose was a motivating factor in the passage of SB 1028." *D.N.*, 701 F. Supp. 3d at 1271.

#### a.   The Impact of the Challenged Law

The first *Arlington Heights* factor asks whether the law itself "has a discriminatory impact[.]" *Greater Birmingham Ministries*, 992 F.3d at 1322. Here, the Defendants admit that SB 1028 excludes "all biological males from girls' sports teams," but they insist that the "uneven effects" of the law on biological males and transgender girls are permissible because the State treats "all biological males equally." Motion to Dismiss at 14. But we've already determined that SB 1028 is constitutional to the extent that it treats biological boys differently from biological girls. *See D.N.*, 701 F. Supp. 3d at 1258 ("In our case, SB 1028's gender-based classifications are rooted in real differences between the sexes— *not* stereotypes. In requiring schools to designate sports-team memberships on the basis of biological sex, the statute adopts the uncontroversial proposition that most men and women *do* have different (and innate) physical attributes. Ignoring those real differences would disserve the purpose of the Equal Protection Clause, which is to safeguard the principle that "all persons similarly situated should be treated alike."). The only question *this time around* is whether the statute is unconstitutional for unlawfully targeting, in a discriminatory way, biological boys who identify as (or transition to) transgender girls.

The whole purpose of engaging the *Arlington Heights* inquiry now, in other words, is to determine whether SB 1028's facially neutral language (vis-à-vis biological boys who identify as, or transition to, transgender girls) masks an invidious intent to discriminate against them—an issue D.N.

hadn't properly pled in the original Complaint. *See D.N.*, 701 F. Supp. 3d at 1256–57 ("To plead animus, however, a plaintiff must raise a plausible inference that an invidious discriminatory purpose was a motivating factor in the relevant decision. And D.N. has failed to do that here." (cleaned up)). In short, we only apply the *Arlington Heights* factors when there's a facially neutral law that was (allegedly) enacted to fulfill a discriminatory purpose. *See* 429 U.S. at 266–67 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . Absent a pattern as stark as that in [*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) or *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)], impact alone is not determinative, and the Court must look to other evidence."); *Sampson v. City of Miami Gardens*, 2015 WL 11202372, at *4 (S.D. Fla. May 27, 2015) (Graham, J.) ("However, a facially neutral law or other official act, without regard to whether it reflects a racially discriminatory purpose, is not unconstitutional solely because it has a racially disparate impact. Instead, proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (cleaned up)).

In this case, that alleged discriminatory animus was (D.N. says) directed at a specific group of people: biological boys who identify as girls. And D.N. is right that SB 1028 results in this group of people (transgender girls) being treated differently from biological girls. *See* Amended Complaint ¶ 107 (noting that the law "forc[es] [transgender girls] to play sports on teams that do not align with their gender identity"). SB 1028 bars "D.N. and other transgender girls from participating on girls' sports teams, [but] it would allow a boy who is transgender to play on the girls' sports teams[.]" *Id.* ¶ 75; *see also* FLA. STAT. § 1006.205(3)(b)–(c) ("Athletic teams or sports designated for males, men, or boys may be open to students of the female sex. Athletic teams or sports designated for females, women, or girls may not be open to students of the male sex."). In other words, "the only group of people whose sports participation was altered by SB 1028 are transgender girls and women. Everyone

else can continue to play for the same teams on which they were playing prior to SB 1028." Amended

Complaint ¶ 80. This first factor, in short, favors D.N.

### b.  Historical Background

The second *Arlington Heights* factor looks at "the historical background of the decision . . .

particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267. The

Eleventh Circuit has told us that this factor "should be focused on the specific sequence of events

leading up to the challenged decision rather than providing an unlimited lookback to past

discrimination." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State* ("*League of Women Voters I*"), 32

F.4th 1363, 1373 (11th Cir. 2022) (cleaned up).

According to D.N., the relevant historical background picks up around 2016, when a "growing

network of anti-trans activists and legislators realized that . . . there was ample opportunity to shape a

narrative that would motivate their political base around targeting transgender people through the

passage of laws aimed at restricting their rights, activities, and support systems." Amended Complaint

¶ 37. This "network" of activists pressured state legislatures around the country to pass bills "banning

transgender people from living their lives in accordance with their gender identity[.]" *Id.* ¶ 39.[6] D.N.

says that this network of "anti-trans activists and legislators" included Florida State Representative

Anthony Sabatini, "a co-sponsor [of] one of SB 1028's predecessor bills," who "actively sought

assistance lining up legislative witnesses for anti-trans bills from an email distribution group which

worked to attempt to pass anti-trans laws across the U.S., including Florida." *Id.* ¶ 41. This wave of

"anti-trans" sentiment within Florida, D.N. alleges, led to the enactment of SB 1028 in 2021. *Id.* ¶ 42.

---

[6] These bills include a 2016 North Carolina law "banning transgender people from using bathrooms
that aligned with their gender identity," a 2019 Georgia law and a 2020 Idaho law that "ban[ned]
transgender youth from participating in sports teams that aligned with their gender identity," and bans
around the country targeting "public drag performances." Amended Complaint ¶¶ 38–39.

The Defendants dismiss this background as mostly irrelevant. In their view, under the Eleventh Circuit's decision in *Greater Birmingham Ministries*, "the enactment of similar legislation in other states" cuts *against* a finding that "animus" motivated the Florida Legislature. Motion to Dismiss at 12. The Defendants also claim that D.N. failed to "allege any well-pleaded facts to show that the motivation of legislators in those states is at all probative of the motivation of Florida's legislators in passing the challenged law." *Ibid.* D.N. responds that the "significant recent history of efforts to restrict the rights and opportunities of transgender people"—and the purported ties between "key legislators" and anti-transgender "activist groups"—are sufficient to presume discriminatory intent. Response at 12.

We agree with the Defendants that the relevant historical background *doesn't* plausibly suggest a discriminatory intent. Even if we presume that the passage of similar bills in *other* states indicates a "coordinated" effort "by networks of anti-transgender activists" to discriminate against transgender people, D.N. hasn't sufficiently alleged that this "network" was responsible for SB 1028. The only portion of the Amended Complaint that describes this link between the Florida Legislature and the broader anti-transgender movement is an allegation that Representative Sabatini "actively sought assistance" from these groups. Amended Complaint ¶ 41. But, even assuming that Representative Sabatini "actively sought [the] assistance" of this network of "anti-trans activists and legislators," *ibid.*, we cannot impute the (allegedly) improper motivations of one legislator to the Florida Legislature as a whole. *See Common Cause Fla. v. Byrd*, __ F. Supp. 3d ___, 2024 WL 1308119, at *31 (N.D. Fla. Mar. 27, 2024) (three-judge panel) ("The unlawful motivations of others—whether constituents, the Governor, or even a single member of the body itself—do not become those of the decision-making body as a whole unless it is shown that a majority of the body's members shared and purposefully adopted (i.e., ratified) the motivations." (citing *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006))); *see also Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("But no case in this Court has held

that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.").

D.N. insists that "it is unlikely [Representative Sabatini] was the only such contact" with anti-transgender activists and expects that "additional evidence [will] be uncovered through third-party discovery." Response at 12. But this speculative assertion that other legislators *might have been* part of the same network of anti-transgender activists—or that they *may have been* animated by similar motives—is plainly insufficient, even at this pleading phase of the case. *See Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 543 (1982) (describing the plaintiff's argument that a law was "enacted with a discriminatory purpose" as "pure speculation" because "[v]oters may have been motivated by any [number of] purposes"); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" (cleaned up)). This factor thus weighs against a finding of discriminatory animus.

### c.  Events and Statements Leading Up to the Passage of SB 1028

Because the third, fourth, and fifth *Arlington Heights* factors (the sequence of events leading up to the passage of SB 1028, any procedural or substantive departures, and the contemporary statements of key legislators) are interrelated, we'll address them together. *See, e.g.*, *Thompson v. Sec'y of State for the State of Ala.*, 65 F.4th 1288, 1327–28 (11th Cir. 2023) (Rosenbaum, J., concurring in part and dissenting in part) ("I combine my consideration of the third [*Arlington Heights*] factor—'the specific sequence of events leading up to [the law's] passage'—the 'procedural . . . departures' aspect of the fourth factor, and the fifth factor—'the contemporary statements and actions of key legislators.'").

On these three factors, D.N. principally relies on the statements of several Florida legislators during the debates preceding SB 1028's passage. The Amended Complaint describes these statements as "repeatedly painting outlandish scenarios" and as "fearmongering fantasies, rooted in

discriminatory tropes[.]" Amended Complaint ¶¶ 53–54. According to D.N., SB 1028 started out as two separate bills: Representative Kaylee Tuck introduced HB 1475 ("Sex-Specific Student Athletic Teams or Sports") in the Florida House of Representatives on February 26, 2021; and Senator Kelli Stargel introduced SB 2012 ("Promoting Equality of Athletic Opportunity") in the Florida Senate on March 2, 2021. *See id.* ¶¶ 51–52. At the subsequent hearings and floor debates, members of both houses offered their views on the bills' respective merits. Discussing HB 1475, for instance, Representative Tuck said that the law would "allow girls to '[compete] in sports without fear that they will have to compete against biological males.'" *Id.* ¶ 55. Another representative, Jason Schoaf, "said he was concerned about boys deciding to be transgender in order to have an advantage in sports. 'If my son decided tomorrow that he is now a girl, he could use his natural biological advantages to take opportunities away from biological girls.'" *Id.* ¶ 60.

Several state senators offered similar comments about SB 2012. Senator Stargel, for example, "admitted that she '[had] not received any complaints' about transgender athletes," but explained that she introduced the bill because she "believe[d] that there is a problem that needs to be settled with this bill." *Id.* ¶ 56. Senator Stargel added that "being gay or transgender is a choice" and that "a child who would like to be trans—that's their choice. If they are a LGB- LGB . . . gay—they have that choice." *Id.* ¶ 62. Senator Doug Broxson explained that he was supporting the bill because "the thought that his 'four foot eleven . . . less than 100 pound' granddaughter would '[be] struck by a six foot five or six foot six male terrifies [him].'" *Id.* ¶ 57. Senator Dennis Braxley voiced his support for the bill on two occasions, claiming that "young women [ ] are in serious physical danger of being harmed . . . which could cost someone their life. . . . I have a lot of granddaughters. I do not want to see some big male who thinks he's a woman or is convinced he's a woman, knocking them down on the ground . . . . We cannot just let these social winds blow us into corners that are dangerous for people's lives." *Id.* ¶ 58; *see also id.* ¶ 61 (comparing transgender girls to "a male body who believes they

are a woman—or are posing as a woman—I don't know how you actually discern those two. . . . I can stand out here in the garage all day convinced that I am an automobile, but it does not make me an automobile"). In D.N.'s view, these seven statements by five different legislators "show that the sponsors and supporters of SB 1028 were motivated by fear of transgender people based on stereotypes about transgender people" that run "counter to established scientific, medical, and psychosocial understanding, [and instead] tap into a narrative commonly used by those who would discriminate against transgender people." *Id.* ¶¶ 59, 63.

According to D.N., the bills that would become SB 1028 "appeared unlikely to pass" until certain legislators engaged "in a contested, eleventh-hour procedural move three days before the end of the 2021 legislative session" to ensure its survival. *Id.* ¶ 64. D.N. says neither HB 1475 nor SB 2012 was "reported out of the Senate Rules Committee." *Id.* ¶¶ 51–52. Representative Tuck moved to amend SB 1028 (a bill originally "concerning charter schools") with a rider known as "House Amendment 649221." *Id.* ¶ 64 This amendment—which became the "Fairness in Women's Sports Act"—was adopted "[a]fter just over an hour and a half of debate[.]" *Ibid.* The newly reconstituted SB 1028 was passed by the Florida House of Representatives and the Florida Senate on April 28, 2021, and was signed into law by Governor DeSantis on June 1, 2021. *See id.* ¶¶ 65–66.

But these statements mostly indicate that, in promulgating SB 1028, the Florida Legislature intended to "protect[ ] and promot[e] athletic opportunities for girls." *D.N.*, 701 F. Supp. 3d at 1254. As we've seen, Representative Tuck (who sponsored the original bill that ultimately became SB 1028) said that the law's purpose was "[to allow girls to compete] in sports without fear that they will have to compete against biological males." Amended Complaint ¶ 55. And the other legislators echoed this basic sentiment. *See, e.g.*, *id.* ¶ 57 (statement of Senator Broxton: "[the thought that a girl could be] struck by a six foot five or six foot six male terrifies [me]"); *id.* ¶ 58 (statement of Senator Baxley: "young women [ ] are in serious physical danger of being harmed"); *id.* ¶ 60 (statement of

Representative Schoaf: "[a biological male] could use his natural biological advantages to take opportunities away from biological girls").[7]

And, while some of the statements D.N. has identified veer off into the somewhat ancillary notion that a person might "choose" to be transgender "to have an advantage in playing sports," *id.* ¶ 59 (quoting Senator Stargel),[8] even these statements were rooted in the legislature's central concern that biological males would outcompete biological females on the playing field, *see, e.g., id.* ¶ 58 (statement of Senator Braxley: "I do not want to see some big male who thinks he's a woman or is convinced he's a woman, knocking [girls] down on the ground"); *id.* ¶ 60 (statement of Representative Shoaf: "If my son decided tomorrow that he is now a girl, he could use his natural biological advantages to take opportunities away from biological girls"). In any event, we agree with the Defendants that these isolated comments by two or three legislators about the extent to which a person might "choose" to identify as transgender—especially when compared with *the many other* statements in which legislators expressed their collective view that SB 1028 was enacted to promote and protect the integrity of female sports—aren't nearly sufficient to tilt this factor in D.N.'s favor. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State* ("*League of Women Voters II*"), 66 F.4th 905, 932

---

[7] D.N. takes issue with this entire line of reasoning, arguing that the legislators' "statements are replete with the trope that girls are universally weaker and more vulnerable than boys, who are big and strong. The proponents of SB 1028 use these stereotypes to deepen the misunderstanding and fear many people have regarding transgender youth, specifically transgender girls. They inform a hypothetical scenario for which there is no evidence to support: that a non-transgender boy would choose to identify as a girl to play on a girls' team in order to win." Response at 11. But we've already held that these aren't "impermissible stereotypes about transgender girls" because "real [biological] differences exist between boys and girls, which justify the exclusion of biological males from girls' sports teams." *D.N.*, 701 F. Supp. 3d at 1258–59 (cleaned up). In saying so, of course, we followed the views the Eleventh Circuit expressed in *Adams. See* 57 F.4th at 809 ("The bathroom policy does not depend in any way on how students act or identify. The bathroom policy separates bathrooms based on biological sex, which is not a stereotype. As this opinion has explained, the Supreme Court has repeatedly recognized the biological differences between the sexes by grounding its sex-discrimination jurisprudence on such differences.").

[8] *See also id.* ¶ 62 (statement of Senator Stargel: "And I embrace a child who would like to be trans— that's their choice. If they are a LGB- LGB … gay—they have that choice").

(11th Cir. 2023) ("[T]he explanatory value of an isolated statement would be limited. That the statement was made by the sponsor adds little to its significance. As we have explained, a sponsor is only one vote out of many." (cleaned up)); *League of Women Voters I*, 32 F.4th at 1373 ("Applying the presumption of good faith—as a court must—[a] statement by a single legislator is not fairly read to demonstrate discriminatory intent by the state legislature."); *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 836 (11th Cir. 2020) ("[W]e have held that we won't impute the discriminatory intent of one or a few decisionmakers to the entire group[.]" (citing *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297–98 (11th Cir. 2002))); *cf. Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1294 (M.D. Fla. 2022) (Howard, J.) ("Priestly Jackson's defense of the plan was the only real response offered and she was unequivocal in her position that the minority access districts, with significant Black voter majorities, must be maintained. In light of the foregoing, the Court finds this factor weighs in favor of a finding that race predominated the decision[.]").[9]

Nor have we seen any procedural or substantive departure that would support a finding of discriminatory purpose. D.N. argues that we should view Representative Tuck's "contested, eleventh-hour procedural move" to amend SB 1028—rather than advance SB 2012 or HB 1475—with

---

[9] In a Notice of Supplemental Authority, D.N. asks us to follow Judge Hinkle's decision in *Doe v. Ladapo*, 2024 WL 2947123, at *4 (N.D. Fla. June 11, 2024), where "[t]he Court considered the public statements of numerous state legislators who voted for SB 254" and found that the statements "were inaccurate, denied the existence of gender dysphoria, and/or facially bigoted." Notice of Supplemental Authority [ECF No. 163] at 1. For two reasons, *Ladapo* won't save D.N.'s claims here. *One*, the Supreme Court has been clear that "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 132 (1974). And there's no dispute that the statements at issue in *Ladapo*— even if they were relevant to an analysis of SB 1028's merits—post-dated the enactment of SB 1028. *See* Amended Complaint ¶ 46 (alleging that SB 254—the law at issue in *Ladapo*, which "bans gender transition care for transgender minors"—was enacted during the 2023 legislative session). *Two*, the comments Judge Hinkle referenced in *Ladapo* were orders of magnitude more inflammatory than any statement D.N. has identified about SB 1028. *See, e.g.*, *Ladapo*, 2024 WL 2947123, at *17–18 (recounting that a House member "loudly referred to transgender witnesses at a committee hearing on a related bill as 'mutants' and 'demons'" and that another legislator accused opponents of the bill as "evil" and as supporting "the castration and mutilation of children").

suspicion. Amended Complaint ¶ 64. That seems absurd. Laws on hotly debated topics are often "contested" on partisan, ideological, or political lines. *See League of Women Voters II*, 66 F.4th at 931 ("Any procedural departures in the legislative history, the district court determined, 'show only that SB 90 was highly partisan.' Once again, partisan motives are not the same as racial motives." (cleaned up)). D.N. hasn't alleged that the procedure Representative Tuck employed—attaching SB 2012 or HB 1475 or both as a rider to SB 1028—was in any way unusual in the Florida Legislature. *See generally* Amended Complaint. Nor could D.N. do so, since riders and last-minute changes are a feature—not a bug—of our legislative processes. *See, e.g.*, *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 731–32 (1984) ("Gray contends that retroactive legislation does not satisfy due process requirements unless persons affected by the legislation had 'notice' of changing legal circumstances and an opportunity to conform their conduct to the requirements of the new legislation. We have doubts, however, that retroactive application of the MPPAA would be invalid under the Due Process Clause for lack of notice even if it was suddenly enacted by Congress without any period of deliberate consideration, as often occurs with floor amendments or 'riders' added at the last minute to pending legislation." (cleaned up)); *Lamar Advert. of Mobile, Inc. v. City of Lakeland, Fla.*, 189 F.R.D. 480, 490 (M.D. Fla. 1999) (Kovachevich, J.) ("Pieces of legislation routinely succeed or fail depending on attachment to other pieces of legislation. A piece of legislation that might pass if it were on its own as a separate bill may be defeated merely because it is a rider on another bill that is less popular."). The third, fourth, and fifth *Arlington Heights* factors, in short, weigh heavily for the Defendants.

### d. Foreseeability and Knowledge of Disparate Impact

We'll also review the sixth and seventh *Arlington Heights* factors together. *Cf. League of Women Voters II*, 66 F.4th at 938 (analyzing "[t]he [f]oreseeability of the [d]isparate [i]mpact [and] [l]egislators' [k]nowledge of that [i]mpact" together). "[A]ctions having foreseeable and anticipated disparate

impact are relevant evidence to prove the ultimate fact, forbidden purpose." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979).

D.N. has properly alleged that the Florida Legislature could have foreseen a disparate impact on biological boys who identify as transgender girls. In fact, the Defendants don't suggest otherwise. *See generally* Motion to Dismiss; Reply. The Defendants have thus conceded this point. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

But mere "awareness of the consequences" of a law "is insufficient to establish discriminatory purpose." *League of Women Voters I*, 32 F.4th at 1373; *see also Penick*, 443 U.S. at 464 ("[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation."). And, as we've said, "actions having foreseeable and anticipated disparate impact are relevant evidence" only to the extent they "prove the ultimate fact, forbidden purpose." *Penick*, 443 U.S. at 464. D.N. says that "comments by other legislative proponents at other times demonstrate that the targeting of transgender people has been and continues to be a longstanding goal of theirs." Response at 15; *see also, e.g.*, Amended Complaint ¶¶ 81–84 (listing these comments). As we've seen, however, the statements D.N. has identified reflect mainly an interest in preserving and promoting female sports. *See, e.g., id.* ¶ 55 ("Rep. Tuck said HB 1475 would allow girls to '[compete] in sports without fear that they will have to compete against biological males.'"); *id.* ¶ 60 ("Rep. Jason Schoaf said he was

concerned about boys deciding to be transgender in order to have an advantage in sports. 'If my son decided tomorrow that he is now a girl, he could use his natural biological advantages to take opportunities away from biological girls.'"). And, in any event, the isolated statements of two or three legislators—especially to the extent they post-date SB 1028's enactment—are mostly inapposite here. *See League of Women Voters I*, 32 F.4th at 1373 ("Applying the presumption of good faith—as a court must—that statement by a single legislator is not fairly read to demonstrate discriminatory intent by the state legislature."); *Thai Mediation Ass'n*, 980 F.3d at 836 ("[W]e have held that we won't impute the discriminatory intent of one or a few decisionmakers to the entire group[.]"); *see also Blanchette*, 419 U.S. at 132 ("But post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage.").

So, while D.N. has satisfied the sixth and seventh *Arlington Heights* factors, the Amended Complaint's allegations (even when taken as true) don't support D.N.'s view that SB 1028 was passed to promote a "forbidden purpose." *Penick*, 443 U.S. at 464.

### e.  Availability of Alternatives

The final *Arlington Heights* factor looks to the availability of viable alternatives. As the Eleventh Circuit has explained, if there are "viable alternatives to the challenged provisions that would have achieved the same objectives," then the failure of the legislature to implement those alternatives can constitute evidence of discriminatory purpose. *League of Women Voters II*, 66 F.4th at 941. But the failure to "include [an] alternative option that [D.N.] would have preferred" is not, standing alone, evidence of an improper motive. *Greater Birmingham Ministries*, 992 F.3d at 1327.

D.N. points to what she characterizes as two viable alternatives that would have been "reasonably designed to protect fairness in women's sports" *without* categorically preventing all transgender girls from participating in women's athletics. Amended Complaint ¶ 85. *First*, D.N. cites the FHSAA's previous "Gender Identity Participation" Policy, under which a committee was formed

to "consider the totality of an individual's circumstances"—*e.g.*, the student's medical records and statements from the student, the parents, and medical professionals—and "to confirm 'a student's consistent gender identity and expression'" *before* a transgender girl could play on a women's team. *Id.* ¶¶ 87–89. This policy also created an exception "for private religious schools where 'profoundly held religious beliefs' would be in conflict with this policy." *Id.* ¶ 90. *Second*, D.N. relies on the NCAA's Transgender Student-Athlete Participation Policy, which "requires that a transgender woman student athlete submit laboratory results showing that her blood serum testosterone levels are within allowable limits." *Id.* ¶ 92. The Defendants reject these policies as viable alternatives because, unlike SB 1028, "they would expressly allow biological males to compete with and displace biological females." Motion to Dismiss at 14.

An alternative isn't viable if it "would not achieve the [same] goal" as the challenged law. *League of Women Voters II*, 66 F.4th at 941. The Defendants say that the State's goal in promulgating SB 1028 was to prevent *all* biological males (both cisgender males and transgender females) from participating in girls' sports. *See* Motion to Dismiss at 13 ("Any regulatory scheme that permits biological males to compete against biological females and join girls' teams does not serve, but rather defeats that purpose of the challenged law."). We agree with the Defendants that D.N.'s proposed alternatives aren't viable because they would allow *some* biological boys to play on women's sports teams. Since D.N. has failed to identify a viable alternative to the one the Florida Legislature chose, this final factor weighs against a finding of discriminatory intent.

*          *          *

D.N., in sum, hasn't plausibly alleged that, in promulgating SB 1028, the Florida Legislature was motivated by a discriminatory purpose. Although D.N. has satisfied *Arlington Heights*'s disparate-impact factor, "disparate impact alone does not violate the Constitution." *Adams*, 57 F.4th at 810. And, of the remaining seven factors, D.N. has met only two—the foreseeability and knowledge of the

law's disparate impact. Even as to these two factors, though, the Eleventh Circuit has been clear that mere "awareness of the consequences" of a law "is insufficient to establish discriminatory purpose." *League of Women Voters I*, 32 F.4th at 1373; *see also Penick*, 443 U.S. at 464 ("[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation."). And, as we've explained, the Amended Complaint's allegations *don't* support D.N.'s position that the Florida Legislature passed SB 1028 to promote a "forbidden purpose." *Penick*, 443 U.S. at 464. Since D.N. hasn't plausibly alleged a discriminatory purpose, her Equal Protection claim fails.

## IV.   Rational-Basis Review

But here's the thing: Even if the *Arlington Heights* factors had cut the other way, we'd still dismiss D.N.'s Amended Complaint because SB 1028 survives rational-basis review. As we've said, *other* courts have held that transgender-discrimination claims should be subject to intermediate scrutiny—*either* because they view transgender status as a quasi-protected class *or* because they believe that claims of transgender and sex discrimination should be treated the same. *See, e.g., Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024) ("[W]e held that heightened scrutiny applies to laws that discriminate based on transgender status."); *B.P.J.*, 98 F.4th at 555–56 ("If B.P.J. were a cisgender girl, she could play on her school's girls teams. Because she is a transgender girl, she may not. The Act declares a person's sex is defined only by their 'reproductive biology and genetics at birth.' The undisputed purpose—and the only effect—of that definition is to exclude transgender girls from the definition of 'female' and thus to exclude them from participation on girls sports teams. That is a facial classification based on gender identity. And, under this Court's binding precedent, such classifications trigger intermediate scrutiny."); *Tirrell*, 2024 WL 4132435, at *9 ("[D]iscrimination based on transgender status or homosexuality, by definition, entails discrimination based on sex"); *Slusser v. The Mountain West Conference*, 2024 WL 4876221, at *10 (D. Colo. Nov. 25, 2024) ("[T]he Tenth Circuit's recent interpretation of the meaning of 'sex' under the Equal Protection Clause [applied] the reasoning

27

in *Bostock* [*v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020)] to hold that discrimination based on trans status is discrimination on the basis of sex that implicates the Equal Protection Clause." (citing *Fowler*, 104 F.4th at 790)). Again, however, our Circuit has taken a different view. *See Adams*, 57 F.4th at 803 n.5 ("[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class."); *see also Ladapo*, 2024 WL 4132455, at *3 (holding that "[n]either the Supreme Court nor this court has recognized transgender status as a quasi-suspect class." (cleaned up)). And we're "duty-bound" to follow *our* Circuit's pronouncements on the law. *Gissendaner*, 779 F.3d at 1284.

A law satisfies the "deferential standard" of rational-basis review if "the challenged legislation is rationally related to a legitimate state interest"—even if this relationship is "based on rational speculation" rather than "evidence or empirical data." *Eknes-Tucker*, 80 F.4th at 1224–25 (cleaned up). We've already found that SB 1028 aims to "promot[e] women's equality in athletics"—an "important" and "legitimate" state interest. *D.N.*, 701 F. Supp. 3d at 1254. And the Florida Legislature's decision to prevent *all* transgender girls from participating in women's sports is rationally related to that goal because of the "inherent biological difference between the sexes"—whatever the individual athlete's gender identity happens to be. *Id.* at 1261; *see also Adams*, 57 F.4th at 820 (Lagoa, J., concurring) ("Importantly, scientific studies indicate that transgender females, even those who have undergone testosterone suppression to lower their testosterone levels to within that of an average biological female, retain most of the puberty-related advantages of muscle mass and strength seen in biological males."). So, while D.N. may believe that the Florida Legislature improperly disregarded other, less-intrusive alternatives to SB 1028, rational-basis review "does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests. It requires only that some plausible reason supports the classification, no matter how imprudent or ineffective. A State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Gore v. Lee*, 107 F.4th 548, 561 (6th Cir. 2024) (cleaned up).

In addition, *Adams* suggests that SB 1028 is constitutional—even if it discriminates against transgender girls—because the law was designed to preserve traditional and appropriate divisions between the biological sexes. One of the issues in *Adams* was whether the St. Johns County School Board's "Bathroom Policy"—which required students "to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms"—unlawfully discriminated against transgender students. 57 F.4th at 801. After finding that the Bathroom Policy was substantially related to the School Board's "objective of protecting the privacy interests of students to use the bathroom away from the opposite sex and to shield their bodies from the opposite sex in the bathroom," *id.* at 805, the court concluded that the Bathroom Policy didn't discriminate against transgender students because it "divides students into two groups, both of which include transgender students, [so] there is a 'lack of identity' between the policy and transgender status, as the bathroom options are 'equivalent to those provided to all' students of the same biological sex," *id.* at 809 (cleaned up) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496–97 & n.20 (1974)). Separately, the *Adams* Court held that the Bathroom Policy's disparate impact on transgender students *couldn't* have been infected with discriminatory animus because it (among other things) "sought to accommodate transgender students by providing them with an alternative— *i.e.*, sex-neutral bathrooms[.]" *Id.* at 810.

Both rationales apply with equal force to SB 1028. As to the first, SB 1028's "gender-based classifications are rooted in real differences between the sexes" and are justifiably designed to exclude "biological males from girls' sports teams." *D.N.*, 701 F. Supp. 3d at 1258; *see also Adams*, 57 F.4th at 819 (Lagoa, J., concurring) ("[A] transgender athlete, who is born a biological male, could demand the ability to try out for and compete on a sports team comprised of biological females. Such a commingling of the biological sexes in the female athletics arena would significantly undermine the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams. This is because it is neither myth nor outdated stereotype that there are inherent differences between

those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports."). As for the second *Adams* rationale, SB 1028 has carved out reasonable accommodations by "giv[ing] transgender girls like D.N. the option to play on either boys' or 'coed or mixed' teams[.]" *D.N.*, 701 F. Supp. 3d at 1261–62 (quoting FLA. STAT. § 1006.205(3)(a)). So, while there may be some minor differences between SB 1028 and the Bathroom Policy,[10] the court's reasoning in *Adams* suggests that SB 1028 would likewise survive constitutional scrutiny.

*     *     *

We recognize that D.N. (and other biological boys who identify as transgender girls) want to play on women's sports teams. But "few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results." *Lalli v. Lalli*, 439 U.S. 259, 273 (1978); *see also D.N.*, 701 F. Supp. 3d at 1261–62 ("We acknowledge that the statute creates a difficult (and perhaps unfair) situation for D.N., who identifies as a girl in all respects and who may be prohibited from playing on the teams *of her choice*. . . . [But] [w]e are, in the end, a democracy—made up of three coequal branches. As unelected judges within that democratic framework, our job isn't to decide whether a law is good or bad, smart or silly, fair or unfair. . . . Our job is to apply the law as it's been expressed through the will of a democratically-elected legislature and the signature of a democratically-elected governor— unless (of course) the law violates some more fundamental (call it constitutional) law.").

---

[10] For example, the Bathroom Policy applied equally to *all* transgender students—whereas SB 1028 treats transgender boys and girls somewhat differently. *See Adams*, 57 F.4th at 808 ("And both sides of the classification—biological males and biological females—include transgender students."). But this difference doesn't necessarily help D.N. As we explained in our first dismissal order, SB 1028 "doesn't discriminate against [all] transgender students. In addition to allowing transgender athletes of both sexes to play on coed (or mixed) teams, the law *explicitly* allows transgender boys to try out and play for boys' sports teams. If the law had intended to discriminate against transgender student-athletes, in other words, it's done a very poor job of it." *D.N.*, 701 F. Supp. 3d at 1257.

In the end, D.N.'s Amended Complaint satisfies only three of the eight *Arlington Heights* factors. At best, D.N. has suggested that SB 1028 impacts transgender girls differently than it does other students and that *one or two* legislators *may* have been motivated by improper animus when they voted for the law. As we've shown, however, we cannot impute the motivations of a couple legislators to the Florida Legislature as a whole. *See League of Women Voters I*, 32 F.4th at 1373 ("Applying the presumption of good faith—as a court must—that statement by a single legislator is not fairly read to demonstrate discriminatory intent by the state legislature."); *Thai Mediation Ass'n*, 980 F.3d at 836 ("[W]e have held that we won't impute the discriminatory intent of one or a few decisionmakers to the entire group[.]"). "And a disparate impact alone does not violate the Constitution. Instead, a disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by 'purposeful discrimination.'" *Adams*, 57 F.4th at 810; *see also Feeney*, 442 U.S. at 279 ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."). We therefore conclude that the Amended Complaint's allegations—even when viewed in the light most favorable to D.N.—fail to show that, in enacting SB 1028, the Florida Legislature acted with a discriminatory purpose.

## CONCLUSION

Accordingly, we hereby **ORDER and ADJUDGE** that the Defendants' Motion to Dismiss [ECF No. 153] is **GRANTED**. The Amended Complaint [ECF No. 140] is **DISMISSED with prejudice**. All pending deadlines and hearings are **TERMINATED**, and any other pending motions are **DENIED as moot**. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on December 18, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record